IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PROGRESSIVE SPECIALTY        *
INSURANCE COMPANY,           *
                             *
      Plaintiff,             *
                             *
v.                           *        CASE NO.:
                             *        2:05-CV-438-T
McKNIGHT AGENCY, INC.;       *
JOE McKNIGHT; RICKY LANE;    *
RIVERSIDE TURF FARM; JANE    *
HOLMES, individually and as the  *
personal representative of the   *
Estate of DAISY BEASLEY,     *
deceased,                    *
                             *
      Defendants.            *

## MOTION FOR SUMMARY JUDGMENT AGAINST PROGRESSIVE

COMES NOW the defendant, JANE HOLMES, individually and as the personal

representative of the Estate of DAISY BEASLEY, deceased, and asks this Honorable Court

to issue a summary judgment against Progressive on the grounds that a liability automobile

insurance policy was formed between Progressive and Ricky Lane with one million dollars

in liability limits. To the extent that written documents from Progressive indicate otherwise,

summary judgment should also be granted against Progressive on the issue of reformation,

and the policy be reformed to reflect liability limits in the amount of one million dollars.

($1,000,000.00).

For grounds, Ms. Holmes would show the Court that there are no genuine issues of

material fact, and all the defendants in this matter are entitled to judgment as a matter of law

1

on the issues regarding the liability policy limits.

## I.  INTRODUCTION

On July 6, 2004, Daisy Beasley burned to death in a fire caused as a result of a collision between her vehicle and tractor-trailers driven by Michael McDonald, an employee of Excel Carriers, and Ricky Lane, who was hauling for Riverside Turf, Inc.[1]  In her capacity as personal representative of Ms. Beasley's estate, Jane Holmes has filed suit against Excel Carriers, Riverside Turf, Inc. and Ricky Lane for the wrongful death of Daisy Beasley in the Pike County Circuit Court, case number CV-04-B-247.

The instant case stems from a dispute between the parties as to the amount of liability coverage available for Mr. Lane/Riverside Turf through the Progressive policy which insured Mr. Lane, Progressive policy number CA01722685-0.  Progressive contends that the limits of liability are $300,000.00.  All of the other parties contend that the liability limits are $1,000,000.

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the Defendant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the burden of demonstrating that no genuine issue as to any material fact exists, and that it is

---

[1] Mr. Lane was either an employee of or independent contractor for Riverside Turf.  The issue of Mr. Lane's exact status with Riverside Turf is an issue pending in the companion state court case.

entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 447 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The facts relied upon by the movant must be viewed in the light most favorable to the non-moving party, so that any doubt as to the existence of a genuine issue of material fact will be resolved in favor of denying the motion. *Adicks v. S. H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1590, 29 L. Ed. 2d 142 (1970). "It is not part of the Court's function, when deciding a Motion for Summary Judgment, to decide issues of material fact, but rather whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Harston v. Gainesville Sun Publishing Co.*, 9 F. 3d 913, 919 (11th Cir. 1993), cited in *Howard v. B.P. Oil Co., Inc.*, 32 F. 3d 520 (11th Cir. 1994).

In the instant case, even when the undisputed facts are viewed in the light most favorable to Progressive, it is clear that no issues of material fact remain to be tried and that the defendants are entitled, as a matter of law, to a declaration that the liability limits on the insurance policy insuring Ricky Lane's vehicle are one million dollars. ($1,000,000).

## III.    STATEMENT OF UNDISPUTED FACTS

Joe McKnight is an insurance agent. (Dep. McKnight, p. 7, Lines 7-10[2]). He was the owner of the McKnight Agency, which after the events giving rise to this suit was sold to Young, Johnston & Associates. (Dep. McKnight, p. 7, Lines 11-22). Mr. McKnight has sold Progressive insurance policies since approximately 1992. (Dep. McKnight, p. 10, Line

---

[2] Excerpts from the deposition of Joe McKnight are attached hereto as Exhibit A.

