# EXHIBIT A

# FREEDOM COURT REPORTING ORIGINAL

```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF ALABAMA

3                       NORTHERN DIVISION

4

5       PROGRESSIVE SPECIALTY COMPANY,

6                       Plaintiff,

7          versus                      2:05-CV-438-W

8       MCKNIGHT AGENCY, INC., et al.,

9                       Defendants.

10

11

12

13

14           *  *  *  *  *  *  *  *  *  *  *  *

15             DEPOSITION OF JOE MCKNIGHT,

16      taken pursuant to stipulation and agreement

17      before Jackie Parham, Certified Shorthand

18      Reporter and Commissioner for the State of

19      Alabama at Large, in the law offices of Lloyd,

20      Gray & Whitehead, 2501 Twentieth Place South,

21      Suite 300, Birmingham, Alabama, on Friday, the

22      28th day of October, 2005, commencing at

23      approximately 9:20 a.m.
```

# FREEDOM COURT REPORTING

1          JOE MCKNIGHT,

2          The witness, after having first been

3     duly sworn to speak the truth, the whole truth,

4     and nothing but the truth, testified as follows:

5          EXAMINATION

6     BY MR. HAYNES:

7     Q.    State your name, please.

8     A.    Joe McKnight.

9     Q.    Mr. McKnight, what is your occupation?

10    A.    Insurance agent.

11    Q.    And by whom are you employed at the

12          present time?

13    A.    Young, Johnston & Associates.

14    Q.    Is Young, Johnston & Associates the

15          successor agency to the McKnight Agency?

16    A.    Yes, sir.

17    Q.    Did you sell your agency to Young,

18          Johnston?

19    A.    Yes, sir.

20    Q.    Are you now an employee of Young,

21          Johnston?

22    A.    Yes, sir.

23    Q.    Mr. McKnight, you understand that we are

# FREEDOM COURT REPORTING

1    A.    Yes, sir.

2    Q.    And when did you sell it to Young,

3          Johnston & Associates?

4    A.    December of 2004.

5    Q.    From 1992 until December of 2004 did you

6          sell at the McKnight Agency any other

7          types of insurance aside from property and

8          casualty?

9    A.    No, sir.

10   Q.    Okay.  What companies did you sell for?

11   A.    Progressive, Sagamore, Victoria.  We had a

12         number of brokerage contracts with

13         companies like Southern Cross

14         Underwriters, Britt Paulk Insurance

15         Agency, Grechian (phonetic) & Associates,

16         Insurance Connection, Burns & Wilcox,

17         Dagle (phonetic) & Associates.  That's

18         basically the main ones.

19   Q.    Okay.

20             MR. WHITEHEAD:  You named about

21                  half of my clients.

22   Q.    When did you start selling for

23         Progressive?

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Okay. Have you ever obtained any other |
| 3 | | licenses, other than the ones we've |
| 4 | | already talked about? |
| 5 | A. | No, sir. |
| 6 | Q. | Do you have a Georgia license of any type? |
| 7 | A. | Yes. |
| 8 | Q. | What Georgia licenses do you currently |
| 9 | | hold? |
| 10 | A. | Just a property and casualty as a |
| 11 | | nonresident. |
| 12 | Q. | And Abbeville is located fairly close to |
| 13 | | the state line; is that true? |
| 14 | A. | About fourteen miles. |
| 15 | Q. | And do you have some customers or clients |
| 16 | | from Georgia? |
| 17 | A. | Yes, sir. |
| 18 | Q. | Speaking about your relationship with |
| 19 | | Progressive Insurance, did you at the |
| 20 | | McKnight Agency have the authority and |
| 21 | | right to bind Progressive? |
| 22 | A. | Yes, sir. |
| 23 | Q. | Let me focus on the last five years, from |

