# EXHIBIT B

**FREEDOM COURT REPORTING**

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4
5  PROGRESSIVE SPECIALTY  )
6  INSURANCE COMPANY,     )
7       Plaintiff,   )
8  vs.              ) CASE NUMBER:
9  MCKNIGHT AGENCY, INC., ) 2:05-CV-438-W
10 JOE MCKNIGHT; RICKY LANE;)
11 RIVERSIDE TURF FARM,   )
12 et al.,          )
13      Defendants.  )
14
15     DEPOSITION OF RICKY ALLEN LANE
16     In accordance with Rule 5(d) of
17 The Alabama Rules of Civil Procedure, as
18 Amended, effective May 15, 1988, I, Cindy
19 Weldon, am hereby delivering to Mark E.
20 Tindal, the original transcript of the oral
21 testimony taken on the 15th day of November,
22 2005, along with exhibits.
23     Please be advised that this is the

Page 2

1  same and not retained by the Court Reporter,
2  nor filed with the Court.

Page 3

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4
5  PROGRESSIVE SPECIALTY  )
6  INSURANCE COMPANY,     )
7       Plaintiff,   )
8  vs.              ) CASE NUMBER:
9                  ) 2:05-CV-438-W
10 MCKNIGHT AGENCY, INC., )
11 JOE MCKNIGHT; RICKY LANE;)
12 RIVERSIDE TURF FARM,   )
13 et al.,          )
14      Defendants.  )
15
16     S T I P U L A T I O N
17     IT IS STIPULATED AND AGREED, by
18 and between the parties through their
19 respective counsel, that the deposition of
20 RICKY A. LANE, may be taken before Cindy
21 Weldon, Certified Shorthand Reporter,
22 Commissioner and Notary Public, at the
23 offices of Lynn Jinks, 219 North Prairie

Page 4

1  Street, Union Springs, Alabama, on November
2  the 15th,, 2005 at 10:15 a.m.
3      IT IS FURTHER STIPULATED AND
4  AGREED that the signature to and the reading
5  of the deposition by the witness is waived,
6  the deposition to have the same force and
7  effect as if full compliance had been had
8  with all laws and rules of Court relating to
9  the taking of depositions.
10     IT IS FURTHER STIPULATED AND
11 AGREED that it shall not be necessary for
12 any objections to be made by counsel to any
13 questions, except as to form or leading
14 questions, and that counsel for the parties
15 may make objections and assign grounds at
16 the time of trial, or at the time said
17 deposition is offered in evidence, or prior
18 thereto.
19     IT IS FURTHER STIPULATED AND
20 AGREED that notice of filing of the
21 deposition by the Commissioner is waived.
22
23

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
(877) 373-3660    **BIRMINGHAM, ALABAMA**    (205) 397-2397

**FREEDOM COURT REPORTING**

Page 25

1 reflect that even the lawyers can't
2 understand these insurance documents.
3    Q. And then underneath your name over
4 there, it has your license number. I don't
5 want to put it on the record. Is that
6 correct?
7    A. Yes, it is.
8    Q. And is that your correct social
9 security number?
10    A. Yes, it is.
11    Q. And then over there to the right,
12 it says points at three again; correct?
13    A. Yes.
14    Q. All right.
15       MR. TULEY: Well, it says PTS
16 three.
17       MR. TINDAL: Okay.
18    Q. So after Mr. McKnight entered all
19 the information on the computer, is it your
20 understanding that the computer then
21 determined whether you would qualify for the
22 million dollars in coverage or not?
23    A. No.

Page 26

1    Q. Okay. I'll just tell you what Mr.
2 McKnight testified. That he would enter all
3 your information into the software into the
4 computer and then he'd hit a button and then
5 the Progressive software would then let him
6 know if you would be approved for the
7 million dollar policy. Do you have any
8 reason to dispute that?
9    A. No.
10    Q. Okay.
11    A. I do not.
12    Q. And then you did get a million
13 dollar policy in October of 2000; correct?
14    A. Yes, I did.
15    Q. And that was what both of you
16 intended at that time; correct?
17    A. Yes.
18    Q. And you paid the premiums for that
19 policy; correct?
20    A. Yes.
21    Q. So now I want to move forward to
22 March of 2003.
23    A. Okay.

