# EXHIBIT A
## RICKY ALLEN LANE DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PROGRESSIVE SPECIALTY )
INSURANCE COMPANY, )
Plaintiff, )
vs. ) CASE NUMBER:
MCKNIGHT AGENCY, INC., ) 2:05-CV-438-W
JOE MCKNIGHT; RICKY LANE;)
RIVERSIDE TURF FARM, )
et al., )
Defendants. )

COPY

DEPOSITION OF RICKY ALLEN LANE

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy Weldon, am hereby delivering to Mark E. Tindal, the original transcript of the oral testimony taken on the 15th day of November, 2005, along with exhibits.

Please be advised that this is the

Q. You receive it at your mailbox out in front of your house and at the post office box?

A. Yes.

Q. All right. If you could briefly go through your education for us.

A. The ninth grade. I went through the second semester of my ninth grade. I quit school.

Q. Is that middle school or high school?

A. High school.

Q. Which high school?

A. It was Carter High in Knoxville, Tennessee.

Q. All right. I don't mean to offend you by asking this question. I just have to. Are you able to read and write?

A. No.

Q. You're not?

A. Very little.

Q. Very little?

A. Yes.

Q. And then he would type them in?

A. Yes, sir.

Q. Now, looking back on the one that has the number thirteen at the top right, I just want to make sure that the information that he entered was correct.

It has under general information -- it has your name as Ricky Lane. That's correct?

A. Yes, sir.

Q. And your home phone number, is that correct?

A. No, sir.

Q. Was it correct at the time?

A. Yes, sir.

Q. Okay. And the company at the time was C & D Express?

A. Yes, sir.

Q. And it has the address as Route 1, Box 77, Shorterville, Alabama. Was that correct at the time?

A. Yes, sir.

Q. And it says business type,

Q. Do you remember coming in to Mr. McKnight's office around March or February of 2003?

A. Yes, I do.

Q. What was the reason you came in?

A. To take out a policy where I could start hauling sod.

Q. Okay. And so at that time, you knew that you needed at least seven hundred and fifty thousand dollars of coverage?

A. Yes.

Q. So you asked Mr. McKnight for seven hundred and fifty thousand; correct?

A. No. I asked him for a million dollars.

Q. Okay. So when you came in, you said I want to get the million?

A. Yes.

Q. Okay. And that was to provide you coverage on the -- on your tractor, your truck?

A. Yes.

Q. For hauling for Riverside Turf; is

A. Yes.

Q. You would answer the questions and he would type the answers into the computer?

A. Yes.

Q. And I'll tell you Mr. McKnight testified that when he was filling out that application in March of 2003 or February of 2003, whenever it was, that he intended to get you a one million dollar policy. Are you aware that he testified to that?

A. No.

Q. Okay.

A. I am not aware of that.

Q. But you know now that Mr. McKnight is taking the position that he intended to get you a one million dollar policy from Progressive?

A. Yes.

Q. I'm going to show you what I'm going to mark as Exhibit 4, which I'll represent to you is the application for the 2003 policy.

(Whereupon, Defendant's Exhibit

No. 4 was marked for identification.)

Q. I'll ask if you recognize any of those documents?

A. Just this one.

Q. Okay. And you're pointing to the page that's Bates stamped?

MR. JINKS: 99.

Q. McKnight 0099?

A. Uh-huh. Yes, sir.

Q. And that is the application for this policy that you signed in March of 2003; correct?

A. Yes, sir.

Q. Okay. And you signed that at Mr. McKnight's office; is that right?

A. Yes, I did.

Q. What's the date on that?

A. 3-10-03.

Q. So that was in March of '03; correct?

A. Yes, sir.

Q. All right. Now, I'd like you to look through here with me the information

A. No, I did not.

Q. But you could have asked if you wanted to; right?

A. Yes, sir.

Q. Okay. He didn't prevent you from looking at them?

A. No. No, sir.

Q. Okay. Now, let's look at what's marked as Defendant's Exhibit 3, which your lawyer just told us that that should have been included with the documents that were in Exhibit 2; correct?

A. Yes, sir.

Q. What's the date on the first document on the top right?

A. 8-8 of 2003.

Q. That's August 8 of 2003?

A. Yes.

Q. And this is -- What is this document?

A. This is an insurance binder.

Q. And then what's the second page?

A. This is the certification of the

liability -- of the liability insurance.

Q. Okay. And what's the date up here on the top right?

A. 3-8-04.

Q. So that's March 8 of 2004. That would have been the time that it was renewed; correct?

A. Yes, sir.

Q. Now, going back to the first page here, do you recall going to Mr. McKnight's office in August of 2003?

A. No. I called him.

Q. You called him?

A. Yes, sir.

Q. Okay.

A. On the phone. I called him and I told him I was looking at another truck. The Freightliner I had, it was broke down and I didn't want to put no more money into that truck.

So I told Joe that I was -- that I was looking at another truck and I was thinking about buying it, but I wanted to

haul a load on it first. So he said that I would need a binder. So he took out the binder and faxed it to me at Riverside Turf.

Q. Okay. So this one right here in August of '03 was sent to Riverside Turf and you got a copy of it there?

A. Yes, sir.

Q. And is that -- the same is true for the second page?

A. No.

Q. How did you get the second page? This is in March of 2004, the renewal.

A. All right. This -- yes. Joe McKnight called Riverside Turf. And then he said that it was coming time for me to renew my insurance.

And then the next day or so, I went down there and I renewed my -- I renewed the insurance.

Q. Yes, sir.

A. All right. Then he said that I would receive everything from Progressive.

Q. Go ahead.

A. Yes, it is.
Q. Is there any listing of the limits for the insurance on this document?
A. No, sir, there is not.
Q. And the same for number seven; is that correct?
A. Yes, sir.
Q. There's no limits on that page?
A. None at all, no, sir.
Q. The next page is a letter you received when?
A. July the 9th of 2004.
Q. And you got this from Progressive; right?
A. Yes, I did.
Q. And this was after the accident?
A. Yes. This is --
Q. Is this the -- go ahead.
A. This is the letter that Progressive sent me telling me that I only had three hundred thousand dollars --
Q. So up until that time --
A. -- coverage.

Q. Up until that time, you thought you had a million?

A. Yes.

Q. And did you call Joe McKnight when you got this letter?

A. Yes, I did.

Q. What did you tell him?

A. I said Joe, that I have received a letter from Progressive that -- showing that I only had three hundred thousand dollars worth of coverage. Now --

Q. And did he tell you I thought you had a million dollars in coverage?

A. No, he did not. He said he would look in on it. He would see what was wrong.

Q. When he found out that it was three hundred thousand dollars, did he sound surprised that it was not a million to you?

A. Yes, he did.

Q. Okay.

A. That is the same letter.

Q. That's Bates stamped number nine?

A. Yes, sir. I received both of

limits?

A. Yes, sir.

Q. Is that correct?

A. Yes, sir, it is.

Q. Did anybody who worked for Progressive ever tell you that you had one million dollar policy limits?

A. No, sir.

Q. Did anybody at all tell you that you had one million dollar policy limits?

A. No, sir.

Q. Why would you have thought you had a million dollar policy limits prior to this wreck?

A. On my certification papers that I took -- as I -- I'm going to state this -- for my policy, it had a million dollars on it. I did not understand it. So I got my oldest daughter to read it to me.

Q. You're talking about the certification papers and the binder that we just talked about?

A. Yes, sir.