# EXHIBIT B
## JOE MCKNIGHT DEPOSITION

FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5  PROGRESSIVE SPECIALTY COMPANY,

6            Plaintiff,

7      versus                    2:05-CV-438-W

8  MCKNIGHT AGENCY, INC., et al.,

9            Defendants.

10

11                                    COPY

12

13

14        * * * * * * * * * * * * *

15        DEPOSITION OF JOE MCKNIGHT,

16  taken pursuant to stipulation and agreement

17  before Jackie Parham, Certified Shorthand

18  Reporter and Commissioner for the State of

19  Alabama at Large, in the law offices of Lloyd,

20  Gray & Whitehead, 2501 Twentieth Place South,

21  Suite 300, Birmingham, Alabama, on Friday, the

22  28th day of October, 2005, commencing at

23  approximately 9:20 a.m.

# FREEDOM COURT REPORTING

Page 8

1   here about a policy of insurance that was

2   sold to an individual named Ricky Lane?

3   A.   Yes, sir.

4   Q.   Tell me what your experience is in the

5   insurance field.

6   A.   Well, I've been in the insurance business

7   since 1982.

8   Q.   And starting in 1982, take us from that

9   date up through today in terms of where

10  you worked, and what you did, and along

11  the way what licenses you have acquired.

12  A.   Okay.  In 1982 I started as a life and

13  health agent as an employee of United

14  Insurance Company.  In 1992 I got my

15  property and casualty license and opened

16  McKnight Agency.  And --

17  Q.   Did you have a life and health license?

18  A.   I had a life and health license until

19  1992.

20  Q.   And then you obtained a property license?

21  A.   Yes, sir.

22  Q.   Property and casualty?

23  A.   Right.

**367 VALLEY AVENUE**
(877) 373-3660    **BIRMINGHAM, ALABAMA**    (205) 397-2397

# FREEDOM COURT REPORTING

1   Q.   And both of those licenses are issued by

2       the Alabama Department of Insurance; is

3       that right?

4   A.   That's correct.

5   Q.   Okay. From 1982 until '92 did you work

6       just for United?

7   A.   I worked for a brief time for Metropolitan

8       Life.

9   Q.   And I haven't even asked you. What is

10      your residence and business addresses?

11  A.   203 West Washington Street in Abbeville.

12      And that's both of them. I live there,

13      and my office is in my house.

14  Q.   Okay. Now, we got up to 1992 when you

15      obtained your property and casualty

16      license.

17  A.   Right. And that's when I started McKnight

18      Agency.

19  Q.   And did you own the McKnight Agency alone,

20      that is, you were the sole owner of that

21      business?

22  A.   Yes, sir.

23  Q.   Was it a corporation?

## FREEDOM COURT REPORTING

1   A.   Yes, sir.

2   Q.   And when did you sell it to Young,

3        Johnston & Associates?

4   A.   December of 2004.

5   Q.   From 1992 until December of 2004 did you

6        sell at the McKnight Agency any other

7        types of insurance aside from property and

8        casualty?

9   A.   No, sir.

10  Q.   Okay.  What companies did you sell for?

11  A.   Progressive, Sagamore, Victoria.  We had a

12       number of brokerage contracts with

13       companies like Southern Cross

14       Underwriters, Britt Paulk Insurance

15       Agency, Grechian (phonetic) & Associates,

16       Insurance Connection, Burns & Wilcox,

17       Dagle (phonetic) & Associates.  That's

18       basically the main ones.

19  Q.   Okay.

20            MR. WHITEHEAD:  You named about

21                 half of my clients.

22  Q.   When did you start selling for

23       Progressive?

# FREEDOM COURT REPORTING

1   A.    Probably in '92.

2   Q.    And was there a contract or agreement that

3         set forth the relationship between

4         Progressive and the McKnight Agency?

5   A.    Yes, sir.

6   Q.    And what is that document called?

7   A.    I guess it would be a Producer's

8         Agreement.

9   Q.    Okay.  And in that Producer's Agreement,

10        or whatever the correct term is, what was

11        the McKnight Agency designated as?

12        Producer?

13  A.    Agent, producer.  I'm not sure.

14  Q.    What types of Progressive products did you

15        sell?

16  A.    Auto and commercial auto.

17  Q.    Auto and commercial auto?

18  A.    Uh-huh (positive response).

19  Q.    Yes, sir?

20  A.    Yes.

21  Q.    Okay.  And commercial auto, generally

22        speaking, that would be in the trucking

23        business?

