IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PROGRESSIVE SPECIALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 2:05-CV-438-00 ) |
| THE MCKNIGHT AGENCY, INC., JOE MCKNIGHT; RICKY LANE; RIVERSIDE TURF FARM, et al. | ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The McKnight Agency, Inc. and Joe McKnight (collectively referred to as "McKnight") respectfully submit this Brief in Support of their Motion for Summary Judgment. For the reasons set forth below, McKnight is entitled to summary judgment as to all claims asserted by Progressive, all claims asserted by Lane and all claims asserted by Riverside.

## SUMMARY OF PERTINENT FACT AND LEGAL ISSUES

If any set of facts ever justified reformation of an insurance policy, it would be the facts present in this case. If the Progressive insurance policy is reformed to reflect the expressed intent of the parties, then all of the claims asserted by all of the parties against each other in this case disappear, with the only issue remaining being payment of additional premiums to Progressive in the approximate amount of $1,700.

The insured, Ricky Lane, is a truck driver engaged in interstate commerce. Under federal law, Lane is required to carry minimum limits of $750,000 in liability insurance. In October of 2000 (almost three years prior to the auto accident at issue in this case), Lane approached

McKnight (a Progressive insurance agent with binding authority) to purchase an auto liability policy. Lane agreed to purchase a Progressive policy with $1,000,000 limits. After Lane's driving history was verified through Progressive's software, Progressive agreed to issue a policy with $1,000,000 limits.

In March 2003, Lane returned to McKnight's office requesting another auto policy with $1,000,000 limits for the period of March 10, 2003 to March 10, 2004. There is no dispute Lane intended to purchase, and McKnight intended to sell, another Progressive policy with $1,000,000 limits. Due to a clerical error facilitated by the Progressive application software, however, the application listed the requested limits as $300,000 rather than the $1,000,000 limits intended.[1] It is undisputed Lane qualified for a Progressive policy with $1,000,000 limits at that time. It is undisputed Lane was willing to pay whatever premiums Progressive required for such a policy. It is undisputed that but for the drop down menu error, Progressive would have issued a policy to Lane at that time with $1,000,000 limits, as it had before.

In March 2004, the Progressive policy was renewed. Because it was a renewal, no application was required. As a result, the premium was paid and the previous error in limits was carried forward, without either Lane or McKnight realizing it.

In July 2004, Lane was involved in a traffic accident that resulted in the death of Daisy Beasley. From March 2003 until the accident, both McKnight and Lane believed the limits on the policy were $1,000,000. It was not until Lane called Progressive to report the accident and

---

[1] As discussed more fully below, Progressive requires its agents to complete insurance applications on-line. The computerized applications require agents to either type in requested information or select one of several options from "drop down menus." Progressive's software requires the limits to be selected from options listed in a drop down menu. When McKnight completed Lane's application, he intended to select limits of $1,000,000 from the drop down menu, but by virtue of an unexplained error with the drop down menu selection, limits of $300,000 were inadvertently input.

the adjuster began investigating the claim that the clerical error was discovered.  Soon thereafter, even in spite of the accident, Progressive agreed to increase the limits on Lane's policy to $1,000,000 for an additional premium.  Further, in March 2005 Progressive renewed Lane's policy, and for the third time, agreed to issue limits of $1,000,000.

Under Alabama law, an insurance policy is due to be reformed when the true intention of the parties to the contract is not expressed in the contract because of a clerical error or a mutual mistake, if reformation can be achieved without prejudice to third parties.  ALA. CODE § 8-1-2 (1975).  The undisputed evidence demonstrates all of the statutory elements for reformation are met in this case and the policy should be reformed to reflect the $1,000,000 limits intended by Lane and by Progressive (through its agent – who has binding authority).  In fact, Progressive's own corporate representative admits that but for the clerical error, Progressive would have issued a policy to Lane with limits of $1,000,000 as it had previously issued in 2000, and subsequently issued in 2004 and 2005.

## I.    NARRATIVE STATEMENT OF RELEVANT, UNDISPUTED FACTS

1.    In October 2000, Ricky Lane and Joe McKnight first met for the purpose of discussing Lane's need for liability insurance.  (Exhibit A, Second Deposition of Ricky Lane, p. 20, lines 1-15; p. 26, lines 12-20).  Lane, as a truck driver engaged in interstate commerce, is required to carry liability insurance with limits of at least $750,000.  (Exh. A, Lane depo, p. 12, lines 1-23; p. 13, lines 5-9; p. 16, lines 2-11).  At this meeting, McKnight and Lane both agreed Lane would purchase a Progressive liability policy with limits of $1,000,000.  (Exh. A, Lane depo, p. 19, lines 17-23; p. 20, lines 1-7).  A policy for $1 million combined single limits ("CSL") was applied for and issued by Progressive on October 27, 2000. (Exh. A, Lane Depo, p.

26, lines 12-14; Exhibit B, 2000 Progressive Quote Sheet, Application, and Invoice; Exhibit C,

2000 Progressive Declarations Page).

    2.      On March 10, 2003, Lane again met with McKnight to acquire liability insurance.

(Exh. A, Lane depo, p. 27, lines 1-18; Exhibit E, 2003 Insurance Application, pp. 1-6). Lane and

McKnight again discussed the amount and type of insurance Lane required. (*Id.*) McKnight

filled out Progressive's computerized application based upon information provided to him by

Lane. (Exhibit F, Deposition of Joe McKnight, p. 13, lines 16-23; p. 14, lines 1-4). Once the

application was approved by Progressive's underwriting software, McKnight printed out the

application and obtained Lane's signature. (Exh. A, Lane depo, p. 27, lines 1-18; Exhibit E,

2003 Insurance Application, pp. 1-6).

    3.      There is no question both Lane and McKnight intended for Lane to receive a

policy with limits of $1,000,000 from Progressive. (Exh. F, McKnight depo, p. 31, lines 4-23; p.

32, lines 1-2; Exh. A, Lane depo, p. 37, lines 11-23; p. 38, lines 1-21).

## LANE TESTIMONY

    Q.     So again, you had already been approved for a one million dollar
policy from Progressive in October of 2000; correct?

[Lane] A.     Yes, sir.

    Q.     And when you met with Mr. McKnight for this policy, you were
willing to pay premiums for a one million dollar policy; correct?

[Lane] A.     Yes.

    Q.     So, except for the fact that three hundred thousand dollars was
selected, you would have gotten a million dollar policy as far as
you're concerned; correct?

[Lane] A.     Yes.

(Exh. A, Lane depo, p. 38, lines 1-21).

**MCKNIGHT TESTIMONY**

> Q.    It was clear, wasn't it, Mr. McKnight, that Ricky Lane wanted a million dollars worth of insurance; is that right?

