## FREEDOM COURT REPORTING

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE MIDDLE DISTRICT OF ALABAMA

 3                   NORTHERN DIVISION

 4

 5    PROGRESSIVE SPECIALTY      )

 6    INSURANCE COMPANY,         )

 7             Plaintiff,        )

 8    vs.                        )   CASE NUMBER:

 9    MCKNIGHT AGENCY, INC.,     )   2:05-CV-438-W

10    JOE MCKNIGHT; RICKY LANE;)

11    RIVERSIDE TURF FARM,       )   ORIGINAL

12    et al.,                    )

13             Defendants.       )

14

15          DEPOSITION OF RICKY ALLEN LANE

16             In accordance with Rule 5(d) of

17    The Alabama Rules of Civil Procedure, as

18    Amended, effective May 15, 1988, I, Cindy

19    Weldon, am hereby delivering to Mark E.

20    Tindal, the original transcript of the oral

21    testimony taken on the 15th day of November,

22    2005, along with exhibits.

23             Please be advised that this is the
```

# FREEDOM COURT REPORTING

1    same and not retained by the Court Reporter,

2    nor filed with the Court.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  NORTHERN DIVISION

 4

 5   PROGRESSIVE SPECIALTY        )

 6   INSURANCE COMPANY,           )

 7        Plaintiff,              )

 8   vs.                          )   CASE NUMBER:

 9                                )   2:05-CV-438-W

10   MCKNIGHT AGENCY, INC.,       )

11   JOE MCKNIGHT; RICKY LANE;)

12   RIVERSIDE TURF FARM,         )

13   et al.,                      )

14        Defendants.             )

15

16          S T I P U L A T I O N

17          IT IS STIPULATED AND AGREED, by

18   and between the parties through their

19   respective counsel, that the deposition of

20   RICKY A. LANE, may be taken before Cindy

21   Weldon, Certified Shorthand Reporter,

22   Commissioner and Notary Public, at the

23   offices of Lynn Jinks, 219 North Prairie
```

# FREEDOM COURT REPORTING

1   Street, Union Springs, Alabama, on November

2   the 15th,, 2005 at 10:15 a.m.

3            IT IS FURTHER STIPULATED AND

4   AGREED that the signature to and the reading

5   of the deposition by the witness is waived,

6   the deposition to have the same force and

7   effect as if full compliance had been had

8   with all laws and rules of Court relating to

9   the taking of depositions.

10           IT IS FURTHER STIPULATED AND

11  AGREED that it shall not be necessary for

12  any objections to be made by counsel to any

13  questions, except as to form or leading

14  questions, and that counsel for the parties

15  may make objections and assign grounds at

16  the time of trial, or at the time said

17  deposition is offered in evidence, or prior

18  thereto.

19           IT IS FURTHER STIPULATED AND

20  AGREED that notice of filing of the

21  deposition by the Commissioner is waived.

22

23

# FREEDOM COURT REPORTING

```
1              A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4           MR. EVAN BAGGETT

5           2020 CANYON ROAD

6           SUITE 100

7           BIRMINGHAM, ALABAMA  35216

8

9   FOR THE DEFENDANT:

10          MR. MARK E. TINDAL

11          2501 TWENTIETH PLACE SOUTH

12          SUITE 300

13          BIRMINGHAM, ALABAMA  35223

14

15          MR. LYNN JINKS

16          219 NORTH PRAIRIE STREET

17          UNION SPRINGS, ALABAMA  36089

18

19          MR. JAY TULEY

20          4001 CARMICHAEL ROAD SUITE 300

21          MONTGOMERY, ALABAMA  36106

22

23
```

# FREEDOM COURT REPORTING

Page 6

1        MR. MICHAEL L. WHITE

2        418 SCOTT STREET, SUITE B

3        MONTGOMERY, ALABAMA   36101

4

5        MR. JEREMY KNOWLES

6        131 MAIN STREET

7        ALEXANDER CITY, ALABAMA   35011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

```
1                    I N D E X

2

3    EXAMINATION BY:                      PAGE

4    MR. TINDAL                              8

5    MR. BAGGETT                            67

6    MR. KNOWLES                           70

7

8

9                 E X H I B I T S

10                                        PAGE

11   DEFENDANT'S EXHIBIT NO. 1             14

12   DEFENDANT'S EXHIBIT NO. 2             29

13   DEFENDANT'S EXHIBIT NO. 3             29

14   DEFENDANT'S EXHIBIT NO. 4             31

15   DEFENDANT'S EXHIBIT NO. 5             52

16   DEFENDANT'S EXHIBIT NO. 6             53

17   DEFENDANT'S EXHIBIT NO. 7             56

18   DEFENDANT'S EXHIBIT NO. 8             57

19   DEFENDANT'S EXHIBIT NO. 9             61

20   DEFENDANT'S EXHIBIT NO. 10            63

21

22

23
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

## FREEDOM COURT REPORTING

```
1                    RICKY ALLEN LANE,

2        after first being duly sworn, testified

3                      as follows:

4    EXAMINATION BY MR. TINDAL:

5              THE COURT REPORTER:  Usual

6    stipulations?