22 - p. 11, Line 17). At all times pertinent to the policy obtained by Mr. Lane and involved

in this suit, Mr. McKnight had the authority to bind Progressive. (Dep. McKnight, pp. 12,

Lines 18-22, 40, Lines 3 - 21, 50, Lines 6 - 9). This authority was confirmed by Mary

Alice Fitzgerald, corporate representative for Progressive, at her deposition on November

21, 2005 as well as by Article II of the Producer Agreement between Progressive and Joe

McKnight signed on February 5, 1998, which was Exhibit 3 to Ms. Fitzgerald's deposition.[3]

Ricky Lane is a truck driver, and obtained his first Progressive policy from Mr.

McKnight in October of 2000. (Dep. McKnight, pp. 19, Line 19 - p. 20, Line 5; Dep. Lane,

p. 26, Lines 12 - 20[4]). The liability limits on that first policy were $1,000,000. (Id.; Exh. C,

Application and Premium Receipt Dated 10/27/2000). The radius of travel described on the

application for Mr. Lane was 100 miles and the category of use for Mr. Lane's vehicle was

H. (Exh. C). Shorterville, where Mr. Lane lives and which the application lists as his

address, is approximately 4 miles from the Georgia state line.

In March of 2003, Mr. Lane returned to Mr. McKnight's agency to obtain liability

insurance, again wanting liability limits of $1,000,000. Both Mr. Lane and Mr. McKnight

knew that Mr. Lane wanted liability limits of $1,000,000 from Progressive, and both Mr.

Lane and Mr. McKnight intended for Mr. Lane to leave the McKnight agency with liability

limits of $1,000,000 from Progressive. (Dep. Lane, p. 30, Line 13 - p. 31, Line 18, p. 71

Line 5 - p. 72, Line 16; Dep. McKnight, p. 28, Line 1 - p. 30, Line 16, p. 31, Line 4 - p. 32,

---

[3] Plaintiff will supplement this Motion with pertinent deposition excerpts and Exhibit 3 when the transcript from the deposition is received.

[4] Excerpt from the deposition of Ricky Lane are attached hereto as Exhibit B.

Line 12, p. 45, Line 21 - p. 46, Line 2, p. 62, Line 17 - p. 63, Line 16). Mr. McKnight knew that Mr. Lane wanted liability insurance limits of $1,000,000 not only because Mr. Lane told him, but also because he knew that Mr. Lane would be hauling for Riverside Turf, Ray Morris' business, and Mr. Morris required the people hauling for him to have insurance limits of $1,000,000. (Dep. McKnight, p. 29, Line 18 - p. 30, Line 16).

Mr. Lane's driving record was sufficient to permit him to obtain liability insurance limits of $1,000,000. As Mr. McKnight explained, Progressive has its own system for calculating points. (Dep. McKnight, p. 16, Lines 1 - 17). If a driver has six or less points, then he can receive up to one million dollars worth of coverage. (*Id.*) If a driver has seven or more points, then Progressive will only insure him in the amount of $500,000. (*Id.*) In March of 2003, under the Progressive system, Mr. Lane had five points. (Dep. McKnight, p. 35, Line 18 - p. 36, Line 5). Mr. McKnight admitted in his deposition that Mr. Lane's five points meant that he would qualify for one million dollars in liability coverage from Progressive. (Dep. McKnight, pp. 35, Line 18 - p. 36, Line 5, p. 61, Lines 9 - 17).