# FREEDOM COURT REPORTING

16

| | | |
|---|---|---|
| 1 | Q. | Okay.  What point systems did the software |
| 2 | | system use, the same the state uses, or |
| 3 | | does it have its own point system? |
| 4 | A. | Progressive has their own point system |
| 5 | | where they rate different offenses, gets |
| 6 | | you a different number of points. |
| 7 | Q. | Do you know the number of points that |
| 8 | | would disqualify someone seeking |
| 9 | | commercial auto insurance, a truck driver? |
| 10 | A. | 6 or more points, maybe it's 7 -- I think |
| 11 | | it's 7.  6 or less you can get up to a |
| 12 | | million dollars worth of coverage.  If |
| 13 | | you've got 7 or more, you can only get a |
| 14 | | half million dollars worth of coverage. |
| 15 | Q. | 7 disqualifies you from one million |
| 16 | | dollars insurance? |
| 17 | A. | That's correct. |
| 18 | Q. | Now, the federal regulations require a |
| 19 | | person engaging in interstate trucking to |
| 20 | | have $750,000.00 worth of insurance.  Can |
| 21 | | we agree on that? |
| 22 | A. | Yes, sir. |
| 23 | Q. | Did Progressive write policies at 750? |

# FREEDOM COURT REPORTING

1    A.    I guess.  For me it's a good amount.

2    Q.    Yes, sir.  That's what I'm thinking, too.

3          Do you have all the trucking business in

4          Henry County?

5    A.    Majority of it.

6    Q.    I think so.

7              Mr. McKnight, before 2003, when Ricky

8          Lane obtained coverage with you -- your

9          agency in March of 2003, did you have any

10         previous business relationship with Ricky

11         Lane?

12   A.    Yes, sir.

13   Q.    What previous dealings did you have with

14         him?

15   A.    Well, Ricky had been a driver on some of

16         the policies that I have insured -- some

17         of the companies that I have insured.  And

18         Ricky -- I don't remember exactly how far

19         back.  But sometime in the past Ricky had

20         insurance with me on a previous occasion.

21   Q.    Do you know which company that was placed

22         with?

23   A.    I believe it was Progressive.  It could

# FREEDOM COURT REPORTING

```
1              have been Scottsdale.  But I think it was
2              probably Progressive.
3      Q.      But most likely either Progressive or
4              Scottsdale?
5      A.      Yes, sir.
6      Q.      Is Progressive the company you placed most
7              of your commercial auto business with?
8      A.      Yes, sir.
9      Q.      Has that been true since 1992?
10     A.      No, sir.  In the early '90s there were
11             other companies that did a lot of what we
12             do.  Scottsdale was one of them.  Credit
13             General was one.  But of late Progressive
14             has been the one we use.
15     Q.      Has that been true for, say, five years?
16     A.      Yes, sir, probably.
17     Q.      And your previous dealings with Ricky Lane
18             were where he came to your agency,
19             obtained some coverage possibly or
20             probably with Progressive; is that right?
21     A.      Yes, sir.
22     Q.      Do you know who Mr. Lane was driving for
23             at that point in time?
```

# FREEDOM COURT REPORTING

1       and maybe one other one, that he would

2       assist in seeing that their payments got

3       paid, you know, to keep their insurance

4       current.

5   Q.   To make sure it stayed in place.  Right.

6       Were there deductions taken from certain

7       drivers, and Riverside Turf would make

8       sure that the payments were made on a

9       monthly or quarterly basis?

10  A.   I'm not sure how Ray did it.

11  Q.   Okay.  Well, did you for Ricky Lane in

12      particular, did you get -- the Payments

13      for his Progressive Insurance, did that

14      come to the McKnight Agency or would that

15      go directly to Progressive?

16  A.   Went to a premium finance company that

17      financed the premiums.

18  Q.   Okay.  And the premium finance company --

19          MR. WHITEHEAD:  There would have

20            been an initial premium.

21  Q.   But you would have gotten the initial

22      premium payment?