Page 27

1    Q. Do you remember coming in to Mr.
2 McKnight's office around March or February
3 of 2003?
4    A. Yes, I do.
5    Q. What was the reason you came in?
6    A. To take out a policy where I could
7 start hauling sod.
8    Q. Okay. And so at that time, you
9 knew that you needed at least seven hundred
10 and fifty thousand dollars of coverage?
11    A. Yes.
12    Q. So you asked Mr. McKnight for
13 seven hundred and fifty thousand; correct?
14    A. No. I asked him for a million
15 dollars.
16    Q. Okay. So when you came in, you
17 said I want to get the million?
18    A. Yes.
19    Q. Okay. And that was to provide you
20 coverage on the -- on your tractor, your
21 truck?
22    A. Yes.
23    Q. For hauling for Riverside Turf; is

Page 28

1 that correct?
2    A. Yes.
3    Q. Now, I'm going to show you what
4 your lawyers have produced to me Bates
5 stamped R period Lane 001 through 015.
6    A. Okay. Just look at those. And
7 after your lawyer looks at them, let me know
8 if you recognize those documents.
9       And I will represent to you that
10 one of your lawyers, Christy Crow, told me
11 that was everything you had in your
12 possession for the policy that's the subject
13 of this lawsuit. So just let me know if you
14 recognize those.
15       MR. JINKS: Something is missing.
16       MR. TINDAL: What's missing?
17       MR. JINKS: These two pages right
18 here.
19       MR. TINDAL: Okay.
20       MR. JINKS: I don't know why they
21 are not included in what she sent you.
22       MR. TINDAL: Okay. Do you just
23 want to add those to --

7 (Pages 25 to 28)

**367 VALLEY AVENUE**
(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

FREEDOM COURT REPORTING

Page 29

1  MR. JINKS: Let me just compare
2  what you've got. With the exception of
3  those two pages, I think that's -- I think
4  they are supposed to be in there.
5  Maybe I just overlooked them. I
6  don't see them. But they should be in
7  there.
8  MR. TINDAL: Do you want to make
9  sure that there's nothing else in yours
10 that's --
11 MR. JINKS: It looks like
12 everything that he got is included in your
13 set of documents except those two.
14 MR. TINDAL: Okay. I would like
15 to add them, but these look like your
16 originals.
17 MR. JINKS: Yes. Let me get
18 copies made right quick.
19 (Whereupon, a short recess was
20 taken.)
21 Q. Back on the record. We'll mark
22 this first one that's Bates stamped as
23 Defendant's Exhibit 2. And then we'll mark

Page 30

1  these two pages that are to be added as
2  Exhibit 3.
3  (Whereupon, Defendant's Exhibits
4  Nos 2 and 3 were marked for identification.)
5  Q. I'll let you look at those as
6  well. Looking at Exhibit 2 and Exhibit 3,
7  Mr. Lane, are those all the documents that
8  you received regarding the insurance policy
9  that's the subject of this lawsuit?
10 A. Yes.
11 Q. Okay. Let's go through the
12 process. When you came in, in March of 2003
13 to meet with Mr. McKnight, was it the same
14 process that was used in March of -- or
15 October of 2000?
16 A. Yes, it was.
17 Q. So you and Mr. McKnight discussed
18 procuring a one million dollar policy for
19 you for your truck for hauling for Riverside
20 Turf?
21 A. Yes.
22 Q. Then he sat down at the computer
23 and started asking you questions?

Page 31

1  A. Yes.
2  Q. You would answer the questions and
3  he would type the answers into the computer?
4  A. Yes.
5  Q. And I'll tell you Mr. McKnight
6  testified that when he was filling out that
7  application in March of 2003 or February of
8  2003, whenever it was, that he intended to
9  get you a one million dollar policy. Are
10 you aware that he testified to that?
11 A. No.
12 Q. Okay.
13 A. I am not aware of that.
14 Q. But you know now that Mr. McKnight
15 is taking the position that he intended to
16 get you a one million dollar policy from
17 Progressive?
18 A. Yes.
19 Q. I'm going to show you what I'm
20 going to mark as Exhibit 4, which I'll
21 represent to you is the application for the
22 2003 policy.
23 (Whereupon, Defendant's Exhibit

Page 32

1  No. 4 was marked for identification.)
2  Q. I'll ask if you recognize any of
3  those documents?
4  A. Just this one.
5  Q. Okay. And you're pointing to the
6  page that's Bates stamped?
7  MR. JINKS: 99.
8  Q. McKnight 0099?
9  A. Uh-huh. Yes, sir.
10 Q. And that is the application for
11 this policy that you signed in March of
12 2003; correct?
13 A. Yes, sir.
14 Q. Okay. And you signed that at Mr.
15 McKnight's office; is that right?
16 A. Yes, I did.
17 Q. What's the date on that?
18 A. 3-10-03.
19 Q. So that was in March of '03;
20 correct?
21 A. Yes, sir.
22 Q. All right. Now, I'd like you to
23 look through here with me the information