# FREEDOM COURT REPORTING

1    be hauling.  And when we get through and

2    get to the end of the steps in this

3    process, it gives us the premium and the

4    payment plans that are available.

5    Q.    Okay.  Has that been true for at least the

6    last five years, that's the way it's

7    worked?

8    A.    Yes, sir.

9    Q.    Would you have to call anyone in Cleveland

10    or some other place for Progressive as

11    part of the process to insure someone?

12    A.    No, sir.

13    Q.    What about underwriting, how is that done,

14    if it is done?

15    A.    Well, the software itself has a list of

16    questions that it asks about what you're

17    hauling and your distances and that sort

18    of stuff.  And then their software runs

19    all the reports that you need, does all

20    the underwriting for you.  It does the

21    Retail Credit Report.  It checks the VIN

22    of the vehicle to make sure that you've

23    classed it right as far as weight.  And it

## FREEDOM COURT REPORTING

1    runs a Motor Vehicle Report.  And those

2    three criteria are basically what

3    determines what the premium is.

4  Q.  And Motor Vehicle Report, is that checking

5    the driver's history?

6  A.  Yes, sir.

7  Q.  So that's done by the Progressive computer

8    system; is that right?

9  A.  That's correct.

10  Q.  But if you put that information in and

11    this hypothetical person had a good enough

12    driving record, then you have the

13    authority to bind Progressive; is that

14    true?

15  A.  The software wouldn't let you bind if the

16    points were too high or something.

17  Q.  For example, if I walked in and my license

18    were revoked, the software wouldn't let

19    you bind?  Is that what you're saying?

20  A.  I think that's right.  I know if you've

21    got too many points, then it wouldn't

22    allow you to bind certain amounts of

23    coverage.

## FREEDOM COURT REPORTING

Page 22

1  Q.    Okay.  And the truckers would obtain

2        insurance through the McKnight Agency, and

3        then you would provide proof via a

4        certificate to Mr. Morris at Riverside

5        Turf; is that right?

6  A.    That's correct.

7  Q.    Do you know his partner, Mr. Nixon?

8  A.    No, sir.

9  Q.    Was there any requirement that you know of

10       that Ray Morris and Riverside Turf

11       required of the drivers who obtained

12       coverage?

13 A.    They usually required a million dollars.

14 Q.    Did you understand that Riverside Turf

15       sold its products in several southeastern

16       states?

17 A.    Yes, sir.

18 Q.    And you knew that that would constitute

19       interstate trucking?

20 A.    Right.

21              MR. SEARS:  Object to the form.

22 Q.    Let me direct this to your lawyer.

23              MR. HAYNES:  Steve, do you have

## FREEDOM COURT REPORTING

1   Q.   I want to look at that first one there

2        that bears Bates number 0001. And I've

3        marked that document, which is apparently

4        an invoice, as Plaintiff's Exhibit 1.

5        This appears to be an invoice to Ricky

6        Lane, care of Riverside Turf, dated March

7        10, 2003. Do you see that?

8   A.   Yes, sir.

9   Q.   It shows that the company insuring

10       Mr. Lane was Progressive; is that right?

11  A.   That's correct.

12  Q.   And it shows under the heading Description

13       one million dollars liability; is that

14       right?

15  A.   That's correct.

16  Q.   Is that the date you had the discussion

17       with Ricky Lane about his need for

18       $750,000.00 or more in liability insurance

19       so as to comply with federal and state

20       law?

21  A.   Yes, sir.

22  Q.   Tell me what the discussion was between

23       you and Mr. Lane on that date.

## FREEDOM COURT REPORTING

1       Ray Morris and Riverside Turf, that it was

2       an interstate situation --

3  A.    Right.

4  Q.    -- whereby the federal laws will have to

5       be complied with in terms of the amount of

6       liability insurance; is that right?

7  A.    That's true.

8  Q.    And then you said to Ricky Lane that it

9       wasn't much difference in the cost between

10      one million dollars worth of liability

11      insurance versus 750,000; is that right?

12  A.    That's correct.

13  Q.    And, so, you billed Mr. Lane for a million

14      dollars worth of liability insurance; is

15      that right?

16  A.    That's correct.

17          MR. WHITEHEAD:  Object to the

18             form.  The document speaks

19             for itself.

20  Q.    Did the insurance that covered Ricky Lane

21      from March 10, 2003 for one year, did that

22      end up being one million dollars of

23      liability insurance?