[McKnight]    A.    Yes, sir.

> Q.    And you intended for Ricky Lane to have one million dollars worth of liability insurance through Progressive; is that true also?

[McKnight]    A.    That's true.

> Q.    And also Mr. Morris over at Riverside Turf was requiring either 750 or a million dollars worth of insurance, wasn't he?

[McKnight]    A.    That's correct.

> Q.    So, as far as you know, that's what everybody intended when he first obtained Progressive – Ricky Lane first obtained Progressive Insurance through your agency?

[McKnight]    A.    Right.

(Exh. F, McKnight depo, p. 31, lines 4-23; p. 32, lines 1-2).

4.    The application process for a Progressive policy is done on-line.   (Exh. F, McKnight depo, pp. 13-15; Exhibit G, Deposition of Progressive Corp. Rep. Mary Alice Fitzgerald, p. 24, lines 19-23; p. 25, lines 1-17).  Progressive provides its agents with software referred to as "ProRater" for this process.  (*Id.*)  **The Progressive ProRater software performs all of the underwriting**.  (*Id.*)  The ProRater software reviews the submitted information, conducts a search of relevant records, including a  Retail Credit Report, a VIN search, and a motor vehicle report ("MVR"), and provides the agent with a summary of the premium due and the payment plans available. (Exh. F, McKnight depo, p. 14, lines 1-4).

5.    McKnight, as Progressive's agent, is vested with binding authority through a contract with Progressive.  (Exh. F., McKnight depo, p. 15, lines 10-16; Exh. G, Fitzgerald depo,

p. 18, lines 11-23; p. 64, lines 3-23; p. 65, lines 1-2).  An insured with more than 6 points would not qualify for a Progressive liability policy with $1,000,000 limits.  (Exh. G, Fitzgerald depo, p. 17, lines 18-23; p. 28, lines 1-2).  As long as the insured had six or less points, he would qualify for $1,000,000 limits.  (*Id.*)

6.    It is undisputed at the time Lane applied for coverage in 2003; he only had 5 points according to Progressive's point system.  (Exh. E, 2003 Insurance Application, p. 2).  Thus, he qualified for $1,000,000 limits and McKnight had full authority to bind the coverage with $1,000,000 limits.  (Exh. F., McKnight depo, p. 15, lines 10-16; Exh. G, Fitzgerald depo, p. 17, lines 18-23; p. 18, lines 11-23; p. 28, lines 1-2; p. 64, lines 3-23; p. 65, lines 1-2).

7.    The Progressive software requires the limits for a requested policy be selected from a drop down menu.  (Exh. F, McKnight depo, p. 33, lines 4-20).  While completing the computerized application, a clerical error was made so that limits of $300,000 were requested instead of the intended limits of $1,000,000.  (*Id.*)  It is undisputed both Lane and McKnight believed Lane had limits of $1,000,000 after the application was completed and submitted to Progressive.  (*Id.*, p. 45, lines 21-23; p. 46, lines 1-2; p. 54, lines 1-10;  Exh. A, Lane depo, p. 39, lines 20-22).  Progressive sent Lane a copy of his policy and a declarations page, showing $300,000 limits, to Lane's correct mailing address.  (Exh. P Declarations Page dated March 10, 2003).

> Q.    Was it your understanding that he [Lane] had a million dollars worth of insurance and you just overlooked the fact that you clicked the wrong box?

[McKnight]    A.    Yes, sir.

(Exh. F, McKnight depo p. 45, lines 21-23, p. 46, lines 1-2).  Lane testified he also believed he had a million dollars of coverage:

[Lane]        A.        When I left Joe McKnight's office, I thought I had a million dollars worth of coverage under the – under liability.

(Exh. A, Lane depo, p. 39, lines 20-22).

8.        The Progressive corporate representative admits Progressive would have issued Lane a policy with limits of $1,000,000 (as it had in 2000 and subsequently did in 2004 and 2005) if the $1,000,000 limits had been selected from the drop down menu.  (Exh. G, Fitzgerald depo, p. 55, lines 4-13).

Q.        If Joe McKnight had selected from the drop down menu $1 million limits, he would have – Ricky Lane would have qualified for that large of a policy, correct?

[Fitzgerald]    A.        Yes.

Q.        And then as long as he paid the premiums, he would have been issued a policy with $1 million limits, correct?

[Fitzgerald]    A.        Correct.

(*Id.*)

9.        In August of 2003, Lane borrowed money from Riverside Turf to purchase a new tractor.  (Exh. N, Depo of Riverside Turf Corp. Rep., p. 46, lines 8-23, p. 47, lines 1-11).  Lane called McKnight and had (1) the new tractor added to the policy, (2) the old tractor removed from the policy, and (3) Riverside Turf added as the loss payee for the physical damage coverage.  (Exh. A, Lane Depo, p. 42, lines 9-20; Exh. P. Declarations Pages dated August 8, 2003).  Progressive mailed to Lane (again at his correct mailing address) declarations pages in August 2003 showing $300,000 limits.  (Exh. P. Declarations Pages dated August 8, 2003).

10.        At some point prior to March 10, 2004, Progressive mailed to Lane a renewal (Exh. G, Fitzgerald Depo., p. 47, lines 19-23, p. 48, lines 1-7, Exh. 7 to Fitzgerald Depo; Exh. F, McKnight Depo., p. 36, lines 11-23, p. 37, lines 8-16)  Lane renewed his Progressive policy and

Progressive sent Lane a declarations page (to Lane's correct mailing address) showing $300,000 limits. (Exh. P, Declarations Pages Dated March 10, 2004).

11.     On July 6, 2004, Lane was involved in an automobile accident resulting in the death of Daisy Beasley. (Exhibit I, Complaint from Holmes v. Riverside Turf, et al. CV-04-B-247, pp. 4-5, ¶¶9, 12).

12.     On or about July 7, 2004, Lane called Progressive to report the accident. (Exh. F, McKnight depo, p. 52, lines 3-22). During a subsequent telephone conversation between Lane and Progressive in the weeks following the July 7, 2004 accident, the clerical error in the application was first discovered by the adjuster investigating the claim. (Id. at p. 54, lines 3-13; p. 55, lines 1-6).

13.     On or around October 15, 2004, Lane returned to McKnight's agency to increase the limits on his Progressive liability policy. (Exh. A, Lane depo, p. 59, lines 16-23; p. 60, lines 1-19). Lane applied and was approved for a Progressive liability policy with limits of $1,000,000. (Exhibit J, 2004 Progressive Declarations Page, McKnight 103-104). The Progressive ProRater software approved Lane for such a policy even though Lane had already had the July 6, 2004 accident resulting in Ms. Beasley's death. (Exh. G, Fitzgerald depo, p. 54, lines 4-20). Lane paid Progressive a prorated amount of premiums for the increased limits for the time from October 15, 2004 through March 10, 2005. (Id. at p. 32, lines 7-23; p. 33, lines 1-23; p. 34, lines 1-21). In October 2004, Progressive sent Lane a declarations page (again to his correct mailing address) showing $1,000,000 limits. (Exhibit J, 2004 Progressive Declarations Page, McKnight 103-104).