7              MR. TINDAL:  That's fine.

8              MR. JINKS:  That's fine.

9        Q.    Could you state your name for the

10   record, please, sir.

11       A.    Ricky Allen Lane.

12       Q.    Mr. Lane, my name is Mark Tindal.

13   I represent Joe McKnight and the McNight

14   Agency.  I'm going to be asking you a few

15   questions today, all right?

16       A.    All right.

17       Q.    It's my understanding you have

18   given at least one deposition previously; is

19   that right?

20       A.    Yes.

21       Q.    And just so we understand each

22   other, I'm going to be asking you some

23   questions.  And if the question doesn't make
```

## FREEDOM COURT REPORTING

Page 9

1    sense or it's not clear in any way, just let

2    me know and I'll rephrase it.

3          Otherwise, whatever the question

4    typed down is, we're going to assume that

5    you understood what the question meant,

6    okay?

7          A.    Okay.

8          Q.    All right.  What is your current

9    address, sir?

10         A.    850 County Road 177.

11         Q.    And how long have you lived there?

12         A.    Shorterville.  About twenty years.

13         Q.    Do you have a post office box?

14         A.    Yes, I do.

15         Q.    Okay.  How long -- Well, what's

16   that post office box?

17         A.    P.O. Box 85, Shorterville.

18         Q.    How long have you had that post

19   office box?

20         A.    Six years.

21         Q.    Is that where you receive all of

22   your mail?

23         A.    No.

## FREEDOM COURT REPORTING

1      Q.   You receive it at your mailbox out

2  in front of your house and at the post

3  office box?

4      A.   Yes.

5      Q.   All right.  If you could briefly

6  go through your education for us.

7      A.   The ninth grade.  I went through

8  the second semester of my ninth grade.  I

9  quit school.

10      Q.   Is that middle school or high

11  school?

12      A.   High school.

13      Q.   Which high school?

14      A.   It was Carter High in Knoxville,

15  Tennessee.

16      Q.   All right.  I don't mean to offend

17  you by asking this question.  I just have

18  to.  Are you able to read and write?

19      A.   No.

20      Q.   You're not?

21      A.   Very little.

22      Q.   Very little?

23      A.   Yes.

# FREEDOM COURT REPORTING

```
1          Q.    Do you have a commercial driver's

2    license?

3          A.    Yes, I do.

4          Q.    Did you have to take that test?

5          A.    Yes, I did.

6          Q.    All right.  Did that require you

7    taking a written test?

8          A.    Yes.

9          Q.    Okay.  And you were able to

10   complete that test and pass it?

11         A.    No.

12         Q.    No?

13         A.    They told -- I requested an oral

14   test.

15         Q.    All right.

16         A.    And I had to take the written test

17   first.

18         Q.    How did you do on the written

19   test?

20         A.    I failed it.

21         Q.    Do you know how many you got

22   correct and how many you missed?