Mr. McKnight filled out Mr. Lane's application for insurance on the computer. (Dep. McKnight, p. 28 Line 1 - p. 30, Line 16). He asked Mr. Lane questions, which Mr. Lane answered, and entered the information on the computer. (Dep. Lane, p. 30, Line 22 - p. 31, Line 4). The application reflected that the radius through which Mr. Lane would be traveling had increased from 100 miles in October of 2000 to 300 miles in October of 2003. (Exh. F, Application for 3/2003 policy). The use category, H, was unchanged from October, 2003. (*Id.*) The amount of insurance for the policy was selected from a drop

5

down menu, and at the time he was filling out the application, Mr. McKnight intended to select coverage limits of $1,000,000. (Dep. McKnight, p. 31, Line 4 - p. 33, Line 20). Once he submitted the application, Mr. McKnight printed the application off, but only gave Mr. Lane the signature page from the application to sign. (Dep. Lane, p. 39, Line 23 - p. 40, Line 22).

   Mr. Lane was not only willing to pay the premiums for a one million dollar policy (Dep. Lane, p. 38, Line 22 - p. 39, Line 3) but also, when he walked out of Mr. McKnight's office that day, he believed that he had paid the premiums for a one million dollar policy. (Dep. Lane, p. 39, Lines 20-22). Nor was that belief unfounded - in addition to Mr. McKnight's own statements that he had a million dollars in coverage, Mr. Lane also had an invoice for the policy issued by the McKnight Agency which showed that Mr. Lane was being charged a premium of $3494 for insurance from Progressive with "$1,000,000 liability." (Exh. D, Premium Receipt; Dep. McKnight, p. 28, Lines 1 - 15). The same receipt also reflects that Mr. Lane paid the initial premium payment of $1440.98 on March 10, 2004. (Exh. D, Premium Receipt; Dep. McKnight, p. 25, Line 21 - p. 26, Line 3). In addition, both Mr. Lane and Riverside Turf were provided with an Acord Certificate of Liability Insurance prepared by the McKnight Agency reflecting that Mr. Lane had a liability insurance policy from Progressive with liability limits of $1,000,000. (Exh. E, 3/2003 Certificate; Dep. McKnight, p. 39, Lines 10 - 19). Mr. McKnight believed that he was authorized to issue such certificates in his capacity as a Progressive agent. (Dep. McKnight, p. 39, Line 20 - p. 40, Line 5). Ricky Lane never received his policy from

6

Progressive. (Dep. Lane, p. 65, Lines 9 - 22).

In August of 2003, Mr. Lane purchased a new tractor and asked Mr. McKnight to change the Progressive policy to reflect that he was driving a new tractor, and to add Riverside Turf as the lienholder on the tractor. (Dep. Lane, p. 54, Line 18 - p. 55, Line 13; p. 65, Line 23 - p. 66, Line 23). Both Mr. Lane and Mr. McKnight still believed at that time that Ricky Lane had $1,000,000 in liability limits, and intended those limits to remain the same. (Dep. Lane, pp. 54, Line 18 - p. 55, Line 13). In fact, Mr. McKnight issued a binder to Mr. Lane for $1,000,000 on August 8, 2003. (Dep. Lane, p. 41, Line 14   p. 43, Line 7; Exh. G, 8/8/03 binder).

In March of 2004, it was time for Mr. Lane to renew the Progressive policy. Mr. Lane did not receive a renewal notice from Progressive; instead, Mr. Lane received a phone call from Mr. McKnight reminding him of the renewal. (Dep. Lane, p. 57, Line 4 - p. 58, Line 9). Mr. Lane did not have to fill out a new application on that date. (Dep. Lane, p. 58, Lines 3 - 9). However, both Mr. McKnight and Mr. Lane still understood that the limits on Mr. Lane's Progressive policy should be one million dollars. (Dep. McKnight, p. 50, Lines 1 - 9). Mr. Lane gave Mr. McKnight the premium payment for the renewal, and Mr. McKnight gave Mr. Lane and Riverside Turf another Acord certificate reflecting $1,000,000 in liability limits. (Dep. Lane, p. 58, Lines 3 - 9, p. 68, Line 12 - p. 69, Line 3; Dep. McKnight, p. 36, Lines 11 - 17, p. 51, Lines 4 - 10; Exh. H, Certificate issued 3/2004).