23  A.   I seem to think that Ray sent a check for

# FREEDOM COURT REPORTING

26

```
1              the down payment.  Yes, sir.
2    Q.        Okay.  To the McKnight Agency?
3    A.        Yes, sir.
4    Q.        Did you own or have any interest in the
5              premium finance company?
6    A.        No, sir.
7    Q.        Mr. McKnight, have you had the opportunity
8              to have read any portion of Ricky Lane's
9              testimony relating to his insurance?
10   A.        Yes, sir.
11   Q.        And did you read that Mr. Lane says that
12             he came to see you about driving for
13             Riverside Turf and discussed with you the
14             fact that he needed at least $750,000.00
15             of liability insurance?
16   A.        Yes, sir.
17   Q.        Is that accurate?
18   A.        Yes, sir.
19   Q.        You had that such discussion with him?
20   A.        Yes.
21   Q.        When did you have the discussion with
22             Ricky Lane about his need for $750,000.00
23             or more in insurance?
```

# FREEDOM COURT REPORTING

1    Q.    I want to look at that first one there

2          that bears Bates number 0001.  And I've

3          marked that document, which is apparently

4          an invoice, as Plaintiff's Exhibit 1.

5          This appears to be an invoice to Ricky

6          Lane, care of Riverside Turf, dated March

7          10, 2003.  Do you see that?

8    A.    Yes, sir.

9    Q.    It shows that the company insuring

10         Mr. Lane was Progressive; is that right?

11   A.    That's correct.

12   Q.    And it shows under the heading Description

13         one million dollars liability; is that

14         right?

15   A.    That's correct.

16   Q.    Is that the date you had the discussion

17         with Ricky Lane about his need for

18         $750,000.00 or more in liability insurance

19         so as to comply with federal and state

20         law?

21   A.    Yes, sir.

22   Q.    Tell me what the discussion was between

23         you and Mr. Lane on that date.

# FREEDOM COURT REPORTING

31

```
1    A.    Could you repeat that?

2    Q.    I'm not sure.  Did Mr. -- Let me strike

3          that and start all over.

4                It was clear, wasn't it,

5          Mr. McKnight, that Ricky Lane wanted a

6          million dollars worth of insurance; is

7          that right?

8    A.    Yes, sir.

9    Q.    And you intended for Ricky Lane to have

10         one million dollars worth of liability

11         insurance through Progressive; is that

12         true also?

13   A.    That's true.

14   Q.    So both of you wanted one million dollars

15         worth of Progressive Insurance, correct?

16   A.    That's right.

17   Q.    And also Mr. Morris over at Riverside Turf

18         was requiring either 750 or a million

19         dollars worth of insurance, wasn't he?

20   A.    That's correct.

21   Q.    So, as far as you know, that's what

22         everybody intended when he first obtained

23         Progressive -- Ricky Lane first obtained
```

# FREEDOM COURT REPORTING

32

```
 1            Progressive Insurance through your agency?
 2      A.    Right.
 3      Q.    In fact, when that policy was issued or
 4            that coverage was obtained by Progressive,
 5            was it, in fact, one million dollars of
 6            liability insurance?  Were the limits one
 7            million dollars?
 8      A.    No, sir.
 9      Q.    Were those limits $300,000.00?
10      A.    Yes, sir.
11      Q.    Was that a mistake?
12      A.    Yes, sir.
13      Q.    What was the mistake that caused the wrong
14            amount of liability limits to be issued?
15      A.    I'm not sure how it happened.  Progressive
16            has their computer software, and there's a
17            pull-down menu where you select the
18            amounts.  And it would only be speculation
19            on my part as to how I selected -- or how
20            300,000 got selected instead of the one
21            million that I intended for it to be.
22      Q.    Okay.  And I haven't been through these
23            documents.  But, Mr. McKnight, do any of
```

# FREEDOM COURT REPORTING

33

1       these documents in your file reflect what

2       you called the pull-down menu?

3   A.  No, sir.

4   Q.  Okay.  But when you -- It's like ordering

5       a -- I ordered some maple syrup from

6       Vermont one time.  You can get 6 ounces,

7       12 ounces, 18 or 24.  And it's got -- you

8       take your computer mouse and select which

9       one you want; is that right?

10  A.  That's correct.

11  Q.  I guess something similar is what happened

12      here.  You intended to click one million

13      dollars worth of liability insurance but

14      apparently you clicked 300,000.  Is that

15      what happened?

16  A.  Apparently so, yes, sir.

17  Q.  But just to dispense with why it happened,

18      it was simply a mistake, apparently, on

19      your part; is that right?