8 (Pages 29 to 32)

367 VALLEY AVENUE
(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

Page 37

1   Q. Then we go to what is Bates
2 stamped McKnight 0097. Under coverages,
3 it's got three hundred CSL listed there;
4 correct?
5   A. Yes, it does.
6   Q. Now, assuming that means three
7 hundred thousand dollar limits, that's a
8 mistake; correct?
9   A. Yes. But I never seen this in his
10 office.
11   Q. I understand that. All I'm asking
12 is, assuming this three hundred CSL means
13 that you had applied for three hundred
14 thousand dollar in limits, that's not what
15 you and Joe McKnight discussed; correct?
16   A. No, it is not.
17   Q. It's not what you intended;
18 correct?
19   A. No, it is not.
20   Q. So I'll tell you Mr. McKnight
21 testified that he intended to get you a one
22 million dollar policy and he doesn't know
23 how the three hundred thousand dollar limits

Page 38

1 were selected. Are you aware that he
2 testified to that?
3   A. No.
4   Q. Okay. But you are now since I
5 told you?
6   A. Yes.
7   Q. So again, you had already been
8 approved for a one million dollar policy
9 from Progressive in October of 2000;
10 correct?
11   A. Yes, sir.
12   Q. And when you met with Mr. McKnight
13 for this policy, you were willing to pay
14 premiums for a one million dollar policy;
15 correct?
16   A. Yes.
17   Q. So except for the fact that three
18 hundred thousand dollars was selected, you
19 would have gotten a million dollar policy as
20 far as you're concerned; correct?
21   A. Yes.
22   Q. And if the premiums had been a
23 little bit higher, you would have been

Page 39

1 willing to pay those additional premiums to
2 get the million dollar policy; correct?
3   A. Yes, sir.
4   Q. So just to summarize, as far as
5 you know, except for a clerical error in
6 filling out this application, you would have
7 been given a one million dollar policy from
8 Progressive?
9   A. Yes.
10   Q. So based on what you know about
11 Mr. McKnight saying what his intentions
12 were, he obviously missed the three hundred
13 thousand when this application was
14 completed?
15   MR. JINKS: And based on what you
16 told him Mr. McKnight said.
17   MR. TINDAL: Yes.
18   A. Yes, sir.
19   Q. Okay.
20   A. When I left Joe McKnight's office,
21 I thought I had a million dollars worth of
22 coverage under the -- under liability.
23   Q. All right. Now, at the time you

Page 40

1 signed the application, which I believe is
2 number 97 --
3   MR. JINKS: 99. You're referring
4 to the Bates stamp.
5   MR. TINDAL: With the signature.
6   MR. JINKS: It's 99.
7   MR. TINDAL: Thank you.
8   Q. Were all of these documents
9 together?
10   A. No, sir.
11   Q. You just received that one page?
12   A. Yes, sir, just that one page. He
13 was printing them off his computer. As he
14 was printing them off, then he handed me the
15 ones that I needed to sign.
16   Q. Okay.
17   A. So I signed them and I handed them
18 back to him.
19   Q. What did he do with these first
20 pages before the signature page? Did he
21 just leave them on the printer?
22   A. Yes, sir.
23   Q. Did you ask to see those pages?

10 (Pages 37 to 40)

**FREEDOM COURT REPORTING**

Page 41

```
 1      A.  No, I did not.
 2      Q.  But you could have asked if you
 3  wanted to; right?
 4      A.  Yes, sir.
 5      Q.  Okay. He didn't prevent you from
 6  looking at them?
 7      A.  No. No, sir.
 8      Q.  Okay. Now, let's look at what's
 9  marked as Defendant's Exhibit 3, which your
10  lawyer just told us that that should have
11  been included with the documents that were
12  in Exhibit 2; correct?
13      A.  Yes, sir.
14      Q.  What's the date on the first
15  document on the top right?
16      A.  8-8 of 2003.
17      Q.  That's August 8 of 2003?
18      A.  Yes.
19      Q.  And this is -- What is this
20  document?
21      A.  This is an insurance binder.
22      Q.  And then what's the second page?
23      A.  This is the certification of the
```