# FREEDOM COURT REPORTING

1   A.    Could you repeat that?

2   Q.    I'm not sure. Did Mr. -- Let me strike

3         that and start all over.

4            It was clear, wasn't it,

5         Mr. McKnight, that Ricky Lane wanted a

6         million dollars worth of insurance; is

7         that right?

8   A.    Yes, sir.

9   Q.    And you intended for Ricky Lane to have

10        one million dollars worth of liability

11        insurance through Progressive; is that

12        true also?

13   A.    That's true.

14   Q.    So both of you wanted one million dollars

15        worth of Progressive Insurance, correct?

16   A.    That's right.

17   Q.    And also Mr. Morris over at Riverside Turf

18        was requiring either 750 or a million

19        dollars worth of insurance, wasn't he?

20   A.    That's correct.

21   Q.    So, as far as you know, that's what

22        everybody intended when he first obtained

23        Progressive -- Ricky Lane first obtained

## FREEDOM COURT REPORTING

Page 33

| | | |
|---|---|---|
| 1 | | these documents in your file reflect what |
| 2 | | you called the pull-down menu? |
| 3 | A. | No, sir. |
| 4 | Q. | Okay. But when you -- It's like ordering |
| 5 | | a -- I ordered some maple syrup from |
| 6 | | Vermont one time. You can get 6 ounces, |
| 7 | | 12 ounces, 18 or 24. And it's got -- you |
| 8 | | take your computer mouse and select which |
| 9 | | one you want; is that right? |
| 10 | A. | That's correct. |
| 11 | Q. | I guess something similar is what happened |
| 12 | | here. You intended to click one million |
| 13 | | dollars worth of liability insurance but |
| 14 | | apparently you clicked 300,000. Is that |
| 15 | | what happened? |
| 16 | A. | Apparently so, yes, sir. |
| 17 | Q. | But just to dispense with why it happened, |
| 18 | | it was simply a mistake, apparently, on |
| 19 | | your part; is that right? |
| 20 | A. | That's correct. |
| 21 | Q. | When you would obtain coverage for |
| 22 | | truckers through Progressive, did you |
| 23 | | personally handle that or did you assign |

# FREEDOM COURT REPORTING

1      after March 10th, 2003?

2  Q.   Yes, sir.

3  A.   What would Ricky have gotten in the mail?

4  Q.   Right.

5  A.   He would have gotten a coupon book from a

6      premium finance specialist.

7  Q.   All right.

8  A.   To make his payments to the premium

9      finance company.

10  Q.   Okay.

11  A.   And he would have gotten a copy of a

12      policy and I.D. cards from Progressive.

13  Q.   Did anybody else get a copy of the policy?

14  A.   I got an agent's copy.  Yes, sir.

15  Q.   What about Riverside Turf, would they get

16      a copy?

17  A.   At that time I don't think they would

18      have.  Because Ricky only applied for

19      liability coverage in the beginning.

20  Q.   Did Riverside Turf get a certificate from

21      you?

22  A.   Yes, sir.  And --

23  Q.   I didn't mean to cut you off.

# FREEDOM COURT REPORTING

1   A.   I faxed a copy to Riverside on the 10th,

2       the day that he bought the policy.

3   Q.   And did that copy that you faxed to

4       Riverside on March 10, 2003, did it

5       reflect one million dollars worth of

6       liability limits?

7   A.   Yes, sir.

8           (Plaintiff's Exhibit 4 marked

9             for purposes of identification)

10  Q.   I'm going to mark as Plaintiff's Exhibit 4

11      a Certificate of Liability Insurance that

12      appears to be from March 10, 2003 through

13      March 10, 2004.  It reflects a combined

14      single limit of a million dollars.  Do you

15      see that?

16  A.   Yes, sir.

17  Q.   Is that a copy of the certificate that you

18      would have faxed to Riverside Turf?

19  A.   Yes, sir.

20  Q.   Did Progressive authorize you as their

21      agent to send this certificate to

22      Riverside Turf?

23        MR. SEARS:  Object to form.

# FREEDOM COURT REPORTING

1    the wrong box?

2  A.    Yes, sir.

3  Q.    And when Ricky Lane -- did he actually

4    come back in to renew in March of 2004?

5  A.    Yes, sir.  I don't remember what date he

6    came in.  I don't remember when.

7  Q.    Sir?

8  A.    I really don't remember if he came back in

9    or if he -- I think he did, though.