14.     On March 10, 2005, Progressive renewed Lane's liability policy, again with limits of $1,000,000. (Exhibit K, 2005 Renewal Declarations Page, R. Lane 12-14). As with the prior

declarations pages, Progressive mailed this document to Lane's correct mailing address showing $1,000,000 limits. (*Id.*)

## II.    SUMMARY JUDGMENT STANDARD

According to at least one Alabama federal court addressing the issue, Fed. R. Civ. P. 56:

> [M]andates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Beck v. City of Haleyville, Alabama, 127 F. Supp. 2d 1197, 1205 (N.D. Ala. 2001) (quoting Celotex Corp. v. Catrett, 477 U. S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." Beck, 127 F. Supp. 2d at 1205 (quoting Chapman v. AI Transport, 229 F. 3d 1012, 1023 (11th Cir. 2000)). In other words, "[a] factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment." Beck, 127 F. Supp. 2d at 1205 (citing Brown v. American Honda Motor Co., 939 F. 2d 946, 953 (11th Cir. 1991)).

## III.    ARGUMENT

### A.    PROGRESSIVE'S CLAIMS AGAINST THESE DEFENDANTS ARE DUE TO BE DISMISSED.

#### 1.    The Insurance Policy Should be Reformed.

##### a.    There was a mutual mistake that justifies the policy being reformed.

Alabama law provides that a written contract which does not express the true intentions of the parties may be reformed:

> When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons in good faith and for value.

ALA. CODE § 8-1-2 (1975). *See also Alabama Farm Bureau Ins. Co. v. Hunt*, 519 So. 2d 480 (Ala. 1987) (a written contract which does not express the true intentions of the parties may be reformed); *Home Indem. Co. of New York v. City of Mobile*, 477 So. 2d 312 (Ala. 1985) (reformation of an insurance policy permitted when there was a prior agreement which the contract failed to express due to mutual mistake).  The purpose of reformation of a written instrument is not to create a new insurance policy, but to bring the written instrument into conformity with the intent of the contracting parties.  43 Am. Jur. 2d Insurance § 368.  Grounds for reformation of an insurance policy exist where the policy as written does not express the true intent of the parties.  43 Am. Jur. 2d Insurance §370; BIBB ALLEN, ALABAMA LIABILITY INSURANCE HANDBOOK § 23-1(d) (1996).

There is no dispute Lane requested a Progressive liability policy with limits of $1,000,000.  (Exh. A, Lane depo, p. 19, lines 8-23; p. 27, lines 1-2, 14-18; p. 38, lines 1-21).  There is no dispute McKnight had authority to bind Progressive coverage, and McKnight intended to sell Lane a Progressive liability policy with $1,000,000 limits.  (Exh. F, McKnight depo, p. 31, lines 4-23; p. 32, lines 1-2).  There is no dispute Lane was willing (and still is willing) to pay whatever premiums Progressive required for such a policy.  (Exh. A, Lane depo, p. 38, lines 7-21; p. 62, lines 19-23; p. 63, lines 1-15).  There is no dispute Lane qualified for $1,000,000 limits with Progressive.  (Exh. G, Fitzgerald Depo, p. 55, lines 4-13).  There is no

dispute Progressive issued policies to Lane with $1,000,000 limits once before, and twice after, the policy in question. In fact, if not for the clerical error of selecting $300,000 limits from the drop down menu on March 10, 2003, the Progressive ProRater software would have approved Lane for a policy with limits of $1,000,000. (Exh. G, Fitzgerald depo, p. 55, lines 4-13).

The precise issue in this case has been addressed by at least one court faced with the issue of reforming the limits of a policy to conform to the intent of the agent and insured.[2] In *Southeastern Ins. Agency,Inc., v. Lumbermens Mut. Ins.*, 650 N.E.2d 1285 (Mass. App. 1995) *rev'd on other grounds*, 668 N.E.2d 347 (Mass. Aug 06, 1996), the insurance agent (Southeastern) was responsible for purchasing and maintaining a primary insurance policy and an umbrella policy for property damage coverage for the insured, Don Adams Oil Company ("Adams"). Pursuant to an agreement between Adams and Southeastern, Southeastern was authorized to and responsible for obtaining any increase in the primary policy in the event an increase was required by the carrier for the umbrella policy.

In June 1986, Southeastern received notice from the umbrella carrier that the limits for the primary policy needed to be increased from $300,000 to $500,000 with an effective date of September 1, 1986. Southeastern failed to contact the primary carrier until October 1986. When it did contact the primary carrier (Lumbermens), Southeastern erroneously requested the coverage to be increased as of January 1, 1987. As a result, a $200,000 gap existed between the primary and umbrella policies from September 1, 1986 to January 1, 1987. *Southeastern Ins. Agency, Inc.*, 650 N.E.2d at 643. The carrier for the primary policy, Lumbermens, admitted it would have increased the limits on the policy to $500,000 as of September 1, 1986, if requested.

---

[2] Admittedly, the *Lumbermens* case is not controlling. However, it is clearly identical and should be persuasive, given the Alabama law on reformation appears substantially similar, if not identical, to the law in Massachusetts.

Lumbermens did, in fact, increase the limits on the policy to $500,000 on January 1, 1987.  On December 1, 1986, an Adams employee spilled fuel on to a homeowner's property causing damages in excess of $500,000.  *Id.* at 643-44.

The court determined the primary insurance policy should be reformed to reflect $500,000 limits for the period from September 1, 1986 to January 1, 1987.  The court determined that pursuant to the contract between Southeastern and Adams, both parties intended to have the primary policy increased whenever higher limits were required by the carrier for the umbrella policy.  In response to Lumbermens' argument that reformation was not appropriate, the court stated as follows:

> Lumbermens argues that although reformation is appropriate in the case of a mutual mistake, Southeastern's negligence constituted a unilateral mistake and reformation is therefore inappropriate. Under the law of agency, however, an insurance agent's knowledge acquired while acting within the scope of the agent's actual or apparent authority is imputed to the insurer even though such knowledge is not actually communicated to the insurer. Southeastern was acting as a Lumbermens agent within the scope of its authority when negotiating the terms of the primary insurance policy with Adams.  Adams and Southeastern had agreed that Southeastern would purchase and maintain sufficient primary insurance coverage for Adams so that no gap would exist between the primary policy's coverage and the umbrella policy's coverage. Southeastern's knowledge of Adams' insurance coverage requirements is imputed to Lumbermens, and Lumbermens is bound by the agreement between Southeastern and Adams.