23         A.    No.  It was quite a few.  And then
```

## FREEDOM COURT REPORTING

Page 12

1 she gave me the oral test later. I had to

2 set up an appointment for that. And then I

3 passed. I made a hundred on everything.

4     Q.    Okay. Do you read any newspapers

5 or magazines ever?

6     A.    I try to.

7     Q.    What do you try to read?

8     A.    The newspaper.

9     Q.    The newspaper. Any trade

10 materials or anything?

11     A.    No.

12     Q.    Okay. And I take it you're

13 capable of reading and understanding the

14 road signs?

15     A.    Yes.

16     Q.    Okay. Now, it's my understanding

17 that there are certain types of insurance

18 coverages that truck drivers like yourself

19 are required to purchase?

20     A.    Yes.

21     Q.    Do you know what those types of

22 insurances are?

23     A.    Yes, I do.

## FREEDOM COURT REPORTING

Page 13

1      Q.    What are they?

2      A.    That is three hundred thousand

3  within the state that you live in.

4      Q.    Okay.  We'll get to that in a

5  second.  What I'm talking about, one of them

6  would be a liability.  Liability insurance

7  is one type of policy.

8      A.    Seven hundred and fifty thousand

9  dollars.

10      Q.    Okay.  Do you also have to have a

11  cargo policy?

12      A.    Yes.

13      Q.    All right.  Do you have to have

14  what's called bob tail coverage?

15      A.    Yes.

16      Q.    What is bob tail coverage?

17      A.    Bob tail coverage is when you have

18  not got no trailer on, that it is just the

19  truck.

20      Q.    Just the truck?  Okay.

21      A.    Yes, sir.

22      Q.    And then do you also have to have

23  physical damage coverage?

# FREEDOM COURT REPORTING

1      A.   Yes.

2      Q.   All right.  Do you understand that

3 the liability coverage provides you

4 insurance for accidents where you are

5 determined to be at fault?

6      A.   Yes.

7      Q.   Okay.  Now, these are some

8 documents that I have passed out this

9 morning that I received yesterday from Joe

10 McKnight.

11        If you could look at those briefly

12 for me, sir, and tell me if you recognize

13 any of those documents?

14      A.   This one right here.

15      Q.   All right.  I'm going to mark all

16 of these pages together as Defendant's

17 Exhibit 1.

18        (Whereupon, Defendant's Exhibit

19 No. 1 was marked for identification.)

20      Q.   And the page you're referring to,

21 at the top right-hand corner has the number

22 seventeen circled.

23        And you're referring to the

## 367 VALLEY AVENUE
## (877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

# FREEDOM COURT REPORTING

1  signature page for an application for

2  insurance; is that right?

3  　　　A.　　Yes, sir.

4  　　　Q.　　Okay.  And that was for a

5  Progressive insurance policy back in 2000;

6  is that right?

7  　　　A.　　Yes, sir.

8  　　　Q.　　Now, my understanding is back in

9  September or early October of 2000, you went

10 to the McKnight Agency to get liability

11 insurance; is that right?

12 　　　A.　　Yes.

13 　　　Q.　　And you went in asking for seven

14 hundred and fifty thousand dollars worth of

15 insurance; right?

16 　　　A.　　No, sir.

17 　　　Q.　　Okay.

18 　　　A.　　I went in asking -- I told Joe

19 McKnight what I wanted or rather what I was

20 doing.

21 　　　Q.　　Right.

22 　　　A.　　And then he told me -- he told me

23 my requirements.  And so we went on from

## FREEDOM COURT REPORTING

1      there.

2          Q.    What did he tell you were your

3      requirements?

4          A.    He asked me what I would be

5      hauling and I told him logs.  At that time,

6      logs and pulp wood chips.  And he asked me

7      where.  And I told him Alabama, Georgia and

8      Florida.

9               And so he said that I would need

10     seven hundred and fifty thousand dollars in

11     order to cross the state line.

12         Q.    Okay.  And it's my understanding

13     Mr. McKnight told you that a million dollar

14     policy was not that more expensive than a --

15         A.    No, he did not.

16         Q.    He did not?

17         A.    Excuse me.  What he said was a

18     million dollars more of coverage was not

19     that much more.  It was -- I forget the

20     actual dollar amount.  But it was something

21     like eighty to a hundred dollars a year

22     more.

23         Q.    Okay.  You're talking about the

## FREEDOM COURT REPORTING

Page 17

1    premiums?

2          A.    Yes.

3          Q.    Would be eighty to a hundred

4    dollars more; is that right?

5          A.    Yes.

6          Q.    And you understand --

7          A.    No.  No.  Excuse me.  The whole

8    policy for a million dollars wouldn't be but

9    around eighty to a hundred dollars a year

10   more.

11         Q.    In premiums; right?  The eighty to

12   a hundred --

13         A.    The whole thing.

14         Q.    Correct.  Okay.  So the one

15   million dollar policy versus a seven hundred

16   and fifty thousand dollar policy is what

17   y'all were talking about; right?

18         A.    Yes, sir.

19         Q.    And he told you that you could get

20   a million dollar policy as opposed to a

21   seven hundred and fifty thousand dollar

22   policy for about eighty to a hundred dollars

23   more in premiums per year?

## FREEDOM COURT REPORTING

```
 1          A.    Yes.
 2          Q.    Okay.  And you understood that the
 3     premiums were what you would pay to the
 4     insurance company for the coverage; right?
 5          A.    Yes, sir.
 6          Q.    If you'll look on this first page
 7     here, right here on the right-hand side of
 8     the page.
 9          A.    Uh-huh.
10          Q.    About two-thirds of the way up,
11     it's got age.  You see that?
12          A.    Yes, sir.
13          Q.    And it had you at forty-two.  Was
14     that correct in --
15          A.    Yes, sir.
16          Q.    In October of 2000, was that
17     correct?
18          A.    Yes, sir.
19          Q.    All right.  And then it says PTS
20     and under -- excuse me -- ST and under that
21     it says the letter M.  You see that?
22          A.    Yes, sir.
23          Q.    And then next to that, it says
```

# FREEDOM COURT REPORTING