The accident occurred on July 6, 2004. Shortly after that, Mr. Lane received a letter from Progressive informing him that his insurance limits were $300,000, not one million.

7

(Dep. Lane, p. 49, Line 10 - p. 50, Line 19). Mr. Lane called Mr. McKnight to discuss the

letter. (Dep. Lane, p. 50, Lines 4 - 19; Dep. McKnight, p. 54, Lines 3 - 10). Mr. McKnight

told Mr. Lane that "I didn't think that was correct." (Dep. McKnight, p. 54, Lines 6 - 7).

However, when he pulled Mr. Lane's file, he discovered that the limits put into the

computer were, in fact, $300,000, not one million. (Dep. McKnight, p. 54, Lines 3 - 10).

There is no dispute between either Mr. McKnight or Mr. Lane that the entry of the

$300,000 limits was simply a mistake. Mr. McKnight and Mr. Lane both testify that the

agreement between them (and thus, through agency, between Progressive and Mr. Lane)

was NOT that Mr. Lane have $300,000 in liability limits, but rather that Mr. Lane have

$1,000,000 in liability limits. (Dep. Lane, p. 38, Line 12 - p. 39, Line 9; Dep. McKnight, p.

32, Lines 9 - 12, p. 33, Lines 12 - 20). Mr. Lane agreed that the $300,000 was a "clerical

error," (Dep. Lane, p. 39, Lines 4 - 9), while Mr. McKnight, to his credit, acknowledged the

following:

> Q.    ...You intended to click one million dollars worth of liability insurance but apparently you clicked 300,000. Is that what happened?
>
> A.    Apparently so, yes, sir.
>
> Q.    But just to dispense with why it happened, it was simply a mistake, apparently, on your part; is that right?
>
> A.    That's correct.

(Dep. McKnight, p. 33, Lines 12 - 20).

A representative of Progressive testified that Joe McKnight informed Progressive

approximately one week after the accident that he had made a mistake in the data entry

process and that it was intended for Ricky Lane to have gotten $1,000.000 in coverage. (Deposition of Larry Lackey taken November 21, 2005)[5]. Progressive obtained this information on July 14 but had already sent a letter to Mr. Lane on July 9 stating that the limits were $300,000 before even talking to their agent, Mr. McKnight.

The undisputed evidence shows that there is no genuine issue of material fact that a contract was formed between Progressive and Ricky Lane for liability insurance with limits in the amount of $1,000,000. In addition, the evidence also shows that if an insurance contract with limits of $300,000 exists instead, it should be reformed to reflect limits of $1,000,000. Accordingly, summary judgment should be granted in favor of all of the defendants against Progressive on these issues.

## IV. INSURANCE CONTRACTS

The elements needed to prove an insurance contract are well settled.

An insurance contract, like all other contracts, requires an offer, acceptance of that offer, consideration, and mutual assent to terms essential to the formation of the contract...The existence of a contract is determined by reference to 'the reasonable meaning of the parties' external and objective manifestations of mutual assent, rather than by their uncommunicated beliefs.'... An application for insurance is merely an offer on the part of the applicant to purchase insurance. 'The acceptance [of such an offer] must be signified by some act or acts agreed upon by the parties, or from which the law raises the presumption of acceptance.' ...

*Mobile Airport Authority*, 886 So. 2d 773, 779 (Ala. 2004). (Citations omitted.)

Further, a valid contract of insurance may be oral, "provided essential terms are agreed upon." *Powell v. State Farm Mut. Automobile Ins. Co.*, 601 So. 2d 60, 62 (Ala.

---

[5] Excerpts of deposition will be provided when transcript is received.

1992).