20  A.  That's correct.

21  Q.  When you would obtain coverage for

22      truckers through Progressive, did you

23      personally handle that or did you assign

# FREEDOM COURT REPORTING

35

1   A.    That's correct.

2   Q.    Do you know what the premium would have

3         been, approximately, had you clicked one

4         million dollars instead of what you

5         apparently did clicking the $300,000.00

6         box?

7   A.    I can't say with any certainty because

8         there's so many variables.  And, for

9         instance, the driving record of the Retail

10        Credit Report, like somebody with a poor

11        credit, poor driving record would pay more

12        than somebody with excellent credit and no

13        points on their license.  So there are

14        just too many variables.

15  Q.    You can't tell me what Ricky Lane's would

16        have been in March of 2003?

17  A.    Not sitting here now.  No, sir.

18  Q.    Okay.  Do you know how many points

19        Mr. Lane had when his driving record was

20        checked?

21  A.    I know now that he had 5 points.  But I

22        don't recall looking at that at the time.

23  Q.    Okay.  But you now know that he had 5

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | | points. That would indicate, wouldn't it, |
| 2 | | Mr. McKnight, that he would have qualified |
| 3 | | to have obtained one million dollars |
| 4 | | limits through Progressive? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Did Ricky Lane's coverage with Progressive |
| 7 | | remain in place throughout that year, that |
| 8 | | first year, from March 10, 2003 through |
| 9 | | March 9, 2004? |
| 10 | A. | Yes, sir. |
| 11 | Q. | And then did Mr. Lane come in sometime |
| 12 | | either late February or early March of |
| 13 | | 2004 to obtain a renewal? |
| 14 | A. | Yes, sir. |
| 15 | Q. | And did you renew his coverage in March of |
| 16 | | 2004? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And how does that renewal process work? |
| 19 | A. | Progressive sends a notice -- a renewal |
| 20 | | offer -- I forget exactly what they call |
| 21 | | it. But, in essence, it's a renewal offer |
| 22 | | telling them what their new premium is |
| 23 | | going to be for the coming year. And they |

# FREEDOM COURT REPORTING

39

1    A.    I faxed a copy to Riverside on the 10th,

2          the day that he bought the policy.

3    Q.    And did that copy that you faxed to

4          Riverside on March 10, 2003, did it

5          reflect one million dollars worth of

6          liability limits?

7    A.    Yes, sir.

8                    (Plaintiff's Exhibit 4 marked

9                    for purposes of identification)

10   Q.    I'm going to mark as Plaintiff's Exhibit 4

11         a Certificate of Liability Insurance that

12         appears to be from March 10, 2003 through

13         March 10, 2004.  It reflects a combined

14         single limit of a million dollars.  Do you

15         see that?

16   A.    Yes, sir.

17   Q.    Is that a copy of the certificate that you

18         would have faxed to Riverside Turf?

19   A.    Yes, sir.

20   Q.    Did Progressive authorize you as their

21         agent to send this certificate to

22         Riverside Turf?

23                    MR. SEARS:  Object to form.

# FREEDOM COURT REPORTING

40

1   A.   This particular one?

2   Q.   Yes, sir.

3   A.   No, sir.  I assumed that to be part of my

4        abilities as an agent of Progressive, to

5        be able to issue certificates.

6   Q.   Okay.  You had the authority, as you've

7        already told me, to have binded -- or

8        bound Progressive Insurance on March 10,

9        2003 when Ricky Lane came in and you went

10       through the process in the Progressive

11       software, and with his having 5 points,

12       you had the authority to bind Progressive

13       with one million dollar liability limits,

14       didn't you?

15  A.   Yes, sir.

16  Q.   And that is what you intended to do?

17  A.   Yes, sir.

18  Q.   And that would not have been outside the

19       scope of your agency relationship with

20       Progressive, would it?

21  A.   No, sir.

22  Q.   And in terms of criteria whether someone

23       is insurable or not, that's built into the

# FREEDOM COURT REPORTING

1        invoice shows Ricky Lane, care of

2        Riverside Turf at the Riverside Turf

3        address in Shorterville.

4    A.  The address on the policy you're stating?

5    Q.  Yes, sir.

6    A.  Would have had P.O. Box 85, Shorterville.

7    Q.  And did you understand that to be Ricky

8        Lane's Post Office Box?

9    A.  Yes, sir.

10   Q.  And then you also would have gotten, you

11       told me, an agent's copy of the policy; is

12       that right?