Page 42

```
 1  liability -- of the liability insurance.
 2      Q.  Okay. And what's the date up here
 3  on the top right?
 4      A.  3-8-04.
 5      Q.  So that's March 8 of 2004. That
 6  would have been the time that it was
 7  renewed; correct?
 8      A.  Yes, sir.
 9      Q.  Now, going back to the first page
10  here, do you recall going to Mr. McKnight's
11  office in August of 2003?
12      A.  No. I called him.
13      Q.  You called him?
14      A.  Yes, sir.
15      Q.  Okay.
16      A.  On the phone. I called him and I
17  told him I was looking at another truck.
18  The Freightliner I had, it was broke down
19  and I didn't want to put no more money into
20  that truck.
21          So I told Joe that I was -- that I
22  was looking at another truck and I was
23  thinking about buying it, but I wanted to
```

Page 43

```
 1  haul a load on it first. So he said that I
 2  would need a binder. So he took out the
 3  binder and faxed it to me at Riverside Turf.
 4      Q.  Okay. So this one right here in
 5  August of '03 was sent to Riverside Turf and
 6  you got a copy of it there?
 7      A.  Yes, sir.
 8      Q.  And is that -- the same is true
 9  for the second page?
10      A.  No.
11      Q.  How did you get the second page?
12  This is in March of 2004, the renewal.
13      A.  All right. This -- yes. Joe
14  McKnight called Riverside Turf. And then he
15  said that it was coming time for me to renew
16  my insurance.
17          And then the next day or so, I
18  went down there and I renewed my -- I
19  renewed the insurance.
20      Q.  Yes, sir.
21      A.  All right. Then he said that I
22  would receive everything from Progressive.
23      Q.  Go ahead.
```

Page 44

```
 1      A.  And I told Joe McKnight that I
 2  needed something to put in my truck to show
 3  that I had insurance and that -- or I was
 4  going to have to wait until Progressive
 5  mailed it to me. So then he run -- he gave
 6  me a copy of this right here.
 7      Q.  The second page of Exhibit 3?
 8  Okay.
 9      A.  Yes.
10      Q.  All right. Looking at the
11  documents that you produced to your lawyers
12  that in turn gave them to me, if you look at
13  the ones that are Bates stamped twelve and
14  thirteen, do you remember receiving that
15  document in 2005?
16      A.  Yes, I do.
17      Q.  That's in 2005?
18      A.  Yes, I do.
19      Q.  Did you receive one of those in
20  2004?
21      A.  No, I did not.
22      Q.  Okay. Now, on this second page of
23  Exhibit 3, it's got a fax line across the
```

11 (Pages 41 to 44)

**FREEDOM COURT REPORTING**

Page 49

1  A. Yes, it is.
2  Q. Is there any listing of the limits
3  for the insurance on this document?
4  A. No, sir, there is not.
5  Q. And the same for number seven; is
6  that correct?
7  A. Yes, sir.
8  Q. There's no limits on that page?
9  A. None at all, no, sir.
10 Q. The next page is a letter you
11 received when?
12 A. July the 9th of 2004.
13 Q. And you got this from Progressive;
14 right?
15 A. Yes, I did.
16 Q. And this was after the accident?
17 A. Yes. This is --
18 Q. Is this the -- go ahead.
19 A. This is the letter that
20 Progressive sent me telling me that I only
21 had three hundred thousand dollars --
22 Q. So up until that time --
23 A. -- coverage.

Page 50

1  Q. Up until that time, you thought
2  you had a million?
3  A. Yes.
4  Q. And did you call Joe McKnight when
5  you got this letter?
6  A. Yes, I did.
7  Q. What did you tell him?
8  A. I said Joe, that I have received a
9  letter from Progressive that -- showing that
10 I only had three hundred thousand dollars
11 worth of coverage. Now --
12 Q. And did he tell you I thought you
13 had a million dollars in coverage?
14 A. No, he did not. He said he would
15 look in on it. He would see what was wrong.
16 Q. When he found out that it was
17 three hundred thousand dollars, did he sound
18 surprised that it was not a million to you?
19 A. Yes, he did.
20 Q. Okay.
21 A. That is the same letter.
22 Q. That's Bates stamped number nine?
23 A. Yes, sir. I received both of

Page 51

1  those letters at the same time in separate
2  envelopes.
3  Q. Looking at these, I don't see any
4  difference between those two letters. Do
5  you?
6  A. No, sir. They are -- There isn't
7  any difference in them. They are the exact
8  same two letters that I received the same
9  day but in separate envelopes.
10 Q. Do you know why they sent you two
11 identical letters?
12 A. No, sir, I do not.
13 Q. Then the next page that's got the
14 number ten on the bottom right is another
15 letter from Progressive; right?
16 A. Yes, sir, it is.
17 Q. And did you receive this around
18 September 27, 2004?
19 A. Yes, sir, I did.
20 Q. Now, the truck that you added in
21 August of 2003, was that a 1995
22 International?
23 A. Yes, sir, it was.