10    Because we would have had some documents

11    for him to sign with National Fire and

12    Marine.

13  Q.    And do they have the cargo coverage?

14  A.    Yes, sir.  But there would have been no

15    application or any reason for him to come

16    back in on the Progressive.

17  Q.    Let me show you two documents, Mr.

18    McKnight.  The first I'm going to mark as

19    Plaintiff's Exhibit Number 5.  And it has

20    the Bates number of 0015.  It appears to

21    me to be a Progressive Insurance Company's

22    receipt dated March 8, 2004 and reflecting

23    a payment of $4219.00 to Progressive.  Do

## FREEDOM COURT REPORTING

```
1    Q.     You knew he was still hauling for
2           Riverside Turf, didn't you?
3    A.     Yes, sir.
4    Q.     And is it correct that it would have been
5           your understanding that he needed 750,000
6           or more in limits; is that right?
7    A.     Yes, sir.
8    Q.     And was it also your assumption and belief
9           that he, in fact, had one million dollars
10          of liability limits through Progressive?
11   A.     Yes, sir.
12   Q.     And, apparently, that was his
13          understanding also?
14                    MR. WHITEHEAD:  Object to the
15                         form.
16   A.     I can't answer for what his understanding
17          was.  But it was my understanding.
18   Q.     Well, you told me earlier, I thought, you
19          read some of his testimony.  That was his
20          understanding, according to his deposition
21          testimony, wasn't it?
22   A.     Yes, sir.
23                    MR. WHITEHEAD:  Well, okay.
```

**FREEDOM COURT REPORTING**

```
 1              the same day we uploaded the money.

 2                   (Plaintiff's Exhibit 7 marked

 3                    for purposes of identification)

 4      Q.     Let me show you Plaintiff's Exhibit 7,

 5             Mr. McKnight.  Is that a copy of the March

 6             2004 certificate to Riverside Turf?

 7      A.     Yes, sir.

 8      Q.     And does that likewise reflect liability

 9             limits of one million dollars?

10      A.     Yes, sir.

11                   (Off-the-Record discussion)

12      Q.     Mr. McKnight, have you ever discussed the

13             point system with -- the Progressive point

14             system with anyone at Riverside Turf?

15      A.     Not to my knowledge.

16      Q.     How did you know to send a Certificate of

17             Insurance on Ricky Lane to Riverside Turf?

18      A.     Ricky told me he was going to be hauling

19             for Riverside.  So if he's hauling, Ray is

20             going to need a certificate.

21      Q.     Is that just normal business procedure?

22      A.     Yes.

23      Q.     Do you do that for all your trucker
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

# FREEDOM COURT REPORTING

```
 1            was an issue or question about the amount

 2            of Ricky Lane's liability limits?

 3     A.     It was -- I don't know.  It was a week or

 4            so later Ricky called me and said that

 5            Progressive told him he only had 300,000.

 6            And I told him I didn't think that was

 7            correct.  And I went to the file and

 8            pulled his file and then went through the

 9            policy and found where he did, in fact,

10            have 300,000.

11     Q.     Did you say anything to Ricky other than

12            you didn't believe that to be the case?

13     A.     Initially, before I checked the file?

14     Q.     Yes, sir.  Before you checked the file.

15     A.     I don't recall saying anything else.

16     Q.     After you checked the file did you talk

17            again to Ricky Lane?

18     A.     Yes, sir.

19     Q.     And when was that conversation?

20     A.     He held on while I pulled his file.

21     Q.     Oh, okay.  So you went and pulled his file

22            while he was on hold?

23     A.     Yes, sir.
```

## FREEDOM COURT REPORTING

1    Q.    And when you came back on the phone, what

2          did you say to Ricky?

3    A.    I told him, I said, "I don't know how it

4          happened, but you've got 300,000 is what

5          the policy says." And I didn't know how

6          it happened.

7    Q.    Did you ever say anything to Ricky to the

8          effect that you'll have a million dollars

9          of liability limits either through

10         Progressive because of what you had

11         previously told him and what you had done

12         or from your own E and O carrier?

13    A.    I don't recall that. No, sir.

14    Q.    Did you ever talk to anyone at Progressive

15         Insurance about the mistake in Ricky

16         Lane's getting insured and actually

17         getting underinsured?

18    A.    Sometime after they talked to Ricky I got

19         a call from -- it may be in the file

20         somewhere. I don't recall his name. But

21         he wanted a copy of the application faxed

22         to him. And I faxed it to him. But I

23         don't remember any kind of statements at

## FREEDOM COURT REPORTING

Page 63