*Id.* at 645-46 (internal citations omitted).

In a ruling that is entirely consistent with Alabama law regarding reformation, the *Southeastern* court held that "[w]here contracting parties have an identical intention as to the terms to be embodied in the contract and the contract fails to reflect that intention, this is mutual mistake, and the contract is subject to reformation." *Id.* at 646.  As a result, the *Lumbermens* court held the policy should be reformed to reflect the higher limits, and further held that the

carrier **could not** recover the difference from the agent, since it acknowledged it would have agreed to the higher limits in the first place.

Here, at the completion of the sale of insurance, both Lane and McKnight believed Lane had a Progressive policy with $1,000,000 limits. (Exh. F, McKnight depo, p. 45, lines 21-23; p. 46, lines 1-2; Exh. A, Lane depo, p. 39, lines 20-22). It was not until after the accident made the basis of the underlying lawsuit against Lane that either Lane or McKnight realized only $300,000 in coverage was issued. (Exh. F, McKnight depo, p. 54, lines 1-10).

A similar result was reached in *Equity Gen. Agents, Inc. v. O'Neal,* 692 S.W.2d 789 (Ark. App. 1985). In that case, the insured, James O'Neal, obtained car insurance through the Joseph M. Dolan Agency for several years. In January 1981, Dolan replaced O'Neal's existing insurance with a policy issued by Allstate Insurance Company. It was undisputed O'Neal and Dolan both intended for the Allstate policy to provide coverage for both of O'Neal's vehicles. Due to an error on the part of Dolan, however, one of the vehicles was omitted from the policy. *O'Neal,* 692 S.W.2d at 791.

The *O'Neal* court determined reformation was proper because "it is undisputed that (1) O'Neal and the Dolan Agency intended that O'Neal's policy would cover both of his vehicles, (2) coverage was provided for only one of the vehicles due to the admitted error of the Dolan Agency, (3) the Dolan Agency had the authority to bind Allstate, and (4) Allstate would have accepted this risk." *Id.* at 793. Almost the same set of facts are present in this case: (1) Lane and McKnight both intended to procure a policy with limits of $1,000,000, (2) the policy was issued with limits of $300,000 due to a clerical error when McKnight completed the application, (3) McKnight had the authority to bind Progressive, and (4) Progressive would have issued Lane a policy with limits of $1,000,000 (which it did on three (3) other occasions). Therefore, the

appropriate remedy in this case is to reform the policy to reflect the $1,000,000 limits intended by the parties.

> b.    A clerical error on an insurance application is equivalent to a mutual mistake under Alabama law.

Reformation is permitted when there is mutuality of mistake, which includes drafting and clerical errors, and mistaken identity of what was to be insured. *Pinson v. Veach*, 388 So. 2d 964 (Ala. 1980)(an error in drafting establishes mutual mistake)(citing *Williams v. Phillips Petroleum Co.*, 453 F.Supp. 967 (S.D. Ala. 1978)). *See also Fidelity Serv. Ins. Co. v. A.B. Legg & Sons Burial Ins. Co.*, 145 So. 2d 811 (Ala. 1962) (if there was a meeting of the minds but the agreement does not express such agreement due to a mistake by the draftsman, then it is immaterial who employed such draftsman); *Atlas Assurance Co. v. Byrne*, 178 So. 451 (Ala. 1938) (when a writing contains substantially more or less than the parties intended, or the intention of the parties is not expressed "due to inapt language" or due to scrivener error, it will be reformed to express the true intention of the parties). *Contra EBSCO Industries, Inc. v. Royal Ins. Co. of Am.*, 775 So. 2d 128 (Ala. 2000) (clerical error of insurer for failing to remove an insured from policy found to be a unilateral mistake, not a mutual clerical mistake requiring reformation where the reformation would have violated Alabama law against canceling or annulling a policy after an insured becomes responsible for loss or damage and where no party contended the insured had knowledge of the mistake); *Am. & Foreign Ins. Co. v. Tee Jays Mfg. Co., Inc.*, 699 So. 2d 1226 (Ala. 1997) (insurer's erroneous inclusion of business income loss protection in insurance policy was not a clerical error but rather a unilateral mistake, and because the mistake must be construed against the insurer and in favor of the insured reformation was not warranted).

The Alabama Supreme Court has explained a clerical mistake as one where "Smyth" is substituted for "Smith" or where "221.1 acres" is typed as "22.11 acres." *Tee Jays*, 699 So. 2d at 1229. The term "mistake" has been defined as "an erroneous mental condition, conception, or conviction induced by ignorance, misapprehension or misunderstanding the truth, but without negligence and resulting in some act or omission done or suffered erroneously by one or both of the parties to a transaction, but without its erroneous character being intended or known at the time." *Springdale Gayfer's Store Co. v. D.H. Holmes Co.*, 201 So. 2d 855, 865 (Ala. 1967).

In this case, a clerical error occurred when the drop down menu reverted to a $300,000 limit selection, rather than the $1,000,000 limits McKnight selected, or intended to select. This type of error is similar to those noted by the Alabama Supreme Court. The clerical error was the result of an incorrect keystroke, much the same as an error in spelling or the incorrect insertion of a decimal point.

Further, other jurisdictions have allowed reformation due to a clerical mistake in which a scrivener's error resulted in the failure of a contract or agreement to reflect the terms agreed to by the parties. *See Dr. Lakes Inc. v. Bransmart U.S.A. of West Palm Beach*, 819 So.2d 971 (Fla. Dist. Ct. App. 2002)(relief in the form of reformation of contract should be given where, through a mistake of the scrivener, a contract contains a clerical error or fails to define the terms as agreed on by the parties); *Paulsen v. Coombs*, 253 P.2d 621 (Utah 1953) (where clerical, typographical or other errors occur, a contract may be reformed to show true intent of the parties); *Home Life Ins. Co. of America v. McCarns*, 16 A.2d 587 (Del Ch. 1940) (reformation of a life insurance policy was appropriate where incorrect mortality value was used to calculate premiums on grounds it was a mutual mistake).

### 2.    Progressive's Declaratory Judgment Action Should Be Dismissed for Lack of Standing.

A plaintiff must satisfy three constitutional elements to prove standing including: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Kossiara v. City of Caselberry*, 392 F.3d 1302, 1304 (11th Cir. 2004).