```
1   PTS.  And underneath that, it says three.
2   Do you see that?
3        A.   Yes, sir.
4        Q.   Now, did you understand that that
5   meant you had three points on your driving
6   record?
7        A.   No, sir.
8        Q.   Okay.  Then underneath on the
9   left-hand side where it has the one thousand
10  CSL -- you see that?
11       A.   Yes, sir.
12       Q.   Did you understand that that meant
13  a million dollars limit?
14       A.   No, sir.
15       Q.   You did not understand that?
16       A.   No, sir, I did not.
17       Q.   Did you understand that you were
18  purchasing a million dollar policy?
19       A.   Yes, sir, I did.
20       Q.   Let me rephrase that.  You
21  understand that you were purchasing a policy
22  with a million dollar limits?
23       A.   Yes, sir, I did.
```

# FREEDOM COURT REPORTING

1    Q.    All right.  And you and Joe

2  McKnight had discussions back in October of

3  2000 where y'all decided that he would help

4  you procure a million dollar policy from

5  Progressive for liability coverage; is that

6  right?

7    A.    Yes, sir.

8    Q.    If you'll go to the third page, is

9  it that an invoice that you received from

10  the McKnight Agency for the two thousand one

11  hundred and thirty-one dollars in premiums?

12    A.    Yes, sir.

13    Q.    And that was for the million

14  dollar policy from October of 2000; correct?

15    A.    Yes, sir.

16    Q.    All right.  If you'll go to the

17  next page, it has the number thirteen

18  circled at the top right.  You see that?

19    A.    Yes, sir.

20    Q.    And then it goes all the way to

21  page eighteen, according to the numbers at

22  the top right.

23       Does this look like the

## FREEDOM COURT REPORTING

1  application that you signed back in October

2  of 2000?

3      A.   I don't know.  I haven't never

4  seen this.

5      Q.   Okay.  You did recognize page

6  seventeen; correct?

7      A.   Yes, sir.

8      Q.   Okay.

9      A.   That I -- That is my signature.

10      Q.   Okay.  Do you recall seeing this

11  page when you signed it?

12      A.   Yes, sir.

13      Q.   Was it attached to other pages?

14      A.   No, sir.

15      Q.   It was all by itself?

16      A.   Yes, sir.

17      Q.   Okay.  Now, when you were meeting

18  with Mr. McKnight -- I want to go through

19  the application process.

20          It's my understanding, based on

21  what Mr. McKnight testified, that he would

22  sit down and pull up the application on the

23  computer; is that right?

## FREEDOM COURT REPORTING

Page 22

```
 1        A.    No, sir.

 2        Q.    It's not right?

 3        A.    No, sir, it is not.

 4        Q.    Okay.  What would he do?

 5        A.    He would ask me -- excuse me -- he

 6   would ask me questions.

 7        Q.    Okay.

 8        A.    And then while I was answering the

 9   questions, he would be typing on his

10   computer.

11        Q.    Okay.  I think we're talking about

12   the same thing.  The application was -- At

13   the time that he was filling in the

14   information, the application was on his

15   computer monitor?

16        A.    Yes, sir.

17        Q.    Okay.  And so he would ask you

18   questions that were requested on the

19   application; right?

20        A.    Yes, sir.

21        Q.    And then you would give him the

22   answers?