> In this state it has long been recognized that a verbal [i.e., oral] contract of insurance, as well as a verbal contract to insure, can be made, and will be enforced, when and if all the terms of the contract are agreed upon. This right [to make an oral contract of insurance] existed at common law and has not been changed by statute. The rate of premium, duration of the policy, nature of the risk, the property, and location of the same, as well as the amount of insurance must be agreed upon. When the minds of the contracting parties reach such an agreement, a valid contract of insurance has been made and may be enforced.

*Id.*, at 62, quoting *Globe & Rutgers Fire Ins. Co. v. Eureka Sawmill Co.*, 151 So. 827, 829

(Ala. 1933).

An agent who has binding authority from an insurance company is capable of forming such an oral contract on behalf of the insurance company. "A party who deals with an agent, through whom he applies for and obtains a policy, has a right to presume that such material facts as are made known to him, are known to the principal...Under that rule an insured would be justified in relying on the insurer's agent to correctly inform the insurer of the terms of the insured's offer and there ought not to be a denial of coverage merely because of the oversight of the insurer's agent." *Barnes v. Atlantic & Pacific Life Ins. Co. of America*, 325 So. 2d 143, 150 (Ala. 1975).

> The test to determine whether a person is a general agent or merely a soliciting agent is whether the agent has the power to bind the insurer to the agent's contract of insurance or to issue policies or to accept risks. If an agent has the actual authority to do these things, he is considered a general agent and may bind his insurance company by oral contract, or by waiving certain policy or application provisions. ... An agent who is, by certain limitations, less than a general agent may bind his principal as though he were a general agent by apparent authority. While an agent's powers can be limited, and such limitations be binding as between the company and the agent, this could not affect third persons relying upon his apparent authority without notice of

his limitations.

*McGhee v. Paramount Life Ins. Co.*, 385 So. 2d 969, 973 (Ala. 1980).  (Citations omitted.)

*See also*, *Hartford Accident and Indemnity Co. v. Oglesby*, 308 So. 2d 695, 699 (Ala. 1975)

("Under Alabama law, a general agent duly authorized to bind his company by contracts of

insurance may make valid contracts by parole.")

The undisputed evidence unequivocally shows that Progressive gave Joe McKnight

binding authority, and Mr. McKnight used that authority.  Mr. McKnight, and through him,

Progressive, agreed with Ricky Lane to a premium rate (Exh. D),  duration of policy (Exh.

D, E, G & H), the nature of the risk (Exh. D), the property (Exh. D), the location of the same

(Exh. D) and the amount of insurance that must be agreed upon.  (Exh. A & B, excerpts of

the depositions of Joe McKnight and Ricky Lane outline above, and Exh. D, E, G & H).  A

valid contract of liability insurance with $1,000,000 limits exists between Ricky Lane and

Progressive, and it must be enforced.

## V.    REFORMATION

Assuming *arguendo* that the contract of insurance between Progressive and Ricky

Lane was for liability limits of $300,000, the evidence also is sufficient to require summary

judgment on the issue of reformation of the insurance contract.

> [R]evision or reformation is designed to make the instrument speak the true
> intent of the parties.  There must have been a meeting of the minds of the
> parties.  The court cannot make a new contract for the parties or establish as a
> contract between them that which it is supposed they would have made had
> they understood the facts.  The function of equity is to 'reform an instrument
> only for the purpose of having it express the understanding and agreement of
> the parties.' ...

11

*Am. Liberty Ins. Co. of Birmingham, Ala. v. Leonard*, 115 So. 2d 470, 474 (Ala. 1959).

> [T]here are three grounds upon which a party to a written contract or policy of
> insurance can have such a contract revised or reformed: (1) Because of
> mutual mistake of both parties to the contract, the contract fails to express the
> intention of the parties; (2) because of a unilateral mistake on the part of one
> of the parties, which the other party knew or suspected, the contract fails to
> express the intention of the parties; or (3) because of fraud the contract fails
> to express the intention of the parties.

*Id.*, at 475.

In the case of *Beasley v. Mellon Financial Services Corp.*, 569 So. 2d 389 (Ala.