13   A.  That's correct.

14   Q.  To your knowledge, Mr. McKnight, were

15       there any claims or lawsuits filed against

16       Ricky Lane that would have invoked his

17       liability coverage during that first

18       policy year, let's call it, from March 10,

19       2003 for the next 365 days?

20   A.  Not to my knowledge.  No, sir.

21   Q.  Was it your understanding that he had a

22       million dollars worth of insurance and you

23       just overlooked the fact that you clicked

# FREEDOM COURT REPORTING

1           the wrong box?

2   A.     Yes, sir.

3   Q.     And when Ricky Lane -- did he actually

4           come back in to renew in March of 2004?

5   A.     Yes, sir.  I don't remember what date he

6           came in.  I don't remember when.

7   Q.     Sir?

8   A.     I really don't remember if he came back in

9           or if he -- I think he did, though.

10          Because we would have had some documents

11          for him to sign with National Fire and

12          Marine.

13   Q.     And do they have the cargo coverage?

14   A.     Yes, sir.  But there would have been no

15          application or any reason for him to come

16          back in on the Progressive.

17   Q.     Let me show you two documents, Mr.

18          McKnight.  The first I'm going to mark as

19          Plaintiff's Exhibit Number 5.  And it has

20          the Bates number of 0015.  It appears to

21          me to be a Progressive Insurance Company's

22          receipt dated March 8, 2004 and reflecting

23          a payment of $4219.00 to Progressive.  Do

# FREEDOM COURT REPORTING

47

1          you see that document?

2    A.    Yes, sir.

3                   (Plaintiff's Exhibit 5 marked

4                    for purposes of identification)

5    Q.    What is that?

6    A.    That's where we uploaded Ricky's payment

7          to Progressive to renew his policy.

8    Q.    And would that indicate the date most

9          likely was March 8, 2004?

10   A.    Yes, sir.

11   Q.    And, of course, that would have been two

12         days before the end of the first year's

13         policy, right?

14   A.    That's correct.

15                  (Plaintiff's Exhibit 6 marked

16                   for purposes of identification)

17   Q.    And then Plaintiff's Exhibit 6 is the

18         March 10, 2004 invoice; is that right?

19   A.    That's correct.

20   Q.    Let's see.  That should be the same

21         amount, and it is, as the receipt,

22         $4219.00 for the liability and physical

23         damage?

# FREEDOM COURT REPORTING

1    Q.    And I know you can't get in his mind.  But

2          both of you understood, apparently, that

3          he had one million dollars of limits

4          through Progressive; is that right?

5    A.    Yes, sir.

6    Q.    And at the time of the renewal in March of

7          2004 you still had the authority to bind

8          Progressive, didn't you?

9    A.    Yes, sir.

10   Q.    And there was no human being you had to

11         call up to get permission to renew Ricky

12         Lane, was there?

13   A.    No, sir.

14   Q.    You didn't have to call Cleveland and talk

15         to anybody, did you?

16   A.    No, sir.

17   Q.    And was Ricky Lane's renewal processed

18         just like you did your other customers?

19   A.    Yes, sir.

20   Q.    And did a new certificate get issued to

21         Riverside Turf on or about March 10, 2004?

22   A.    I think, yes, sir.  I believe there's one

23         in here.  It was probably sent on the 8th,

# FREEDOM COURT REPORTING

51

```
1              the same day we uploaded the money.
2                      (Plaintiff's Exhibit 7 marked
3                          for purposes of identification)
4      Q.    Let me show you Plaintiff's Exhibit 7,
5            Mr. McKnight.  Is that a copy of the March
6            2004 certificate to Riverside Turf?
7      A.    Yes, sir.
8      Q.    And does that likewise reflect liability
9            limits of one million dollars?
10     A.    Yes, sir.
11                     (Off-the-Record discussion)
12     Q.    Mr. McKnight, have you ever discussed the
13           point system with -- the Progressive point
14           system with anyone at Riverside Turf?
15     A.    Not to my knowledge.
16     Q.    How did you know to send a Certificate of
17           Insurance on Ricky Lane to Riverside Turf?
18     A.    Ricky told me he was going to be hauling
19           for Riverside.  So if he's hauling, Ray is
20           going to need a certificate.
21     Q.    Is that just normal business procedure?
22     A.    Yes.
23     Q.    Do you do that for all your trucker
```