Page 52

1  Q. Now, I want to show you what's
2  been Bates stamped as McKnight 0101 which is
3  the certificate of liability insurance from
4  March of 2003 and ask you if you recognize
5  that document?
6    (Whereupon, Defendant's Exhibit
7  No. 5 was marked for identification.)
8  A. Yes, I do.
9  Q. Okay. We've looked at -- I think
10 they are pretty similar to the ones that are
11 dated August of 2003 and March of 2004.
12 A. Uh-huh.
13 Q. But they were not in the stack of
14 documents that you produced. So is this a
15 document you did not receive?
16 A. Yes, sir, it is.
17 Q. You did receive it?
18 A. No, sir, I did not.
19 Q. Okay. Is this a document you
20 received?
21    MR. BAGGETT: What was the exhibit
22 number?
23    MR. TINDAL: 5.

13 (Pages 49 to 52)

367 VALLEY AVENUE
(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

## FREEDOM COURT REPORTING

Page 53

1  A. Yes, I did receive this -- excuse
2  me. I did.
3  Q. Okay. All right. How did you
4  receive that? I see it has your P.O. Box.
5  Was it something that was mailed to you?
6  A. Yes. Yes, it was.
7  Q. All right.
8  A. Yes, it was. It was mailed to me
9  by Joe McKnight.
10  Q. Okay. Do you know what happened
11  to your copy?
12  A. No, I do not.
13  Q. Okay.
14  A. It was in the truck with the rest
15  of -- the rest of my paperwork when I had
16  the accident.
17  Q. Okay.
18  A. Instead of throwing them away, I
19  just kept them all in one.
20  Q. Okay. Now, what I'm going to mark
21  as Defendant's Exhibit No. 6 is a three-page
22  document from Progressive and ask you if you
23  ever received that?

Page 54

1      (Whereupon, Defendant's Exhibit
2  No. 6 was marked for identification.)
3      MR. TULEY: Is that Bates
4  stamped?
5      MR. TINDAL: Yes. It's McKnight
6  0080. The first page is.
7      MR. JINKS: Was this in the group
8  of documents that we supplied to you?
9      MR. TINDAL: No. That's what I'm
10  showing I produced. What are the Bates
11  stamps?
12      MR. JINKS: McKnight 0080 through
13  0082.
14      MR. TINDAL: Okay.
15  A. No, sir, I have not --
16  Q. Okay.
17  A. -- received any of this at all.
18  Q. Looking back at Exhibit No. 3, the
19  first page from August of 2003, you --
20  A. Uh-huh.
21  Q. I'm sorry. You have to answer out
22  loud.
23  A. Yes, sir.

Page 55

1  Q. At that time, you still intended
2  on having a one million dollar policy;
3  correct?
4  A. Yes, sir.
5  Q. And as far as you know, Joe
6  McKnight intended for you to have a million
7  dollar policy at that time?
8  A. Yes, sir.
9  Q. So at the time the new truck was
10  added, neither one of you noticed the three
11  hundred thousand dollar limits as opposed to
12  the one million dollar limits; correct?
13  A. No, sir.
14  Q. Meaning neither one of you --
15  A. No, sir. I did not notice it.
16  The only thing I saw was the one that had my
17  signature on it, what you called the
18  application part of it.
19  Q. Yes.
20  A. That's all I have seen.
21  Q. Okay. You do understand that you
22  have to fill out an application to get an
23  insurance policy; correct?

Page 56

1  A. Yes, sir, I do.
2  Q. So you knew when you were filling
3  -- when you were answering the questions
4  for Mr. McKnight, that was to answer
5  questions on the application for the
6  insurance policy?
7  A. Yes, sir.
8  Q. I'll mark as Defendant's Exhibit
9  No. 7 another three-page document that's
10  Bates stamped McKnight 0120 through 0122 and
11  ask you if you ever received that document?
12      (Whereupon, Defendant's Exhibit
13  No. 7 was marked for identification.)
14  A. No, sir, I have not.
15  Q. Okay. And that is your P.O. Box;
16  correct?
17  A. Yes, sir.
18  Q. All right.
19  A. It is.
20  Q. And the same for Exhibit 7, that
21  is your correct P.O. Box?
22  A. Yes, sir, it is.
23  Q. Okay. Is it your understanding

14 (Pages 53 to 56)