```
1        dollars coverage?  That's not what
2        happened, is it?
3                MR. SEARS:  Object to the form.
4   A.   No.
5   Q.   In fact, he did qualify, and you and he
6        intended for him to have a million
7        dollars; is that right?
8                MR. SEARS:  Same objection.
9   A.   That's correct.
10  Q.   And but for your mistake, he would have
11       had a million dollars coverage; is that
12       right?
13               MR. WHITEHEAD:  Object to the
14                   form.
15               MR. SEARS:  Same objection.
16  A.   Yes, sir.
17  Q.   I don't believe I have anything else.
18       Thank you, Mr. McKnight.
19                   EXAMINATION
20  BY MR. LYONS:
21  Q.   Mr. McKnight, my name is Randy Lyons.  I
22       represent Riverside Turf.  I've just got a
23       couple of questions I want to ask you
```

## FREEDOM COURT REPORTING

1           anyone else assisted in the procurement of

2           Ricky Lane's policy; is that true?

3     A.    That's correct.

4     Q.    All right.  And you would be the one

5           responsible for inputting the information

6           into Progressive's software to procure

7           that coverage for Ricky Lane; is that

8           true?

9     A.    That's true.

10    Q.    Are you contending at all that there's

11          anything Progressive's representatives did

12          or didn't do to procure the policy for

13          Ricky Lane?

14    A.    Could you repeat that?  I don't quite --

15    Q.    It's probably a poor question.

16          Do you place any of the blame or

17          fault for the improper procurement of

18          Ricky Lane's policy on Progressive's

19          representatives?

20                MR. WHITEHEAD:  Object to the

21                form.

22    Q.    You can answer.

23    A.    As far as completing this application?

## FREEDOM COURT REPORTING

1  Q.  Right.

2  A.  No, sir.

3  Q.  So you don't believe they did anything

4     wrong in obtaining this policy?

5  A.  No, sir.

6  Q.  At the time that you obtained the policy

7     originally for Ricky Lane in 2003 and in

8     2004, did you have any conversations

9     whatsoever with any of Progressive's

10    representatives about the policy?

11 A.  Not to my knowledge.

12 Q.  My real question is, did you ever call

13    them up and say, "Hey, I'm sitting here

14    looking at your software, and I need to

15    get this guy a million dollars worth of

16    coverage.  Tell me how to do it"?

17 A.  No, sir.

18 Q.  You knew how to do it correctly?

19 A.  Yes, sir.

20 Q.  You had been trained on how to use that

21    software?

22 A.  I don't recall ever receiving any

23    training.  It was a program we had been

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

## FREEDOM COURT REPORTING

1            using for years.  And I don't recall ever

2            receiving any training on it.

3    Q.     How long did you use that program?

4    A.     We've been using the Pro-Rater system for

5            seven or eight years, I guess.

6    Q.     Had you ever had any previous problems

7            with the Pro-Rater system?

8    A.     No, sir.

9    Q.     And you believe at that time in 2003 you

10           knew how to accurately use the Pro-Rater

11           system?

12   A.     Yes, sir.

13   Q.     And just to make sure I understand.  You

14           never called Progressive either in 2003 or

15           2004, when you were obtaining the policies

16           for Ricky Lane, to discuss either coverage

17           or problems with the Pro-Rater system?

18   A.     No, sir.

19   Q.     After you uploaded -- Before I get to

20           that, once you went to the pull-down menu

21           to select the limits of coverage for

22           Mr. Lane originally in 2003, was there a

23           button that you had to press or a link

## FREEDOM COURT REPORTING

1        policy and/or the dec page?

2  A.    I remember reviewing it.  Yes, sir.

3  Q.    Now, what I want you to do, if you don't

4        mind, is look at I think it's your

5        Bates-stamp number -- it's been copied

6        several times, but it looks like it's 80

7        and 112.  Do you have either of those?

8  A.    Yes, sir.

9  Q.    And at the top -- It says McKnight 80 on

10       the bottom but at the top it says policy

11       period March 10, 2003 to March 10, 2004;

12       is that correct?

13  A.   That's correct.

14  Q.   Is this your copy of the dec page that you

15       received from Progressive?

16  A.   Yes, sir.

17  Q.   And this would have been sent to you as,

18       quote, the agent's copy; is that correct?

19  A.   That's correct.

20  Q.   All right.  And on this dec page did it

21       note anywhere the combined single limit

22       for the insurance issued to Mr. Lane?

23  A.   Yes, sir.

## FREEDOM COURT REPORTING

```
1    Q.    Where did it note that?