Recently, the Alabama Supreme Court held a tort claimant did not have standing to bring a claim for declaratory relief against a tortfeasor's liability insurer prior to a final judgment determining the tortfeasor's liability being entered. *Knox III v. Western World Ins. Co.,* 893 So. 2d 321 (Ala. 2004). Similarly, in this case there has been no judgment triggering liability to Progressive in the underlying action. A number of state courts have held a plaintiff does not having standing to bring a declaratory judgment action against a defendant's liability carrier until he or she has established the defendant's liability. *See Farmers Ins. Exchange v. District Court for the Fourth Judicial District*, 862 P.2d 944 (Colo. 1993) (plaintiff lacks standing to bring a declaratory judgment action against defendant's insurance company before obtaining a judgment against the defendant); *Knittle v. Progressive Cas. Ins. Co.,* 908 P.2d 724 (Nev. 1996) (declaratory judgment action by an injured party against the insurer presented no justifiable controversy ripe for judicial determination where no action to determine the liability of the insured had been decided); *Boyle v. National Union Fire Ins. Co.,* 866 P.2d 595 (Utah Ct. App. 1993) (it is premature for an injured party to file a declaratory judgment action against insurer before a determination that the insurer was in fact liable).

Further, as the policy is due to be reformed to reflect the intended limits of $1,000,000, Progressive can assert no damages sufficient to meet the requirements set by the Eleventh Circuit

in *Kossiara, supra*.    Although it did not properly request this relief from McKnight in its complaint, Progressive might be due to be reimbursed for the **premium difference** between a policy with $1,000,000 limits and a policy with limits of $300,000.    *See Southeastern Ins. Agency v. Lumbermens Mut. Ins. Co.* 650 N.E.2d 1285, 1289 (Mass. App. 1995).

> **3.    Progressive's Claims for Innocent and/or Reckless Misrepresentation are Due to be Dismissed as the Policy is Due to be Reformed.**

To prevail on a claim for misrepresentation, Progressive must prove by substantial evidence: (1) a false representation (2) of a material existing fact (3) reasonably relied upon; and (4) damage resulting as a proximate consequence.  *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 2003 WL 21512990, *13 (Ala. 2003), *quoting Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988).  Progressive alleges McKnight "made an innocent or reckless misrepresentation to Progressive when he submitted the application for the policy to be issued to Lane."  (Progressive Complaint ¶ 18).

As detailed above, a mutual mistake or a clerical error was made on the application.  As a result, the policy is due to be reformed to reflect the full $1,000,000 policy limits intended by Progressive (through its agent, McKnight) and Lane.  Therefore, McKnight cannot be said to have made a false representation.  Moreover, based upon the reformation, Progressive cannot demonstrate how it has been damaged, **at least not beyond the difference in premiums** between a policy with limits of $1,000,000 and a policy with limits of $300,000.  It is undisputed that if the drop down menu had accurately recorded the $1,000,000 limits intended to be selected, Progressive would have the same exposure as it would if the policy were reformed, $1,000,000.  The only difference would be the amount of premium due.

Regardless of whether the contract is reformed to conform to the parties' intent, the law of agency still states the agent's knowledge of an insured's coverage requirements is imputed to

the insurer, and therefore, the insurer is bound by the agreement between the agent and insured. *Lumberman,* 650 N.E.2d at 1287-88. *Citing Lumbermens Mut. Ins. Co. v. Bowman,* 313 F.2d 381, 388 (10th Cir. 1963); *Penn. Millers Mut. Ins. Co. v. Walton*, 365 S.W.2d 859 (Penn. 1963). Therefore, as McKnight's knowledge of Lane's request for a policy with limits of $1,000,000 is imputed to Progressive, the Progressive cannot claim misrepresentation or suppression of a material existing fact of which it is already deemed to have knowledge.

### 4.     Progressive's Claim for Negligent Procurement is Due to be Dismissed.

In order to establish a claim for negligent procurement, a plaintiff must satisfy the following elements: (1) a duty to a foreseeable plaintiff, (2) a breach of that duty, (3) proximate cause, and (4) injury/damage. *Armstrong Bus. Servs., Inc. v. Amsouth Bank*, 817 So. 2d 665, 679 (Ala. 2001). Progressive cannot demonstrate a breach of a duty or damages.

The duty supporting a viable claim for negligent procurement only exists between the insurance agent/broker and the **insured.** *Ivory v. The Gulf Agency*, 667 So.2d 725 (Ala. 1995). In *Ivory*, the court held accident victims who were injured while riding in the owner's van did not have standing to sue the insurance brokerage for negligence in failing to procure a renewal policy for the owner of the vehicle in which they were injured as they were not parties to the contract of insurance. *Id. See also, Pate v. Rollinson Logging Equip., Inc.*, 628 So.2d 337, 343 (Ala. 1993)(holding duty exists only between insurance agent/broker and an insured); *Highland Underwriters Ins. Co. v. Elegante Inns, Inc.*, 361 So.2d 1060, 1065 (Ala. 1978)(holding same). In this case, because Progressive is the insurer, not the insured, no set of circumstances can exist under which McKnight could have owed any duty to Progressive regarding procurement of the coverage. Accordingly, Progressive's claim for negligent procurement is due to be dismissed. *See Ivory,* 667 So.2d at 726-27.

Further, since the policy is due to be reformed, "[a] finding that coverage was effective and that the insurer is liable under the policy will preclude holding the agent or broker liable for failure to procure that coverage." *Gulf Gate Management Corp. v. St. Paul Surplus Lines Ins. Co.*, 646 So. 2d 654, 659 (Ala. 1994). *See e.g. Chicago HMO v. Trans Pacific Life Ins. Co.,* 622 F. Supp. 489 (N.D. Ill. 1985); *Tri- Delta Engineering Inc. v. Ins. Co. of N. America*, 146 Cal. Rptr. 14 (Cal. Ct. App. 1978).

**5.    Progressive is not Entitled to Recover from McKnight the Amount it Must Pay in Excess of $300,000.**

Progressive is not entitled to recover the difference between the policy with $300,000 limits as erroneously issued and the intended limits of $1,000,000 since it admitted it would have issued such a policy regardless. *Lumbermens,* 650 N.E.2d 1285.  An insurer may seek recovery from an agent only where it can demonstrate "bad faith or collusion" by an agent or where it can prove the agent's "negligence was the proximate cause of its actual loss." *Id.* at 1289.  *See also Equity Gen. Agents, Inc. v. O'Neal,* 692 S.W.2d 789 (Ark. App. 1985)(where agent had binding authority, but mistakenly requested coverage on only one vehicle, and insurer would have provided coverage on both vehicles had it had the opportunity,  the contract was reformed and the agent was not required to indemnify insurer).