23        A.    Yes, sir.
```

# FREEDOM COURT REPORTING

1      Q.    And then he would type them in?

2      A.    Yes, sir.

3      Q.    Now, looking back on the one that

4   has the number thirteen at the top right, I

5   just want to make sure that the information

6   that he entered was correct.

7           It has under general information

8    -- it has your name as Ricky Lane.  That's

9   correct?

10     A.    Yes, sir.

11     Q.    And your home phone number, is

12  that correct?

13     A.    No, sir.

14     Q.    Was it correct at the time?

15     A.    Yes, sir.

16     Q.    Okay.  And the company at the time

17  was C & D Express?

18     A.    Yes, sir.

19     Q.    And it has the address as Route 1,

20  Box 77, Shorterville, Alabama.  Was that

21  correct at the time?

22     A.    Yes, sir.

23     Q.    And it says business type,

## FREEDOM COURT REPORTING

1  logging, log transport and sawmills; is that

2  correct?

3      A.   Yes, sir.

4      Q.   All right.  And it has your birth

5  date.  If you go down to the driver

6  information section, your birth date is

7  April 9, 1958?

8      A.   Yes, sir.

9      Q.   And that's correct?

10     A.   Yes, sir.

11     Q.   And it shows that you're not

12  married at that time; is that correct?

13     A.   No.  I was married.

14     Q.   You were married?

15     A.   Yes.

16     Q.   Okay.

17         MR. JINKS:  It says married.

18     Q.   I'm sorry.  I was looking at the Y

19  slash N.  Okay.  So it says you're married.

20  That's correct?  Is that correct?

21     A.   Yes.

22     Q.   All right.

23         MR. JINKS:  And let the record

# FREEDOM COURT REPORTING

1   reflect that even the lawyers can't

2   understand these insurance documents.

3        Q.   And then underneath your name over

4   there, it has your license number.  I don't

5   want to put it on the record.  Is that

6   correct?

7        A.   Yes, it is.

8        Q.   And is that your correct social

9   security number?

10       A.   Yes, it is.

11       Q.   And then over there to the right,

12   it says points at three again; correct?

13       A.   Yes.

14       Q.   All right.

15            MR. TULEY:  Well, it says PTS

16   three.

17            MR. TINDAL:  Okay.

18       Q.   So after Mr. McKnight entered all

19   the information on the computer, is it your

20   understanding that the computer then

21   determined whether you would qualify for the

22   million dollars in coverage or not?

23       A.   No.

## FREEDOM COURT REPORTING

1    Q.   Okay.  I'll just tell you what Mr.

2    McKnight testified.  That he would enter all

3    your information into the software into the

4    computer and then he'd hit a button and then

5    the Progressive software would then let him

6    know if you would be approved for the

7    million dollar policy.  Do you have any

8    reason to dispute that?

9    A.   No.

10   Q.   Okay.

11   A.   I do not.

12   Q.   And then you did get a million

13   dollar policy in October of 2000; correct?

14   A.   Yes, I did.

15   Q.   And that was what both of you

16   intended at that time; correct?

17   A.   Yes.

18   Q.   And you paid the premiums for that

19   policy; correct?

20   A.   Yes.

21   Q.   So now I want to move forward to

22   March of 2003.

23   A.   Okay.

# FREEDOM COURT REPORTING

Page 27

1      Q.    Do you remember coming in to Mr.

2   McKnight's office around March or February

3   of 2003?

4      A.    Yes, I do.

5      Q.    What was the reason you came in?

6      A.    To take out a policy where I could

7   start hauling sod.

8      Q.    Okay.  And so at that time, you

9   knew that you needed at least seven hundred

10  and fifty thousand dollars of coverage?

11     A.    Yes.

12     Q.    So you asked Mr. McKnight for

13  seven hundred and fifty thousand; correct?

14     A.    No.  I asked him for a million

15  dollars.