1990), the Alabama Supreme Court considered whether a deed should be reformed.[6]  At

issue was a released parcel of land, divided out from a larger parcel of land.  The parcel of

land released from a mortgage was supposed to be the parcel of land on which an

individual's house was built, but the deed reflected that an unimproved different parcel of

land had been released instead.  In ruling that this situation constituted a mutual mistake, the

Alabama Supreme Court said the following:

> Alabama Code 1975, § 35-4-153[7], provides that any person may sue to reform
> a deed, mortgage, or other conveyance that is based on fraud or mutual
> mistake.  In the instant case, there is no allegation of fraud; therefore, the
> reformation must have been based upon mutuality of mistake between the
> parties.  Where the reformation is based on mistake, the existence of a valid
> agreement to which the instrument can be made to conform is essential.  The
> trial court cannot make the instrument express a new contract for the parties.
> Rather, the principle on which reformation is based is clear-if the intent of the
> parties was to convey the property actually described, but the parties were

---

[6]  "...[C]ases involving revision or reformation of a 'deed, mortgage or other conveyance'
are just as applicable to a situation such as the instant one which involves the reformation or
revision of a written contract of insurance." *Am. Liberty Ins. Co. of B'ham, Ala. v. Leonard*, 115
So. 2d 470, 473 (Ala. 1959).

[7]  The right to reform contracts is likewise codified, at § 8-1-2, <u>Code of Alabama</u> (1975).

induced to enter into the agreement by a mistake as to the extent or nature of the contract, there can be no reformation; however, "*if the intent was to convey the property as it was known to exist, but the mistake was in the description, reformation is proper.*"  *McClintock on Equity,* Ch. 8, § 95 at 258 (1948). (Emphasis added.)  Such an error establishes mutuality of mistake, and, when one seeks reformation it is immaterial who employed the draftsman.  See *Clemons v. Mallett,* 445 So.2d 276 (Ala.1984).  Where the sole ground for reformation is mistake, the mistake must be mutual as to all of the parties, but only in the sense that they must all have agreed to the same terms and have mistakenly assumed that those terms were properly expressed in the instrument.

*Beasley v. Mellon Financial Services Corp.*, 569 So. 2d 389, 393-394 (Ala. 1990).

(Emphasis in original.)

The likeness of the situation in the *Beasley* case to the situation in the instant case is clear. Here, as shown above, the evidence is overwhelming that the parties to the insurance contract, Joe McKnight, and through him, Progressive, and Ricky Lane agreed to the same terms - liability limits of $1,000,000. The evidence also shows that Mr. McKnight and Mr. Lane both assumed that those terms were properly expressed in the contract. Accordingly, summary judgment is proper on the issue of reformation.

There is another reason that reformation is proper in this case. Reformation also can be granted when there is a mistake of one party which the other at the time knew or suspected. § 8-1-2, Code of Alabama (1975). Another way this reformation ground has been described is that "reformation may be granted because of a unilateral mistake when there is fraud or inequitable conduct on the part of the other party to the contract." *Commercial Union Ins. Co. v. Commercial Bank*, 118 So. 2d 714, 718 (Ala. 1960). In this case, the mistake was by Mr. Lane, who believed that he had one million dollars in liability

13

limits. The inequitable conduct was by Progressive, which, based upon Mr. Lane's October

2000 application for and contract of insurance and the application for the policy at issue,

had reason to know that Mr. Lane needed liability limits of one million dollars, but did

nothing. The October 2000 application had Mr. Lane designated as driving at a radius of

100 miles, which would *have* to necessitate interstate travel, and the one million dollar

limits for that policy period correctly protected Mr. Lane. (Exh. C). However, in spite of

the fact that Mr. Lane's application for insurance in March 2003 reflects that Mr. Lane

would be traveling in a radius of 300 miles, three times higher than the one he used in

October of 2000[8], Progressive chose not to check that the limits being given properly

reflected the interstate nature of Mr. Lane's trucking business. Instead, Progressive let the

$300,000 limits stand.