# FREEDOM COURT REPORTING

54

```
 1            was an issue or question about the amount
 2            of Ricky Lane's liability limits?
 3    A.      It was -- I don't know.  It was a week or
 4            so later Ricky called me and said that
 5            Progressive told him he only had 300,000.
 6            And I told him I didn't think that was
 7            correct.  And I went to the file and
 8            pulled his file and then went through the
 9            policy and found where he did, in fact,
10            have 300,000.
11    Q.      Did you say anything to Ricky other than
12            you didn't believe that to be the case?
13    A.      Initially, before I checked the file?
14    Q.      Yes, sir.  Before you checked the file.
15    A.      I don't recall saying anything else.
16    Q.      After you checked the file did you talk
17            again to Ricky Lane?
18    A.      Yes, sir.
19    Q.      And when was that conversation?
20    A.      He held on while I pulled his file.
21    Q.      Oh, okay.  So you went and pulled his file
22            while he was on hold?
23    A.      Yes, sir.
```

# FREEDOM COURT REPORTING

55

| | | |
|---|---|---|
| 1 | Q. | And when you came back on the phone, what |
| 2 | | did you say to Ricky? |
| 3 | A. | I told him, I said, "I don't know how it |
| 4 | | happened, but you've got 300,000 is what |
| 5 | | the policy says."  And I didn't know how |
| 6 | | it happened. |
| 7 | Q. | Did you ever say anything to Ricky to the |
| 8 | | effect that you'll have a million dollars |
| 9 | | of liability limits either through |
| 10 | | Progressive because of what you had |
| 11 | | previously told him and what you had done |
| 12 | | or from your own E and O carrier? |
| 13 | A. | I don't recall that.  No, sir. |
| 14 | Q. | Did you ever talk to anyone at Progressive |
| 15 | | Insurance about the mistake in Ricky |
| 16 | | Lane's getting insured and actually |
| 17 | | getting underinsured? |
| 18 | A. | Sometime after they talked to Ricky I got |
| 19 | | a call from -- it may be in the file |
| 20 | | somewhere.  I don't recall his name.  But |
| 21 | | he wanted a copy of the application faxed |
| 22 | | to him.  And I faxed it to him.  But I |
| 23 | | don't remember any kind of statements at |

# FREEDOM COURT REPORTING

56

| | | |
|---|---|---|
| 1 | | that time, other than they just wanted a |
| 2 | | copy of the application. |
| 3 | Q. | Has anyone at Progressive ever called you |
| 4 | | up to get your explanation of what |
| 5 | | happened? |
| 6 | A. | Right now I don't recall it.  No, sir. |
| 7 | Q. | So nobody at Progressive has called to |
| 8 | | discuss with you the fact that this |
| 9 | | interstate trucker only had $300,000.00 |
| 10 | | worth of insurance? |
| 11 | A. | Not to my knowledge. |
| 12 | Q. | Mr. McKnight, did you have any discussions |
| 13 | | ever with Ray Morris at Riverside Turf |
| 14 | | about the fact that the limits were |
| 15 | | 300,000 instead of a million as has been |
| 16 | | intended? |
| 17 | A. | I think shortly after talking to Ricky -- |
| 18 | | I don't remember the time frame -- but |
| 19 | | shortly after talking to Ricky Ray called |
| 20 | | and wanted to know did Ricky, in fact, |
| 21 | | have 300,000, and I said it appears so. |
| 22 | | That's what -- the policy got issued with |
| 23 | | 300,000. |

# FREEDOM COURT REPORTING

1    Q.    Okay.  And then under Vehicle Questions it

2          indicates that this is hauling goods; that

3          it's commercial use, right?

4    A.    Right.

5    Q.    And then the point system, apparently, is

6          for 35 months; is that right?

7    A.    Right.  Progressive only goes back 35

8          months.