**FREEDOM COURT REPORTING**

Page 57

1  that that document was supposed to come to
2  you from Progressive?
3     A. Yes, sir.
4     Q. Then I have marked Defendant's
5  Exhibit 8, McKnight 0105 and 0106, which is
6  a renewal notice from 2004, and ask you if
7  you remember seeing that?
8        (Whereupon, Defendant's Exhibit
9  No. 8 was marked for identification.)
10    A. No, sir, I do not.
11    Q. Okay. And that does have your
12 P.O. Box on there; correct?
13    A. Yes, sir, it does.
14    Q. And that was a document that looks
15 like it was being sent by Progressive;
16 correct?
17    A. Yes, sir. That's what it looks
18 like. But Joe McKnight called.
19    Q. Okay. I understand. And when you
20 went in, in March of 2004 to renew the
21 policy -- do you recall doing that?
22    A. Yes, sir, I do.
23    Q. -- did you go into Mr. McKnight's

Page 58

1  office?
2     A. Yes, sir.
3     Q. You did not have to fill out a new
4  application?
5     A. No, I did not. As a matter of
6  fact, the only thing I done was just took
7  him a check down there.
8     Q. Okay. Who wrote the check?
9     A. Riverside Turf.
10    Q. And then you were having a portion
11 of your paycheck taken out by Riverside Turf
12 to reimburse them for the premiums for the
13 insurance?
14    A. Yes, sir.
15    Q. So then the accident happened on
16 July 4, 2004; right?
17    A. Yes, sir.
18    Q. Then after you got the letter from
19 Progressive saying that you had three
20 hundred thousand dollar limits, you went
21 back to the McKnight Agency; correct?
22    A. No. The day of the accident, I
23 was trying to get a hold of Joe, Joe

Page 59

1  McKnight. Okay. He was on vacation. So I
2  left messages. When he got back off of
3  vacation, then he called me.
4        Then he was going over my policy
5  -- my policy and said I only had three
6  hundred thousand dollars worth of coverage.
7  I said no, sir, that ain't right. I'm
8  supposed to have a million.
9     Q. I'm further along in time now.
10 You went in at sometime in October of '04 to
11 have your policy limits increased to a
12 million; right?
13    A. Yes, sir.
14       MR. JINKS: Object to the form.
15 Ask him that again.
16    Q. In October of 2004, you went back
17 to the McKnight Agency about insurance;
18 correct?
19    A. Yes, I did.
20    Q. Okay. And during that meeting,
21 the -- or the purpose of that meeting was to
22 increase the limits from three hundred to a
23 million as to what y'all originally

Page 60

1  intended?
2     A. Yes, sir.
3        MR. JINKS: Object to the form.
4  The reason I'm objecting to the form is our
5  position is he had a million dollars worth
6  of coverage.
7        MR. TINDAL: Right. I
8  understand.
9        MR. JINKS: I know it's
10 semantics.
11       MR. TINDAL: I understand.
12    Q. That's why I'm saying. As you and
13 Joe McKnight intended the million dollars to
14 be in the beginning. Y'all did intend that
15 in the beginning; correct?
16    A. I talked with -- I talked with Joe
17 over the phone and he told me before I start
18 driving the truck again, that we needed to
19 upgrade to a million dollars.
20    Q. Okay.
21    A. Which I already thought I had a
22 million dollars.
23    Q. Okay. And it's your understanding

15 (Pages 57 to 60)

367 VALLEY AVENUE
(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397

**FREEDOM COURT REPORTING**

Page 61

1  at that time you had five points on your
2  record?
3    A.  I didn't know what my point system
4  was. I had no idea.
5    Q.  But it was after the accident,
6  though; correct?
7    A.  Sir?
8    Q.  It was after the July 4, 2004
9  accident that this process was done to get
10 it to a million?
11   A.  Yes, sir.
12   Q.  Okay. I'll just mark this as
13 Defendant's Exhibit 9, which is McKnight
14 0016.
15      (Whereupon, Defendant's Exhibit
16 No. 9 was marked for identification.)
17   A.  If the accident hadn't never
18 happened, I never would have known about the
19 three hundred thousand dollar coverage. I
20 would have always thought I had a million.
21   Q.  Well, there's no date on this
22 document that I've marked as Exhibit 9. But
23 does that appear to be an MVR report? Have