2    A.    In the Coverage, Limits of Liability, it

3          states 300,000.

4    Q.    And at the time that you reviewed McKnight

5          number 80, which is the dec page, your

6          copy, did you contact Progressive and say,

7          "Something is wrong.  We've got the wrong

8          amount on here"?

9    A.    No, sir.

10               MR. WHITEHEAD:  Object to the

11                    form.

12   Q.    Did you ever contact them at all --

13         Progressive's reps at all after you

14         received McKnight Bates-stamped 80?

15   A.    No, sir.

16   Q.    I want you to look at McKnight Bates-stamp

17         number 120, please.

18   A.    Okay.

19   Q.    Can you tell me what McKnight Bates-stamp

20         120 is?

21   A.    That's the agent's copy of the renewal

22         policy.

23   Q.    And is that policy period from March 10th,
```

# FREEDOM COURT REPORTING

Page 76

```
1              2004 to March 10th, 2005?

2    A.        Yes, sir.

3    Q.        And, again, did you receive a copy of this

4              dec page for Ricky Lane?

5    A.        Yes, sir.

6    Q.        And did you note at the time of the

7              renewal or at the time that you received

8              this copy the combined single limit of the

9              coverage?

10   A.        I notice now it's 300,000.  I apparently

11             didn't catch it at the time.

12   Q.        Did you review this document when you

13             received it, Mr. McKnight?

14   A.        Yes, sir.

15   Q.        And that same question applies to the time

16             of the renewal.  When you renewed Ricky

17             Lane's policy, I guess it was March 8th

18             was your testimony of 2004, did you upload

19             it the same way in the Pro-Rater system

20             for Progressive?

21   A.        Yes, sir.

22   Q.        And when you went on to the system, did

23             you request to review information
```

## FREEDOM COURT REPORTING

1          McKnight Bates-stamp 120, which was the

2          agent's copy of the dec page?

3   A.     That's true.

4   Q.     Now, at any time after you received the

5          agent's copy of the dec page in 2003 or in

6          2004, did Ricky Lane ever call you and

7          say, "Hey, look, I've got this dec page

8          and it's got the wrong coverage amount"?

9   A.     No, sir.

10   Q.     If at any time in either 2003 or 2004 you

11          wanted to check the limits of liability

12          coverage for Mr. Lane through Progressive

13          could you have done that?

14   A.     Yes, sir.

15   Q.     How would you have done that?

16   A.     You go into their "For Agents Only" web

17          site and look at a policy summary.

18   Q.     You testified earlier that it took sixty

19          or so seconds to obtain a policy through

20          Progressive and to input the information

21          for the application. How long would it

22          take you to get on there to check

23          someone's liability limits that you have

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

1              procured insurance for?

2                    MR. WHITEHEAD:  Objection, to the

3                         extent, Shane, I don't think

4                         he said it takes sixty

5                         seconds to fill out the

6                         application.  It takes sixty

7                         seconds to get the

8                         information back once he

9                         uploaded it.  But in any

10                        event, restate your

11                        question.

12    Q.    You can answer my question.  Do you

13          understand what I asked?

14                    MR. WHITEHEAD:  Answer the

15                        question whether you

16                        understand what he asked

17                        first.

18    A.    Well --

19                    MR. WHITEHEAD:  I'd like to have

20                        the question read back.

21    Q.    Mr. McKnight, how long does it take you on

22          the computer, on the Pro-Rater system, to

23          fill out the application for Progressive's

## FREEDOM COURT REPORTING

```
 1          policy?

 2   A.     Probably five or ten minutes.

 3   Q.     Okay.  How long did it take you with Ricky

 4          Lane?

 5   A.     Probably five or ten minutes.

 6   Q.     How long would it take you to get on the

 7          "For Agents Only" web site to look and

 8          determine someone's liability limits

 9          through Progressive?

10   A.     Just a matter of a minute or so.

11   Q.     Did you ever do that for Ricky Lane?

12   A.     No, sir.

13   Q.     Did you ever do that in 2003, 2004 or

14          since then to determine his liability

15          limits?

16   A.     No, sir.

17   Q.     Do you remember any conversations

18          whatsoever that you've had with any of

19          Progressive's representatives?

20   A.     Can we back up to that other question?

21   Q.     Yeah.  Absolutely.  Which one?

22   A.     Since 2003 have I ever gone on the "For

23          Agents Only" and checked Ricky's coverage?
```