According to the court in *Lumbermens*, for Progressive to demonstrate proximate cause, it must prove it would have refused to provide coverage to Lane had it been informed Lane sought limits of $1,000,000, rather than $300,000.  *Id.*   In *Lumbermens*, the insurer admitted that but for failure to receive notice of the request for a $500,000.00 increase to the insured's property damage coverage to prevent a gap between the insured's primary and umbrella policy, it would have increased the insured's coverage.  *Id.* at 1289.  The court held that based upon the

insurer's admission it would have issued the coverage, the agent's negligence was not, therefore, the proximate cause of the insurer's loss. *Id.*

Further, the court found that due to the mutual mistake between the agent and insured, the policy did not reflect the true intent of the parties, and the court reformed the policy to reflect the true intent and to prevent a gap in coverage. *Id.* The court found in accord with the laws of agency, the agent's knowledge of the insured's coverage requirements is imputed to the insurer, and therefore, the insurer is bound by the agreement between the agent and the insured. *Id.* at 1287-88. *Citing Lumbermens Mut. Ins. Co. v. Bowman,* 313 F.2d 381, 388 (10th Cir. 1963); *Penn. Millers Mut. Ins. Co. v. Walton*, 365 S.W.2d 859 (Penn. 1963). Further, the court held the insurer was not entitled to indemnification from the agent for the amounts paid in excess of the policy limits or for defense costs. *Id.* at 1289. The court held the insurer's only claim for recovery would be for the difference in the premiums due under the two policy limits. *Id. citing Reserve Ins. Co. v. Netzer,* 621 F.2d 314, 317 (8th Cir. 1980); *Walton*, 365 S.W.2d 859.

Here Progressive admits it would have issued the policy to Lane with limits of $1,000,000. (Exh. G, Fitzgerald depo, p. 55, lines 4-13). Therefore, under the reasoning in the *Lumbermens* case, Progressive would be unable to demonstrate McKnight's actions are the proximate cause of any alleged loss. To the contrary, any losses Progressive suffers in this case would be due to its own handling of Lane's claim. During the deposition of Larry Lackey, it was revealed Progressive made one phone call to McKnight about the claim and then hired legal counsel. If Progressive had thoroughly investigated the facts surrounding the application in March 2003, it would have (or should have) determined the intent of the parties and that the policy should be reformed.

**B.    LANE'S CLAIMS AGAINST THESE DEFENDANTS ARE ALSO DUE TO BE DISMISSED.**

**1.    Lane's Claims for Misrepresentation and Suppression Should Be Dismissed on the Grounds McKnight Did Not Breach Any Duty to Disclose and Because Lane Cannot Demonstrate Reasonable Reliance.**

Lane alleges claims for misrepresentation, suppression, and negligent procurement against McKnight for the alleged failure to procure a policy with limits of $1,000,000.  Since the policy is due to be reformed to reflect  the $1,000,000 limits intended by the parties, Lane's claims are due to be dismissed.

Moreover, Lane is unable to prove by substantial evidence all of the elements of misrepresentation. *See Waddell,* 2003 WL 21512990 at *13.  Further, to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following: "(1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result." *Johnson v. Sorensen*, 2005 WL 1253829 **1, 6 (Ala. May 27, 2005) (citing *Waddell,* 875 So.2d at 1161).

"A duty to disclose can arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case." *Id.* at *6 (citing *Ex parte Farmers Exch. Bank,* 783 So.2d 24, 27 (Ala. 2000)).  "Although the term 'inducement' has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's ["**reasonable reliance**"] is an essential element of a suppression claim." *Id.* (citing *Allstate Ins. Co. v. Ware,* 824 So.2d 739, 744-45 (Ala.2002))(emphasis added).

"An essential element of any fraud claim is that the plaintiff must have ***reasonably relied*** on the alleged misrepresentation."  *Id.* (emphasis added).  "If the purchaser blindly trusts, where

he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, 'volunti non fit injuria.'" *Alfa Life Ins. Co. v. Green*, 2003 WL 22113937, 4 (Ala. 2003), *quoting Torres v. State Farm Fire & Casualty Co.*, 438 So. 2d 757, 758-59 (Ala. 1983).

"If one receives from a defendant documents that put him on notice of the very facts alleged to have been suppressed, then that defendant cannot have suppressed those facts." *Richardson v. Liberty National Life Ins. Co.,* 750 So. 2d 575, 578 (Ala. Civ. App. 1999). In *State Farm Fire & Casualty Co. v. Slade*, the insureds alleged their insurance agent fraudulently induced them to purchase their homeowner's policy by "misrepresent[ing] the extent of coverage under their policy and suppress[ing] the fact that the policy contained exclusions." 747 So. 2d 293, 321 (Ala. 1999). Specifically, the insureds claimed the agent stated the policy was an "all-risk, full-coverage-on-everything" policy and this statement was a misrepresentation because the policy contained exclusions. *Id.* The insureds also claimed the agent fraudulently suppressed that the policy contained exclusions. *Id.* Further, the insureds claimed the agent misrepresented the nature of the policy by stating the policy was "the Cadillac of all insurance" and was "the very best." *Id.*

The court held in favor of the agent on the fraudulent suppression claim stating because "there was no evidence [the insured] inquired into the scope of coverage or asked any questions regarding the existence of exclusions," "[t]here was no evidence [the insurance agent or the insurer] prevented him from obtaining the information or from viewing the policy before purchasing it," the agent had no duty to disclose the exclusions to the insured. *Id.* at 324. *See also Alfa Life Ins. Co. v. Green,* 2003 WL 22113937 (Ala. 2003) (no fraudulent suppression where plaintiff has access to documents providing allegedly suppressed information); *Ex Parte*

*Alfa Mutual Fire Ins. Co.,* 742 So. 2d 1237 (Ala. 1999) (insured could not establish insurer's fraudulent suppression where she admitted she did not read the policy and failed to ask agent questions to clarify any misunderstandings she had about the scope of coverage under the policy); *Ex Parte Caver*, 742 So. 2d 168, 172-73 (Ala. 1999) (life insurer and agent had no duty to inform the policy holder of arbitration provisions where policy holder had an opportunity to examine the policies and presented no evidence of inability to read or understand the policy provisions, and thus insurer and agent were not liable on theory of fraudulent inducement); *Robinson v. JMIC Life Ins. Co.,* 697 So. 2d 461, 462 (Ala. 1997) (car buyer was not entitled to complain automobile dealer's credit manager fraudulently suppressed fact buyer was also buying credit life insurance as part of transaction where those terms appeared repeatedly in documents buyer signed but did not examine).

Again, Lane's claims for misrepresentation and suppression are due to be dismissed because reformation of the contract to reflect the $1,000,000 limits intended by the parties negates the elements of fraud. Further, even if the contract is not reformed to provide $1 million in coverage, Lane had the opportunity to review the application and declined. Lane testified he had an opportunity to request to review all pages of the application, but did not.