16     Q.    Okay.  So when you came in, you

17  said I want to get the million?

18     A.    Yes.

19     Q.    Okay.  And that was to provide you

20  coverage on the -- on your tractor, your

21  truck?

22     A.    Yes.

23     Q.    For hauling for Riverside Turf; is

## FREEDOM COURT REPORTING

1    that correct?

2         A.   Yes.

3         Q.   Now, I'm going to show you what

4    your lawyers have produced to me Bates

5    stamped R period Lane 001 through 015.

6         A.   Okay.  Just look at those.  And

7    after your lawyer looks at them, let me know

8    if you recognize those documents.

9              And I will represent to you that

10   one of your lawyers, Christy Crow, told me

11   that was everything you had in your

12   possession for the policy that's the subject

13   of this lawsuit.  So just let me know if you

14   recognize those.

15              MR. JINKS:  Something is missing.

16              MR. TINDAL:  What's missing?

17              MR. JINKS:  These two pages right

18   here.

19              MR. TINDAL:  Okay.

20              MR. JINKS:  I don't know why they

21   are not included in what she sent you.

22              MR. TINDAL:  Okay.  Do you just

23   want to add those to --

## FREEDOM COURT REPORTING

1    MR. JINKS: Let me just compare

2   what you've got. With the exception of

3   those two pages, I think that's -- I think

4   they are supposed to be in there.

5    Maybe I just overlooked them. I

6   don't see them. But they should be in

7   there.

8    MR. TINDAL: Do you want to make

9   sure that there's nothing else in yours

10   that's --

11    MR. JINKS: It looks like

12   everything that he got is included in your

13   set of documents except those two.

14    MR. TINDAL: Okay. I would like

15   to add them, but these look like your

16   originals.

17    MR. JINKS: Yes. Let me get

18   copies made right quick.

19    (Whereupon, a short recess was

20   taken.)

21    Q. Back on the record. We'll mark

22   this first one that's Bates stamped as

23   Defendant's Exhibit 2. And then we'll mark

## FREEDOM COURT REPORTING

1    these two pages that are to be added as

2    Exhibit 3.

3              (Whereupon, Defendant's Exhibits

4    Nos 2 and 3 were marked for identification.)

5        Q.   I'll let you look at those as

6    well.  Looking at Exhibit 2 and Exhibit 3,

7    Mr. Lane, are those all the documents that

8    you received regarding the insurance policy

9    that's the subject of this lawsuit?

10       A.   Yes.

11       Q.   Okay.  Let's go through the

12   process.  When you came in, in March of 2003

13   to meet with Mr. McKnight, was it the same

14   process that was used in March of -- or

15   October of 2000?

16       A.   Yes, it was.

17       Q.   So you and Mr. McKnight discussed

18   procuring a one million dollar policy for

19   you for your truck for hauling for Riverside

20   Turf?

21       A.   Yes.

22       Q.   Then he sat down at the computer

23   and started asking you questions?

## FREEDOM COURT REPORTING

1    A.    Yes.

2    Q.    You would answer the questions and

3  he would type the answers into the computer?

4    A.    Yes.

5    Q.    And I'll tell you Mr. McKnight

6  testified that when he was filling out that

7  application in March of 2003 or February of

8  2003, whenever it was, that he intended to

9  get you a one million dollar policy.  Are

10  you aware that he testified to that?

11    A.    No.

12    Q.    Okay.

13    A.    I am not aware of that.

14    Q.    But you know now that Mr. McKnight

15  is taking the position that he intended to

16  get you a one million dollar policy from

17  Progressive?

18    A.    Yes.

19    Q.    I'm going to show you what I'm

20  going to mark as Exhibit 4, which I'll

21  represent to you is the application for the

22  2003 policy.

23              (Whereupon, Defendant's Exhibit

## FREEDOM COURT REPORTING