The case of *United States Guarantee Co. v. Harrison & Owen Produce Co.*, 198 So.

240 (Ala. 1940) is instructive to the instant case. In that case, Harrison & Owens (H & O)

attempted to insure two trucks, one they called the old truck and one they called the new

truck. When H & O went to insure the two trucks, it had the vehicle information for each

truck in two envelopes, one labeled old truck and one labeled new truck. Unfortunately,

someone had switched the information in the two envelopes, so that H & O gave the

company that was supposed to insure the new truck, London Company, the information for

the old truck, and the company that was supposed to insure the old truck, United States

---

[8] Mr. McKnight testified that "the three hundred mile radius would have caused him to be able to go engage in interstate commerce." (Dep. McKnight, p. 89, Line 16 - p. 90, Line 5).

Company, the information for the new truck. (*Id.* at 243). When the new truck accidentally hit and killed a child, London Company attempted to avoid its obligations under the liability portion of the policy by claiming that its policy should apply only to the old truck since that was the vehicle information it had been given. The Alabama Supreme Court disagreed. It first observed the following:

> The rule applied as to reformation of an automobile liability insurance policy only as to the motor number of the automobile insured is that *there must be shown to have been a mutual agreement to embrace a certain automobile, but that it was incorrectly described as to its number, by mutual mistake*, or by the mistake of one party and fraud of the other (or the equivalent of fraud). ... Sufficient mutuality is shown to exist if the insurance company intended to insure a certain automobile which assured had in mind and proposed to insure by that policy. Where the mistake of the parties goes to the identity of the automobile itself to be insured, reformation is denied and the contract of insurance may be rescinded since there was no meeting of the minds of the parties.

*Id.* at 242. (Emphasis added.)

After setting forth the evidence of the mistake and acknowledging the good faith by the people at H & O, the Alabama Supreme Court ruled that both the London policy and the United States policy should be reformed to reflect the correct truck number. *Id.* at 244.

H & O's situation is very close to that of Mr. Lane in the instant case. At issue here is what limits of liability to which Mr. Lane and Progressive agreed, $300,000 or $1,000,000, instead of the correct vehicle description. However, the undisputed evidence shows that Progressive and Mr. Lane agreed to $1,000,000 in liability limits, and therefore the policy should be reformed.

## VI.    CONCLUSION

15

For all of the foregoing reasons, a summary judgment declaring that the liability policy limits between Progressive and Mr. Lane were $1,000,000 should be granted against Progressive.

Respectfully submitted on this the 22nd day of November, 2005.

/s/Randall S. Haynes
RANDALL S. HAYNES (HAYN2865)
Attorney for Defendant Jane Holmes

OF COUNSEL:

**MORRIS, HAYNES and HORNSBY**
131 Main Street
Post Office Box 1660
Alexander City, Alabama 35011-1660
Telephone: 256-329-2000
Facsimile: 256-329-2015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon all counsel of record as follows by electronic filing on this the 22nd day of November, 2005.

/s/Randall S. Haynes
OF COUNSEL

cc:    R. Larry Bradford, Esq.
       Bradford Law Firm, P.C.
       2020 Canyon Road
       Suite 100
       Birmingham, Alabama 35216

       Stephen E. Whitehead, Esq.
       Erin E. May, Esq.
       Mark E. Tindal, Esq.
       Lloyd, Gray & Whitehead, P.C.
       2501 Twentieth Place South, Suite 300
       Birmingham, Alabama 35223

       T. Randall Lyons, Esq.
       Webster, Henry
       Auburn Bank Center
       132 N. Gay Street, Suite 211
       Auburn, Alabama 36830

17

Mr. Lynn Jinks
Ms. Christina Crow
Jinks, Daniel & Crow, P.C.
Post Office Box 350
Union Springs, Alabama 36089