9    Q.    And then we look right above that under

10         Driver Information, there it's reflected 5

11         points?

12   A.    Right.

13   Q.    And as you testified to earlier, that

14         meant that he was qualified to have

15         obtained a million dollars coverage,

16         right?

17   A.    That's correct.

18   Q.    And the Underwriting Questions really

19         consisted of one for Ricky Lane's, whether

20         he was currently insured as of 3/10/03,

21         and at that point he wasn't, was he?

22   A.    That's correct.

23   Q.    And then flipping on to the next page

# FREEDOM COURT REPORTING

```
1              under Coverages.  That's where it's
2              reflected 300 CSL.  Is that where there
3              was a menu where you click?
4    A.        Yes, sir.  Each one of these sections here
5              has a pull-down menu.
6    Q.        Okay.  The BI-PD would be bodily
7              injury-property damage; is that right?
8    A.        Right.
9    Q.        UM-UIM is uninsured and underinsured; is
10             that right?
11   A.        That's correct.
12   Q.        And, so, the mistake would have been on
13             the BI-PD on the pull-down menu?  You just
14             clicked, as you said earlier, the wrong
15             box; is that right?
16   A.        That's right.
17   Q.        Mr. McKnight, an issue that's come up or
18             been suggested by some other people, this
19             was not a matter of where Ricky Lane was
20             disqualified by virtue of a poor driving
21             record from getting a million dollars
22             coverage and you tried to subvert the
23             system in telling him he had a million
```

# FREEDOM COURT REPORTING

1        dollars coverage?  That's not what

2        happened, is it?

3                    MR. SEARS:  Object to the form.

4    A.    No.

5    Q.    In fact, he did qualify, and you and he

6        intended for him to have a million

7        dollars; is that right?

8                    MR. SEARS:  Same objection.

9    A.    That's correct.

10   Q.    And but for your mistake, he would have

11       had a million dollars coverage; is that

12       right?

13                   MR. WHITEHEAD:  Object to the

14                       form.

15                   MR. SEARS:  Same objection.

16   A.    Yes, sir.

17   Q.    I don't believe I have anything else.

18       Thank you, Mr. McKnight.

19                        **EXAMINATION**

20   **BY MR. LYONS:**

21   Q.    Mr. McKnight, my name is Randy Lyons.  I

22       represent Riverside Turf.  I've just got a

23       couple of questions I want to ask you

# FREEDOM COURT REPORTING

1  Q.    Yes, sir.

2  A.    Since the accident Ricky's coverage has

3        been increased to a million dollars.

4  Q.    Okay.

5  A.    And if I'm not mistaken, Ricky came in and

6        said we needed to upgrade his limits to a

7        million when he went back to hauling.  And

8        at some point in time Ray and I had a

9        conversation about that.  It seems like it

10       might have been over the payment of that

11       money.  And I went on the "For Agents

12       Only" and printed out a copy of the policy

13       after we updated it and upgraded it to a

14       million dollars.  And I faxed that to Ray

15       so that he would know that we had taken

16       care of what Ricky had requested we do.

17 Q.    But prior to then --

18 A.    Prior to that I did not.  No, sir.

19 Q.    All right.  Now, back to my other

20       question.  Have you had any conversations

21       that you can remember with any of

22       Progressive's representatives concerning

23       this accident or the coverage for Ricky

# FREEDOM COURT REPORTING

```
1              Lane?

2     A.       Not that I recall.  Other than him calling

3              and requesting a copy of the application.

4     Q.       Did you ever have any conversations with

5              any of its representatives concerning the

6              fact that you had made a mistake in the

7              pull-down menu and chosen the wrong

8              coverage?

9     A.       Not that I recall.

10    Q.       I think that's all I have.  Thank you,

11             Mr. McKnight.

12    A.       Okay.

13                       (Brief recess)

14                    EXAMINATION

15    BY MR. WHITEHEAD:

16    Q.       Joe, I just want to clarify two things to

17             make sure the Record is clear and you

18             testified what you intended to.  First you

19             were asked the question about what was

20             sent to Riverside or what would have been

21             sent to Riverside by way of policy

22             information.  Do you recall that question?

23    A.       Yes.
```