Page 62

1  you ever seen one before?
2    A.  Yes, sir.
3    Q.  Is that your MVR report?
4    A.  Yes, sir, it is.
5    Q.  And it shows your license date as
6  October 1, 2004 through October 2, 2008;
7  correct?
8    A.  Yes, sir.
9    Q.  So this would have been done at
10 some point after October 1, 2004; correct?
11   A.  Yes, sir.
12   Q.  Down at the bottom it has listed
13 some driving record information. You see
14 that?
15   A.  Yes, sir.
16   Q.  And it has your July 6, 2004 entry
17 for an accident; correct?
18   A.  Yes, sir.
19   Q.  All right. So after the wreck
20 occurred, Progressive issued you a one
21 million dollar policy; correct?
22   A.  Yes, sir.
23   Q.  And you had to pay the difference

Page 63

1  in premiums for the remainder of the year;
2  correct?
3    A.  Yes, sir, I did.
4    Q.  Okay. And you paid that?
5    A.  Yes, sir, I did.
6    Q.  And then in March of 2005, you
7  renewed your policy with Progressive;
8  correct?
9    A.  Yes, sir, I did.
10   Q.  And that was also for a million
11 dollars; correct?
12   A.  Yes, sir.
13   Q.  And you paid the premiums for a
14 million dollar policy; correct?
15   A.  Yes, sir, I did.
16   Q.  And is that policy still in force
17 today?
18   A.  Yes, sir, it is.
19   Q.  I'll mark this as Defendant's
20 Exhibit 10.
21      (Whereupon, Defendant's Exhibit
22 No. 10 was marked for identification.)
23   Q.  And I'll tell you, this is

Page 64

1  something that Joe McKnight printed out off
2  of a web site. But I want to ask you if you
3  have seen a document similar to that in
4  March of 2005? Before you answer, it is one
5  that you have already produced.
6    A.  Yes, sir.
7    Q.  Okay.
8        MR. JINKS: Now, the one you're
9  showing him is a little bit different.
10       MR. TINDAL: It is a little bit
11 different.
12   Q.  It's the declaration's page for
13 the March 2005 through March 2006 policy;
14 correct?
15       MR. JINKS: It appears to be.
16       MR. TINDAL: If y'all will give me
17 just a few minutes, I may be done.
18       (Whereupon, a short recess was
19 taken.)
20   Q.  Mr. Lane, I just have a few more
21 questions. Looking at the insurance cards
22 that are part of Exhibit 2 that are Bates
23 stamped R. Lane 002 --

16 (Pages 61 to 64)

**FREEDOM COURT REPORTING**

Page 65

1  A. Yes, sir.
2  Q. -- are these documents that Joe
3  McKnight gave to you at the time you applied
4  for insurance?
5  A. No, sir.
6  Q. These are not?
7  A. No, sir. These is the ones that I
8  -- that I received in the mail.
9  Q. All right. Did you ever receive a
10 copy of a policy from Progressive?
11 A. Well, I thought it was a policy.
12 As a matter of fact, in my first deposition,
13 I was asked that same question and I said
14 yes. What I thought was my policy was these
15 right here or this right here.
16 Q. Okay. The certificate of
17 liability insurance and the binder?
18 A. Yes, sir. That's what I thought
19 was my policy.
20 Q. So you never received a policy
21 from Progressive?
22 A. No, sir. Never.
23 Q. Now, when you went back in August

Page 66

1  of 2003 to switch the trucks, do you recall
2  a discussion with Mr. McKnight about a loss
3  payee under the policy?
4  A. A loss what, sir?
5  Q. A loss, L-O-S-S, payee?
6  A. No.
7  Q. Okay. Do you know that -- Did you
8  tell him at the time that you switched the
9  trucks, that Riverside Turf had some
10 interest in your insurance coverage?
11 A. Yes, sir.
12 Q. And was Riverside Turf added to
13 some of the documents?
14 A. Joe McKnight asked me who was
15 going to be the lienholder. And I told him
16 Riverside Turf.
17 Q. And is it your understanding that
18 Mr. McKnight -- Was it your understanding
19 that Mr. McKnight entered some information
20 on the computer in August of 2003 adding
21 Riverside Turf as the loss payee or the
22 lienholder?
23 A. Yes, sir.