Q.      Did you ask to see those pages [referring to the application]?

[Lane] A.      No, I did not.

Q.      But you could have asked if wanted you to; right?

[Lane] A.      Yes, sir.

Q.      Okay, he didn't prevent you from looking at them?

[Lane] A.      No.  No, sir.

(Exh. A, p. 40, line 23; p. 41, lines 1-4). In light of Lane's opportunity to review the application for insurance, he cannot now claim not have known the application only requested $300,000.00 in coverage and his claims for misrepresentation and suppression are due to be dismissed. Further, Progressive's corporate representative testified it was Progressive responsibility to send (1) the policy to Lane in March 2003 showing $300,000 limits, (2) a declarations pages March 2003 showing $300,000 limits, (3) a declarations page in August 2003 showing $300,000 limits and (4) a declarations page in March 2004 showing $300,000 limits.

During his deposition, Lane testified he has a Ninth grade education and he is capable of reading and writing. (Exh. A, Lane depo, p. 10; lines 5-15 and lines 16-23). Lane also testified he tries to read newspapers and he is capable of reading and understanding road signs. (*Id.* at p. 12, lines 4-15). Under Alabama law, this is sufficient to place Alabama's affirmative duty on insureds to read their insurance documents. *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 422 (Ala. 1997) (Alabama law places affirmative duty on insureds to read insurance documents). *See also Liberty Nat. Life Ins. Co. v. Ingram*, 887 So.2d 222 (Ala. 2004) (insured did not reasonably rely on insurance agent's alleged misrepresentations that life insurance policy would accumulate value based on a fixed interest rate of 9.75% and that insured was only required to pay premiums for 10 years; although insured had only a **seventh-grade education**, he was capable of reading the policy and the yearly reports that indicated that premiums were payable for the life of the policy and that the guaranteed accumulation interest rate was four percent); *Alfa Life Ins. Corp. v. Green*, 881 So.2d 987 (Ala. 2003)(plaintiffs with eleventh grade and high school education could not prove they reasonably relied on agent's statements in face of contrary writings).

2.    **Lane's Claim for Negligent Procurement is Due to be Dismissed in Light of Reformation of the Policy, Lack of Duty, and His Own Contributory Negligence.**

For the reasons stated above, since the policy is due to be reformed, Lane cannot prove negligence on the part of McKnight.  *See Armstrong Bus. Servs.,* 817 So. 2d at 679 (Ala. 2001). Further, under Alabama law, contributory negligence is a complete defense to a claim for negligent procurement.  *See Aplin v. Tew*, 839 So. 2d 635 (Ala. 2002) ("plaintiff cannot recover in a negligence action where the plaintiff's own negligence is shown to have proximately contributed to his injury, notwithstanding a showing of negligence on the part of the defendant"); *Bergob v. Scrushy*, 2002 WL 31002513 (Ala. Civ. App. 2002) ("contributory negligence is an affirmative and complete defense to a claim based on negligence").

In Alabama, plaintiffs are charged with the duty to read their insurance contract and the application.  *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 422 (Ala. 1997).  In fact, under Alabama law, an insured is considered to be contributorily negligent for failing to read their insurance policy.  *Kanellis v. Pacific Indemnity Co.*, 2005 WL 1253122 (Ala. Civ. App. May 27, 2005).  Therefore, under Alabama law, Lane was under a duty to read his policy.  If he claims that he did not receive a policy, this still does not relieve him of the obligation Alabama state courts impose on insureds.  To satisfy this affirmative legal duty, again assuming Lane claims not to have received his policy, Lane should have called Progressive or McKnight and asked for a copy of his policy.  Further, Lane failed to review his application before signing it and cannot now argue Defendants were negligent in light of his own negligence.  (*See* Exh. A, p. 40, line 23; p. 41, lines 1-4).  Moreover, Lane would have received three separate declarations pgs indicating limits of $300,000.  Therefore Lane's negligence claim is due to be dismissed based on contributory negligence.

### C. RIVERSIDE TURF'S CROSS-CLAIM IS DUE TO BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

#### 1. Riverside Turf Lacks Standing to Sue McKight.

Standing is necessary for a valid legal action. *Liberty National Life Ins. Co. v. Univ. of Ala. Health Services Foundation, P.C.,* 881 So.2d 1013, 1019 (Ala. 2003). Furthermore, to have standing (i.e. to be a "proper party") a person must have a real, tangible legal interest in the subject matter of the lawsuit. *Id.* Standing exists only where a party has been injured in fact and whether the injury is to a legally protected right. *Id.*

The issue regarding Riverside Turf's claims asserted against McKnight is whether a third party to an insurance policy, Riverside Turf, has standing to sue for tort claims arising out of that insurance policy. There is no dispute Riverside Turf was not a party to the contract of insurance between Lane and Progressive. It is well-settled law that "one not a party to, or in privity with a contract, cannot sue for its breach." *Dunning v. New England Life Ins. Co.*, 890 So.2d 92, 97 (Ala. 2003), *quoting Twine v. Liberty Nat'l Life Ins. Co.,* 294 Ala. 43, 50, 311 So.2d 299, 305 (1975). "A party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental benefit upon the third party." *Id.*, *quoting Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co.*, 619 So. 2d 1328, 1329 (Ala. 1993).

Thus, to establish a third-party beneficiary is entitled to recovery, the claimant must show, "(1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; (2) that the complainant was the intended beneficiary of the contract; and (3) that the contract was breached." *Custer v. Homeside Lending, Inc.*, 858 So.2d 233, (Ala. 2003), *citing H.R.H. Metals, Inc. v. Miller,* 833 So.2d 18, 24 (Ala. 2002).

The initial application from March of 2003 does not name Riverside Turf as beneficiary of the policy. (Exh., the 2003 Application, pp. l-6). In fact, Riverside Turf is not named anywhere on the application at all. Riverside Turf was later named as a "loss payee," (a.k.a. a lienholder) for purposes of the physical damage coverage under the physical damage policy, not the Progressive liability policy. (Exh. N, Morris depo, p. 28, lines 7-23; p. 29, lines 1-11). This did not even occur until August of 2003. (Exh. L, 2003 ACORD Insurance Binder, McKnight 27).

Alabama courts have held third parties, such as Riverside Turf, must be intended beneficiaries at the outset of the contract and the benefit conferred must be direct rather than incidental. *Custer v. Homeside Lending, Inc.*, 858 So.2d 233, 249 (Ala. 2003). *See also Beverly v. Macy*, 702 F.2d 931 (Ala. Civ. App. 1983) ("the intention of the parties disclosed by the writing and surrounding circumstances known to the parties, *and not their motive,* determines the rights of the third-party beneficiary"). "The court's inquiry may stop when it determines from the face of the contract that the parties did not intend to confer upon the third person a direct benefit." *Id.* at 249. Therefore, the fact Riverside Turf was **not** named in the original application demonstrates it was not an intended beneficiary at the outset of the contract.