```
1    No. 4 was marked for identification.)
2         Q.   I'll ask if you recognize any of
3    those documents?
4         A.   Just this one.
5         Q.   Okay.  And you're pointing to the
6    page that's Bates stamped?
7              MR. JINKS:   99.
8         Q.   McKnight 0099?
9         A.   Uh-huh.  Yes, sir.
10        Q.   And that is the application for
11   this policy that you signed in March of
12   2003; correct?
13        A.   Yes, sir.
14        Q.   Okay.  And you signed that at Mr.
15   McKnight's office; is that right?
16        A.   Yes, I did.
17        Q.   What's the date on that?
18        A.   3-10-03.
19        Q.   So that was in March of '03;
20   correct?
21        A.   Yes, sir.
22        Q.   All right.  Now, I'd like you to
23   look through here with me the information
```

# FREEDOM COURT REPORTING

1  and tell me if everything on the driver

2  information and point development and

3  violations are correct as of March 10 of

4  2003.  It's got your name as Ricky Lane.

5  That's correct?

6  　　　　A.  Yes, sir.

7  　　　　Q.  And it has your birth date there.

8  Is that correct?

9  　　　　A.  Yes, sir.

10  　　　　Q.  And it shows that you're married.

11  Were you still married at the time?

12  　　　　A.  Yes, sir.

13  　　　　Q.  All right.  It has your driver's

14  license number listed.  Is that correct?

15  　　　　A.  Yes, sir, it is.

16  　　　　Q.  And it has your social security

17  number there.  Is that correct?

18  　　　　A.  Yes, sir.

19  　　　　Q.  And then here it says PTS five.

20  You see that?

21  　　　　A.  Yes, sir, I do.

22  　　　　Q.  Okay.  Do you understand that to

23  mean that you had five points?

## FREEDOM COURT REPORTING

1    A.    I do now.

2    Q.    You do now?

3    A.    Yes, sir.

4    Q.    Have five points or --

5    A.    I do understand what that means

6    now.  I didn't before.

7    Q.    I understand.

8    A.    But I do now.

9    Q.    Okay.  Then we have a violation on

10   January 25, 2001.  Do you remember having a

11   traffic violation around January 25 of 2001?

12   A.    Yes, sir, I do.

13   Q.    And then another one listed for

14   August 27, 2001.  Do you remember that?

15   A.    Not really, no.

16   Q.    Okay.  But it may be true, just

17   depending on what your records show;

18   correct?

19   A.    Yes, sir.

20   Q.    And then there's one for September

21   18, 2002.  Do you remember that one?

22   A.    No, sir, I don't.

23   Q.    What about October 12, 2002.  Do

# FREEDOM COURT REPORTING

1    you remember that one?

2         A.    No, sir, I do not.

3         Q.    So again, if your records shows

4    that violations occurred on those dates,

5    then you wouldn't dispute that?

6         A.    No, sir, I wouldn't.

7         Q.    Okay.  Then over here where it

8    says named insured slash business, it has

9    your business type as trucking and

10   transportation of goods.  Is that correct?

11        A.    Yes, sir, it is correct.

12        Q.    And that was correct at the time

13   of the application?

14        A.    Yes, sir.

15        Q.    It has underneath there trucking

16   for hire.  Was that correct in March of --

17        A.    Yes.

18        Q.    -- that year?

19        A.    Yes.

20        Q.    It has your name again, Ricky

21   Lane, and P.O. Box 85, Shorterville,

22   Alabama.  That was correct at the time?

23        A.    Yes.

# FREEDOM COURT REPORTING

1      Q.    And was that your correct phone

2   number at the time?

3      A.    Yes.

4      Q.    All right.  And you owned the

5   tractor at the time; correct?

6      A.    Yes, sir.

7      Q.    And it was a 1993 Freightliner?

8      A.    Yes, sir.

9      Q.    Do you know if that's the correct

10  vehicle number?

11          MR. JINKS:  Talking about that

12  number right there?

13          MR. TINDAL:  Yes.  1 FUY.

14     A.    Not without looking at it, sir.

15     Q.    Okay.

16     A.    I owned the truck.  But I've only

17  owned one Freightliner.

18     Q.    That's fine.  It's not a memory

19  test.  I was just curious if you knew.  And

20  at the time of your application, it shows

21  here that you were not currently insured.

22  Is that a correct answer?

23     A.    Yes.

# FREEDOM COURT REPORTING

1      Q.    Then we go to what is Bates

2  stamped McKnight 0097.  Under coverages,

3  it's got three hundred CSL listed there;

4  correct?

5      A.    Yes, it does.

6      Q.    Now, assuming that means three

7  hundred thousand dollar limits, that's a

8  mistake; correct?

9      A.    Yes.  But I never seen this in his

10 office.

11     Q.    I understand that.  All I'm asking

12 is, assuming this three hundred CSL means

13 that you had applied for three hundred

14 thousand dollar in limits, that's not what

15 you and Joe McKnight discussed; correct?

16     A.    No, it is not.

17     Q.    It's not what you intended;

18 correct?

19     A.    No, it is not.

20     Q.    So I'll tell you Mr. McKnight

21 testified that he intended to get you a one

22 million dollar policy and he doesn't know

23 how the three hundred thousand dollar limits

# FREEDOM COURT REPORTING

1    were selected.  Are you aware that he

2    testified to that?

3         A.    No.

4         Q.    Okay.  But you are now since I

5    told you?

6         A.    Yes.

7         Q.    So again, you had already been

8    approved for a one million dollar policy

9    from Progressive in October of 2000;

10   correct?

11        A.    Yes, sir.

12        Q.    And when you met with Mr. McKnight

13   for this policy, you were willing to pay

14   premiums for a one million dollar policy;

15   correct?

16        A.    Yes.

17        Q.    So except for the fact that three

18   hundred thousand dollars was selected, you

19   would have gotten a million dollar policy as

20   far as you're concerned; correct?

21        A.    Yes.

22        Q.    And if the premiums had been a

23   little bit higher, you would have been

### FREEDOM COURT REPORTING

1    willing to pay those additional premiums to

2    get the million dollar policy; correct?

3        A.    Yes, sir.

4        Q.    So just to summarize, as far as

5    you know, except for a clerical error in

6    filling out this application, you would have

7    been given a one million dollar policy from

8    Progressive?

9        A.    Yes.

10       Q.    So based on what you know about

11   Mr. McKnight saying what his intentions

12   were, he obviously missed the three hundred

13   thousand when this application was

14   completed?

15           MR. JINKS:   And based on what you

16   told him Mr. McKnight said.

17           MR. TINDAL:   Yes.

18       A.    Yes, sir.

19       Q.    Okay.

20       A.    When I left Joe McKnight's office,

21   I thought I had a million dollars worth of

22   coverage under the -- under liability.

23       Q.    All right.   Now, at the time you

# FREEDOM COURT REPORTING