Page 67

1  Q. Have you ever had problems in the
2  past with getting mail to you?
3  A. No, sir.
4  Q. Okay. And I should have asked you
5  this at the beginning. Are you a member of
6  any social organizations like the Shriner's
7  or just any type of social club?
8  A. No, sir.
9  Q. Hunting club?
10 A. No, sir, I am not.
11 Q. Do you go to church?
12 A. No, sir.
13 Q. Okay.
14    MR. TINDAL: That's all I have.
15 Thank you.
16 EXAMINATION BY MR. BAGGETT:
17 Q. Mr. Lane, my name is Evan
18 Baggett. We met just a few minutes ago.
19 I'll be real quick.
20    I believe you testified earlier
21 that if this wreck, if this July '04 wreck
22 never would have happened, you would have
23 thought you had one million dollar policy

Page 68

1  limits?
2  A. Yes, sir.
3  Q. Is that correct?
4  A. Yes, sir, it is.
5  Q. Did anybody who worked for
6  Progressive ever tell you that you had one
7  million dollar policy limits?
8  A. No, sir.
9  Q. Did anybody at all tell you that
10 you had one million dollar policy limits?
11 A. No, sir.
12 Q. Why would you have thought you had
13 a million dollar policy limits prior to this
14 wreck?
15 A. On my certification papers that I
16 took -- as I -- I'm going to state this --
17 for my policy, it had a million dollars on
18 it. I did not understand it. So I got my
19 oldest daughter to read it to me.
20 Q. You're talking about the
21 certification papers and the binder that we
22 just talked about?
23 A. Yes, sir.

17 (Pages 65 to 68)

367 VALLEY AVENUE
(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

**FREEDOM COURT REPORTING**

Page 69

1  Q. Who sent you those certification
2  papers?
3  A. Joe McKnight.
4  MR. TINDAL: Object to the form.
5  Asked and answered. Sorry.
6  Q. From the time you went to Mr.
7  McKnight's office to apply for the March
8  2003 policy that we've talked about earlier
9  today --
10  A. Yes, sir.
11  Q. -- until this July 2004 wreck, did
12  you ever speak directly with any employee of
13  Progressive?
14  A. No, sir.
15  Q. Did you talk with anybody at
16  Progressive after this accident?
17  A. Yes.
18  Q. When was that? How long after the
19  accident?
20  A. The day of the accident, the next
21  day of the accident, the next day after that
22  and the next day after that. So for four
23  days straight in a row, I was talking

Page 70

1  directly to Progressive.
2  Q. Do you remember that person's
3  name?
4  A. No, sir, I do not.
5  Q. Was is it the same person on all
6  those occasions?
7  A. No, sir, it was not.
8  Q. But you spoke to them on the
9  telephone?
10  A. Yes, I did.
11  MR. BAGGETT: That's all I've
12  got.
13  EXAMINATION BY MR. KNOWLES:
14  Q. Mr. Lane, I've got just a few. My
15  name is Jeremy Knowles. And my law partner
16  Randy Haynes deposed you a few months ago.
17  Do you remember that? Or took your
18  deposition?
19  A. Yes, sir.
20  Q. Randy Haynes, do you remember him?
21  A. Yes, sir.
22  Q. He asked you a bunch of
23  questions. I'm not going to go over all of

Page 71

1  that. But he asked you a lot of questions
2  about your insurance. And some of those
3  have been asked again today. So I'm going
4  to try not to go over that, too.
5  But the bottom line, it's true,
6  isn't it, that you went in and asked Mr.
7  McKnight for a million dollars in liability
8  coverage? Is that true?
9  A. I went in to ask to get any
10  insurance. The very first time I went in
11  his office for it, for insurance, I had no
12  idea what to get from what.
13  Q. I understand.
14  A. I knew that there was so many
15  different parts of the insurance. So I left
16  that up to Joe McKnight.
17  Q. I understand. But back in March
18  of '04, you knew and Joe knew that you
19  needed at least seven hundred and fifty
20  thousand?
21  A. Yes, sir.
22  Q. And there was some talk about it's
23  not much difference in the cost, so I'll

Page 72

1  just get the mill?
2  A. Yes, sir.
3  Q. That's true, isn't it?
4  A. Yes, sir.
5  Q. And so you intended to get a
6  million, and as far as you know, Mr.
7  McKnight intended to get you a million
8  dollars in coverage?
9  A. Yes, sir.
10  Q. All right. And you left his
11  office thinking you had a million dollars?
12  A. Yes, sir.
13  Q. The day of the wreck with Ms.
14  Beasley, you thought you had a million
15  dollars?
16  A. Yes, sir.
17  Q. It was the next day when somebody
18  told you that, hey, I don't think you've got
19  a million, I think you've got three hundred
20  thousand or three hundred and fifty thousand
21  or something; is that correct?
22  A. Yes, sir.
23  Q. All right. Now, you've already

18 (Pages 69 to 72)

**367 VALLEY AVENUE**
(877) 373-3660    BIRMINGHAM, ALABAMA    (205) 397-2397