Riverside Turf has the burden of proving the contract between Lane and Progressive was intended to create a direct benefit for Riverside Turf. *Mills v. Welk*, 470 So. 2d 1226 (Ala. 1985); *Holley v. St. Paul Fire & Marine Ins. Co.*, 396 So. 2d 75 (Ala. 1981); *Gay v. Broder*, 109 Cal.App.3d 66 (1980) (*discussed in Smith v. Equifax Serv., Inc.*, 537 So. 2d 463 (Ala. 1988)).

At the time of contracting, Riverside Turf was not named in the application as a beneficiary. Neither Lane nor McKnight, therefore, intended at the time the contract was formed to bestow any type of direct benefit upon Riverside Turf. The contract at issue is one for liability

coverage. Riverside Turf has testified that it is the beneficiary of its own separate liability insurance policy, among other policies. (Exh. N, Morris depo, p. 18, lines 8-14). Riverside Turf is merely a loss payee to the policy issued to Lane for physical damage coverage since Riverside Turf loaned Lane the money to purchase the tractor added to the policy in August 2003. (Exh. N, Morris depo, p. 28, lines 7-23; p. 29, lines 1-11; p. 43, lines 14-23). Any benefit to Riverside Turf flowing from the liability policy insuring Lane was merely "incidental" or secondary. *See Mills*, 470 So.2d at 1226.

### 2. Riverside Turf Can Not Sue These Defendants for Negligent Procurement.

Riverside Turf's claim is due to be dismissed as a negligent procurement claim only exists between the insurance agent/broker and the insured. *Ivory v. The Gulf Agency*, 667 So.2d 725 (Ala. 1995). Riverside Turf is neither the insured nor the agent. Therefore, Riverside Turf cannot demonstrate any set of facts under which Defendants could have owed a duty to it regarding procurement of the coverage. Accordingly, Riverside Turf's claim for negligent procurement are due to be dismissed. *See Ivory,* 667 So.2d at 726-27.

### 3. Riverside Turf's Fraud Claims Fail as a Matter of Law.

Riverside Turf is unable to demonstrate the elements of misrepresentation or suppression sufficient for its claims to stand. *See Johnson v. Sorensen*, 2005 WL 1253829 **1, 6 (Ala. May 27, 2005) (citing *Waddell,* 875 So.2d at 1161); *Waddell,* 2003 WL 21512990 at *13. As an initial matter, reformation of the contract negates a false representation or suppression of a material fact. Further, Riverside Turf has offered no evidence it relied to its detriment on the alleged misrepresentations or suppressions allegedly made by these Defendants. *See e.g. Ames v. Pardue*, 389 So.2d 927, 931 (Ala. 1980) (in action for fraud, representee who relied on

defendant's misstatement and plaintiff who was injured must be one and the same, and representee must have relied on and have been deceived and damaged by the statement).

It is true that "[w]here fraudulent representations are made to a beneficiary of a life insurance policy at the time the application for the policy is made by the insured, the beneficiary may have standing to bring an action for fraud." *Smith v. Equifax Serv., Inc.*, 537 So. 2d at 464. However, the beneficiary only will have standing if the misrepresentations were made to the beneficiary or if the consideration for the contract "was to and did flow from the plaintiff [beneficiary]." *Id.*, *citing N.C. Mut. Life Ins. Co. v. Holley*, 533 So. 2d 497 (Ala. 1987); *Nat'l States Ins. Co. v. Jones*, 393 So. 2d 1361 (Ala. 1980); *see e.g. Nat'l States Ins. Co. v. Jones*, 393 So. 2d 1361 (plaintiff niece of deceased insured was third-party beneficiary with standing to sue on life insurance policy because she was responsible for paying the policy premiums, she paid her aunt's medical expenses, the insurance sales presentation was directed at the niece, and the consideration for the contract flowed from the niece).

Unlike the situation in *Jones,* Riverside Turf is not a beneficiary under the liability policy. (Exh. N, Morris depo, p. 31, lines 7-22). Riverside Turf was not present at the time of contracting. Further, while Riverside Turf may have helped Lane finance a portion of his premium payments, Lane was ultimately responsible for paying the premiums. (Exh. A, Lane depo, p. 62, lines 19-23; p. 63, lines1-15; Exh. N, Morris depo, p. 48, lines 14-19). As Riverside Turf was not present at the time of contracting, was not a named beneficiary, and was only a named loss payee for the physical damage coverage (as opposed to the liability coverage at issue in this case), it cannot be said that the consideration for the contract flowed from Riverside Turf.

**CONCLUSION**

Therefore, based upon the foregoing, Defendants respectfully request this Court enter an Order (1) reforming the policy to reflect the $1,000,000 limits as requested in Ricky Lane's amended complaint, (2) dismissing all of Progressive's claims against them, (3) dismissing all of Lane's claims against them, and (4) dismissing all of Riverside's claims against them in this lawsuit.

<u>*s/Stephen E. Whitehead*</u>
Stephen E. Whitehead
Mark E. Tindal
Erin E. May
Attorneys for Defendants

*OF COUNSEL*:
LLOYD, GRAY, & WHITEHEAD, P.C.
2501 Twentieth Place South, Suite 300
Birmingham, Alabama 35223
Telephone - (205) 967-8822
Facsimile - (205) 967-2380

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been served upon the following by placing a copy of same in the United States Mail, postage prepaid, on this the 25<u>th</u> day of November, 2005.

Randy Haynes
Morris, Haynes & Hornsby
P.O. Box 1660
Alexander City, Alabama 35011

T. Randall Lyons
Webster, Henry & Lyons, P.C
Post Office Box 239
Montgomery, Alabama 36101

Christina D. Crow
Lynn W. Jinks, III
Nathan A. Dickson, II
Jinks, Daniel & Crow
P.O. Box 350
Union Springs, Alabama 36089

Larry Bradford
Bradford Law Firm, P.C.
2020 Canyon Road, Suite 100
Birmingham, Alabama 35216

**Courtesy Copy sent to the following:**
G. Thomas Yearout
Yearout, Spina & Lavelle, P.C.
1500 Urban Center Drive, Suite 450
Birmingham, Alabama 35242

Jay Tuley
Alex Holtsford
Nix, Holtsford, Gilliland, Higgins & Higgins, P.C.
P.O. box 4128
Montgomery, Alabama 36103-4128

Jeffery W. Smith
Slaten & O'Connor
P.O. Box 1110
Montgomery, Alabama 36101

<u>Stephen E. Whitehead</u>
OF COUNSEL