```
 1   signed the application, which I believe is
 2   number 97 --
 3           MR. JINKS:  99.  You're referring
 4   to the Bates stamp.
 5           MR. TINDAL:  With the signature.
 6           MR. JINKS:  It's 99.
 7           MR. TINDAL:  Thank you.
 8       Q.   Were all of these documents
 9   together?
10       A.   No, sir.
11       Q.   You just received that one page?
12       A.   Yes, sir, just that one page.  He
13   was printing them off his computer.  As he
14   was printing them off, then he handed me the
15   ones that I needed to sign.
16       Q.   Okay.
17       A.   So I signed them and I handed them
18   back to him.
19       Q.   What did he do with these first
20   pages before the signature page?  Did he
21   just leave them on the printer?
22       A.   Yes, sir.
23       Q.   Did you ask to see those pages?
```

# FREEDOM COURT REPORTING

1      A.    No, I did not.

2      Q.    But you could have asked if you

3  wanted to; right?

4      A.    Yes, sir.

5      Q.    Okay.  He didn't prevent you from

6  looking at them?

7      A.    No.  No, sir.

8      Q.    Okay.  Now, let's look at what's

9  marked as Defendant's Exhibit 3, which your

10  lawyer just told us that that should have

11  been included with the documents that were

12  in Exhibit 2; correct?

13      A.    Yes, sir.

14      Q.    What's the date on the first

15  document on the top right?

16      A.    8-8 of 2003.

17      Q.    That's August 8 of 2003?

18      A.    Yes.

19      Q.    And this is -- What is this

20  document?

21      A.    This is an insurance binder.

22      Q.    And then what's the second page?

23      A.    This is the certification of the

# FREEDOM COURT REPORTING

1  liability -- of the liability insurance.

2      Q.   Okay.  And what's the date up here

3  on the top right?

4      A.   3-8-04.

5      Q.   So that's March 8 of 2004.  That

6  would have been the time that it was

7  renewed; correct?

8      A.   Yes, sir.

9      Q.   Now, going back to the first page

10 here, do you recall going to Mr. McKnight's

11 office in August of 2003?

12     A.   No.  I called him.

13     Q.   You called him?

14     A.   Yes, sir.

15     Q.   Okay.

16     A.   On the phone.  I called him and I

17 told him I was looking at another truck.

18 The Freightliner I had, it was broke down

19 and I didn't want to put no more money into

20 that truck.

21         So I told Joe that I was -- that I

22 was looking at another truck and I was

23 thinking about buying it, but I wanted to

# FREEDOM COURT REPORTING

Page 43

1    haul a load on it first.  So he said that I

2    would need a binder.  So he took out the

3    binder and faxed it to me at Riverside Turf.

4        Q.    Okay.  So this one right here in

5    August of '03 was sent to Riverside Turf and

6    you got a copy of it there?

7        A.    Yes, sir.

8        Q.    And is that -- the same is true

9    for the second page?

10        A.    No.

11        Q.    How did you get the second page?

12    This is in March of 2004, the renewal.

13        A.    All right.  This -- yes.  Joe

14    McKnight called Riverside Turf.  And then he

15    said that it was coming time for me to renew

16    my insurance.

17             And then the next day or so, I

18    went down there and I renewed my -- I

19    renewed the insurance.

20        Q.    Yes, sir.

21        A.    All right.  Then he said that I

22    would receive everything from Progressive.

23        Q.    Go ahead.

## FREEDOM COURT REPORTING

1       A.    And I told Joe McKnight that I

2    needed something to put in my truck to show

3    that I had insurance and that -- or I was

4    going to have to wait until Progressive

5    mailed it to me.  So then he run -- he gave

6    me a copy of this right here.

7       Q.    The second page of Exhibit 3?

8    Okay.

9       A.    Yes.

10      Q.    All right.  Looking at the

11   documents that you produced to your lawyers

12   that in turn gave them to me, if you look at

13   the ones that are Bates stamped twelve and

14   thirteen, do you remember receiving that

15   document in 2005?

16      A.    Yes, I do.

17      Q.    That's in 2005?

18      A.    Yes, I do.

19      Q.    Did you receive one of those in

20   2004?

21      A.    No, I did not.

22      Q.    Okay.  Now, on this second page of

23   Exhibit 3, it's got a fax line across the

# FREEDOM COURT REPORTING

1    top.

2        A.    Uh-huh.

3        Q.    Do you have a fax machine?

4        A.    No, I do not.

5        Q.    Okay.  So that would have been

6    faxed to Riverside Turf?

7        A.    Yes.

8        Q.    Okay.

9        A.    Now, after I received -- after I

10   got my copy at Joe McKnight's office, then

11   he turned around and faxed a copy of this to

12   Riverside.

13        Q.    Do you have the original of the

14   one that Joe McKnight gave you?

15        A.    Yes.

16        MR. JINKS:  Is this it?

17        A.    I believe that is.  No, no.  I do

18   not.

19        Q.    Okay.

20        A.    I am sorry.  But when the accident

21   occurred, everything was in the truck.  When

22   I got the truck back, none of my paperwork

23   was in the truck.  None of it.

# FREEDOM COURT REPORTING

Page 46

1    Q.    Do you have any idea what --

2    A.    What happened to it, sir, I have

3    no idea.

4    Q.    Was it in police custody?

5    A.    Yes, it was.

6    Q.    The whole time from the accident

7    until you got it back?

8    A.    Yes.

9    Q.    Now, this first document that's

10   Bates stamped number one, it says bill to

11   Ricky Lane at -- or it's got a percentage

12   sign Riverside Turf?

13   A.    That's supposed to be in care of

14   Riverside Turf.  Ricky Lane in care of

15   Riverside Turf.

16   Q.    Now, was this sent to Riverside

17   Turf?

18   A.    No, it was not.  It was sent to

19   me.

20   Q.    To you?

21   A.    Yes.

22   Q.    Where, at your home or P.O. Box?

23   A.    At my P.O. Box.