# FREEDOM COURT REPORTING

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5     PROGRESSIVE SPECIALTY COMPANY,

6                  Plaintiff,

7        versus                    2:05-CV-438-W

8     MCKNIGHT AGENCY, INC., et al.,

9                  Defendants.

10

11                                    COPY

12

13

14          * * * * * * * * * * * * *

15          DEPOSITION OF JOE MCKNIGHT,

16     taken pursuant to stipulation and agreement

17     before Jackie Parham, Certified Shorthand

18     Reporter and Commissioner for the State of

19     Alabama at Large, in the law offices of Lloyd,

20     Gray & Whitehead, 2501 Twentieth Place South,

21     Suite 300, Birmingham, Alabama, on Friday, the

22     28th day of October, 2005, commencing at

23     approximately 9:20 a.m.

# FREEDOM COURT REPORTING

1                    APPEARANCES

2   APPEARING ON BEHALF OF THE PLAINTIFF:

3   SHANE T. SEARS, ESQUIRE

4   Bradford & Sears

5   2020 Canyon Road

6   Suite 100

7   Birmingham, Alabama  35216

8

9

10  APPEARING ON BEHALF OF THE DEFENDANTS:

11  RANDALL S. HAYNES, ESQUIRE

12  NANCY EADY, ESQUIRE

13  Morris, Haynes & Hornsby

14  131 Main Street

15  Alexander City, Alabama  35010

16

17

18  STEVE WHITEHEAD, ESQUIRE

19  MARK TINDAL, ESQUIRE

20  Lloyd, Gray & Whitehead

21  2501 Twentieth Place South

22  Suite 300

23  Birmingham, Alabama  35223

## FREEDOM COURT REPORTING

1   T. RANDALL LYONS, ESQUIRE
2   Webster, Henry & Lyons
3   418 Scott Street
4   Montgomery, Alabama   36104
5
6
7   JAY S. TULEY, ESQUIRE
8   Nix, Holtsford, Gilliland,
9     Higgins & Hitson
10  4001 Carmichael Road
11  Suite 300
12  Montgomery, Alabama   36106
13
14  Also present:   Ray Morris
15
16
17  JAY SMITH, ESQUIRE
18  Yearout, Spina & Lavelle
19  1500 Urban Center Drive
20  Suite 450
21  Birmingham, Alabama   35242
22
23

## FREEDOM COURT REPORTING

```
1                    STIPULATION

2            It is hereby stipulated and agreed by

3    and between counsel representing the parties

4    that the deposition of

5                    JOE MCKNIGHT

6    may be taken before Jackie Parham, Certified

7    Shorthand Reporter and Commissioner for the

8    State of Alabama at Large, without the

9    formality of a commission, and all formality

10   with respect to other procedural requirements

11   is waived; that objections to questions, other

12   than objections as to the form of the question,

13   need not be made at this time, but may be

14   reserved for a ruling at such time as the said

15   deposition may be offered in evidence or used

16   for any other purpose, by either party, as

17   provided for by the Federal Rules of Civil

18   Procedure.

19           It is further stipulated and agreed by

20   and between the parties hereto and the witness

21   that the signature of the witness to this

22   deposition is hereby waived.

23
```

# FREEDOM COURT REPORTING

1                        INDEX OF EXHIBITS

2    PX-1 (Invoice) ...................... 27

3

4    PX-2 & 3 (Renewal Notices) ........... 37

5

6    PX-4 (Certificate of Insurance) ...... 39

7

8    PX-5 (Receipt) ...................... 47

9

10   PX-6 (Invoice) ...................... 47

11

12   PX-7 (Certificate of Insurance) ...... 51

13

14   PX-8 (Application, etc.) ............. 58

15

16   PX-9 (Coverage Summary) ............. 87

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

```
 1                    INDEX OF EXAMINATION

 2   MR. HAYNES  ...........................  7

 3   MR. LYONS  ...........................  63

 4   MR. SEARS  ...........................  67

 5   MR. WHITEHEAD  .......................  82

 6   MR. HAYNES  ...........................  86

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

# FREEDOM COURT REPORTING

```
 1                    JOE MCKNIGHT,

 2          The witness, after having first been

 3   duly sworn to speak the truth, the whole truth,

 4   and nothing but the truth, testified as follows:

 5                    EXAMINATION

 6   BY MR. HAYNES:

 7   Q.    State your name, please.

 8   A.    Joe McKnight.

 9   Q.    Mr. McKnight, what is your occupation?

10   A.    Insurance agent.

11   Q.    And by whom are you employed at the

12         present time?

13   A.    Young, Johnston & Associates.

14   Q.    Is Young, Johnston & Associates the

15         successor agency to the McKnight Agency?

16   A.    Yes, sir.

17   Q.    Did you sell your agency to Young,

18         Johnston?

19   A.    Yes, sir.

20   Q.    Are you now an employee of Young,

21         Johnston?

22   A.    Yes, sir.

23   Q.    Mr. McKnight, you understand that we are
```

# FREEDOM COURT REPORTING

1      here about a policy of insurance that was

2      sold to an individual named Ricky Lane?

3  A.    Yes, sir.

4  Q.    Tell me what your experience is in the

5      insurance field.

6  A.    Well, I've been in the insurance business

7      since 1982.

8  Q.    And starting in 1982, take us from that

9      date up through today in terms of where

10      you worked, and what you did, and along

11      the way what licenses you have acquired.

12  A.    Okay.  In 1982 I started as a life and

13      health agent as an employee of United

14      Insurance Company.  In 1992 I got my

15      property and casualty license and opened

16      McKnight Agency.  And --

17  Q.    Did you have a life and health license?

18  A.    I had a life and health license until

19      1992.

20  Q.    And then you obtained a property license?

21  A.    Yes, sir.

22  Q.    Property and casualty?

23  A.    Right.

## FREEDOM COURT REPORTING

1   Q.   And both of those licenses are issued by

2        the Alabama Department of Insurance; is

3        that right?

4   A.   That's correct.

5   Q.   Okay.  From 1982 until '92 did you work

6        just for United?

7   A.   I worked for a brief time for Metropolitan

8        Life.

9   Q.   And I haven't even asked you.  What is

10       your residence and business addresses?

11  A.   203 West Washington Street in Abbeville.

12       And that's both of them.  I live there,

13       and my office is in my house.

14  Q.   Okay.  Now, we got up to 1992 when you

15       obtained your property and casualty

16       license.

17  A.   Right.  And that's when I started McKnight

18       Agency.

19  Q.   And did you own the McKnight Agency alone,

20       that is, you were the sole owner of that

21       business?

22  A.   Yes, sir.

23  Q.   Was it a corporation?

# FREEDOM COURT REPORTING

```
 1    A.    Yes, sir.

 2    Q.    And when did you sell it to Young,

 3          Johnston & Associates?

 4    A.    December of 2004.

 5    Q.    From 1992 until December of 2004 did you

 6          sell at the McKnight Agency any other

 7          types of insurance aside from property and

 8          casualty?

 9    A.    No, sir.

10    Q.    Okay.  What companies did you sell for?

11    A.    Progressive, Sagamore, Victoria.  We had a

12          number of brokerage contracts with

13          companies like Southern Cross

14          Underwriters, Britt Paulk Insurance

15          Agency, Grechian (phonetic) & Associates,

16          Insurance Connection, Burns & Wilcox,

17          Dagle (phonetic) & Associates.  That's

18          basically the main ones.

19    Q.    Okay.

20                MR. WHITEHEAD:  You named about

21                    half of my clients.

22    Q.    When did you start selling for

23          Progressive?
```

# FREEDOM COURT REPORTING

| 1  | A. | Probably in '92. |
|----|----|------------------|
| 2  | Q. | And was there a contract or agreement that |
| 3  |    | set forth the relationship between |
| 4  |    | Progressive and the McKnight Agency? |
| 5  | A. | Yes, sir. |
| 6  | Q. | And what is that document called? |
| 7  | A. | I guess it would be a Producer's |
| 8  |    | Agreement. |
| 9  | Q. | Okay.  And in that Producer's Agreement, |
| 10 |    | or whatever the correct term is, what was |
| 11 |    | the McKnight Agency designated as? |
| 12 |    | Producer? |
| 13 | A. | Agent, producer.  I'm not sure. |
| 14 | Q. | What types of Progressive products did you |
| 15 |    | sell? |
| 16 | A. | Auto and commercial auto. |
| 17 | Q. | Auto and commercial auto? |
| 18 | A. | Uh-huh (positive response). |
| 19 | Q. | Yes, sir? |
| 20 | A. | Yes. |
| 21 | Q. | Okay.  And commercial auto, generally |
| 22 |    | speaking, that would be in the trucking |
| 23 |    | business? |

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Okay. Have you ever obtained any other |
| 3 | | licenses, other than the ones we've |
| 4 | | already talked about? |
| 5 | A. | No, sir. |
| 6 | Q. | Do you have a Georgia license of any type? |
| 7 | A. | Yes. |
| 8 | Q. | What Georgia licenses do you currently |
| 9 | | hold? |
| 10 | A. | Just a property and casualty as a |
| 11 | | nonresident. |
| 12 | Q. | And Abbeville is located fairly close to |
| 13 | | the state line; is that true? |
| 14 | A. | About fourteen miles. |
| 15 | Q. | And do you have some customers or clients |
| 16 | | from Georgia? |
| 17 | A. | Yes, sir. |
| 18 | Q. | Speaking about your relationship with |
| 19 | | Progressive Insurance, did you at the |
| 20 | | McKnight Agency have the authority and |
| 21 | | right to bind Progressive? |
| 22 | A. | Yes, sir. |
| 23 | Q. | Let me focus on the last five years, from |

## FREEDOM COURT REPORTING

1       2000 up through today.  When you would

2       sell a policy of commercial auto

3       insurance, walk me through the steps that

4       you would take if I walked in off the

5       street and said to you that I was going to

6       be hauling for Riverside Turf.  What are

7       the steps that would be necessary for me

8       to obtain commercial auto insurance with

9       Progressive?

10                  MR. WHITEHEAD:  Object to the

11                      form.  You can answer the

12                      question.  I just objected

13                      to the form.

14                  MR. TULEY:  Object to the form.

15                  MR. LYONS:  Same objection.

16   A.   They have their own software.  When they

17       come in, we start at the beginning and ask

18       you the questions in their software and

19       just fill it out as we go through.  And

20       obtain information about the person, about

21       the vehicle that we're going to be

22       insuring, and basically what you're going

23       to be doing with it, what you're going to

## FREEDOM COURT REPORTING

```
 1           be hauling.  And when we get through and

 2           get to the end of the steps in this

 3           process, it gives us the premium and the

 4           payment plans that are available.

 5    Q.     Okay.  Has that been true for at least the

 6           last five years, that's the way it's

 7           worked?

 8    A.     Yes, sir.

 9    Q.     Would you have to call anyone in Cleveland

10           or some other place for Progressive as

11           part of the process to insure someone?

12    A.     No, sir.

13    Q.     What about underwriting, how is that done,

14           if it is done?

15    A.     Well, the software itself has a list of

16           questions that it asks about what you're

17           hauling and your distances and that sort

18           of stuff.  And then their software runs

19           all the reports that you need, does all

20           the underwriting for you.  It does the

21           Retail Credit Report.  It checks the VIN

22           of the vehicle to make sure that you've

23           classed it right as far as weight.  And it
```

## FREEDOM COURT REPORTING

```
 1              runs a Motor Vehicle Report.  And those
 2              three criteria are basically what
 3              determines what the premium is.
 4      Q.      And Motor Vehicle Report, is that checking
 5              the driver's history?
 6      A.      Yes, sir.
 7      Q.      So that's done by the Progressive computer
 8              system; is that right?
 9      A.      That's correct.
10      Q.      But if you put that information in and
11              this hypothetical person had a good enough
12              driving record, then you have the
13              authority to bind Progressive; is that
14              true?
15      A.      The software wouldn't let you bind if the
16              points were too high or something.
17      Q.      For example, if I walked in and my license
18              were revoked, the software wouldn't let
19              you bind?  Is that what you're saying?
20      A.      I think that's right.  I know if you've
21              got too many points, then it wouldn't
22              allow you to bind certain amounts of
23              coverage.
```

# FREEDOM COURT REPORTING

1   Q.   Okay.  What point systems did the software

2         system use, the same the state uses, or

3         does it have its own point system?

4   A.   Progressive has their own point system

5         where they rate different offenses, gets

6         you a different number of points.

7   Q.   Do you know the number of points that

8         would disqualify someone seeking

9         commercial auto insurance, a truck driver?

10   A.   6 or more points, maybe it's 7 -- I think

11         it's 7.  6 or less you can get up to a

12         million dollars worth of coverage.  If

13         you've got 7 or more, you can only get a

14         half million dollars worth of coverage.

15   Q.   7 disqualifies you from one million

16         dollars insurance?

17   A.   That's correct.

18   Q.   Now, the federal regulations require a

19         person engaging in interstate trucking to

20         have $750,000.00 worth of insurance.  Can

21         we agree on that?

22   A.   Yes, sir.

23   Q.   Did Progressive write policies at 750?

# FREEDOM COURT REPORTING

```
 1   A.    Yes, sir.

 2   Q.    And obviously wrote at a million; is that

 3         right?

 4   A.    That's correct.

 5   Q.    But if a person had 7 or more points, they

 6         were disqualified from getting that

 7         million dollars worth of coverage; is that

 8         right?

 9   A.    That's correct.

10   Q.    What if you had 7 points?  Could you get

11         the $750,000.00 worth of coverage?

12   A.    No, sir.

13   Q.    You could get 500,000 but not more?

14   A.    That's correct.

15   Q.    Okay.  6 or less points you could get

16         either 750 or a million dollars worth of

17         coverage; is that right?

18   A.    That's correct.

19   Q.    Mr. McKnight, before we get into the

20         particulars of Ricky Lane's situation,

21         have you ever been identified or

22         recognized by Progressive for good

23         performance or good production?
```

# FREEDOM COURT REPORTING

```
 1   A.    No, sir.

 2   Q.    I mean, have you ever gotten any awards

 3         from Progressive?

 4   A.    No, sir.

 5   Q.    What volume of business did you produce

 6         for Progressive during, let's say, 2004?

 7               MR. WHITEHEAD:  Object to the

 8                    form.  But you can answer.

 9   A.    It was roughly a million dollars in

10         annualized premium.

11   Q.    And would that have been approximately

12         true for 2003 also?

13               MR. WHITEHEAD:  Same objection.

14   A.    It would have been close to that.  Yes,

15         sir.

16   Q.    One million dollars in annualized

17         premiums?

18   A.    Yes, sir.

19   Q.    For a town the size of Abbeville, that's

20         significant, isn't it?

21               MR. WHITEHEAD:  Object to the

22                    form.

23               MR. SEARS:  Object to the form.
```

## FREEDOM COURT REPORTING

1   A.   I guess.  For me it's a good amount.

2   Q.   Yes, sir.  That's what I'm thinking, too.

3        Do you have all the trucking business in

4        Henry County?

5   A.   Majority of it.

6   Q.   I think so.

7        Mr. McKnight, before 2003, when Ricky

8        Lane obtained coverage with you -- your

9        agency in March of 2003, did you have any

10       previous business relationship with Ricky

11       Lane?

12  A.   Yes, sir.

13  Q.   What previous dealings did you have with

14       him?

15  A.   Well, Ricky had been a driver on some of

16       the policies that I have insured -- some

17       of the companies that I have insured.  And

18       Ricky -- I don't remember exactly how far

19       back.  But sometime in the past Ricky had

20       insurance with me on a previous occasion.

21  Q.   Do you know which company that was placed

22       with?

23  A.   I believe it was Progressive.  It could

# FREEDOM COURT REPORTING

```
 1              have been Scottsdale.  But I think it was

 2              probably Progressive.

 3    Q.        But most likely either Progressive or

 4              Scottsdale?

 5    A.        Yes, sir.

 6    Q.        Is Progressive the company you placed most

 7              of your commercial auto business with?

 8    A.        Yes, sir.

 9    Q.        Has that been true since 1992?

10    A.        No, sir.  In the early '90s there were

11              other companies that did a lot of what we

12              do.  Scottsdale was one of them.  Credit

13              General was one.  But of late Progressive

14              has been the one we use.

15    Q.        Has that been true for, say, five years?

16    A.        Yes, sir, probably.

17    Q.        And your previous dealings with Ricky Lane

18              were where he came to your agency,

19              obtained some coverage possibly or

20              probably with Progressive; is that right?

21    A.        Yes, sir.

22    Q.        Do you know who Mr. Lane was driving for

23              at that point in time?
```

# FREEDOM COURT REPORTING

Page 21

```
1   A.    No, sir.

2   Q.    Can you help us date that any better than

3         the early '90s?

4   A.    I don't know that Ricky goes back to the

5         early '90s.  It could have been four or

6         five years ago.  I'm not sure.

7   Q.    All right.  But, again, you don't remember

8         who he was hauling for?

9   A.    No, sir.

10  Q.    What about Ray Morris?  How long have you

11        known Mr. Morris?

12  A.    I've been sending certificates out there

13        for years.  I personally have known Ray --

14        I met Ray three or four years ago when I

15        bought some grass sod out there when I was

16        redoing my house.  And I guess I've met

17        him once or twice in other places.

18  Q.    But when you say "I've been sending

19        certificates out there for years," tell me

20        what types of certificates you're talking

21        about.

22  A.    Certificates of insurance for truck

23        drivers.
```

# FREEDOM COURT REPORTING

1  Q.    Okay.  And the truckers would obtain

2        insurance through the McKnight Agency, and

3        then you would provide proof via a

4        certificate to Mr. Morris at Riverside

5        Turf; is that right?

6  A.    That's correct.

7  Q.    Do you know his partner, Mr. Nixon?

8  A.    No, sir.

9  Q.    Was there any requirement that you know of

10       that Ray Morris and Riverside Turf

11       required of the drivers who obtained

12       coverage?

13 A.    They usually required a million dollars.

14 Q.    Did you understand that Riverside Turf

15       sold its products in several southeastern

16       states?

17 A.    Yes, sir.

18 Q.    And you knew that that would constitute

19       interstate trucking?

20 A.    Right.

21              MR. SEARS:  Object to the form.

22 Q.    Let me direct this to your lawyer.

23              MR. HAYNES:  Steve, do you have

# FREEDOM COURT REPORTING

```
 1                      any documents to produce?

 2              MR. WHITEHEAD:  We have copies of

 3                  our file.  But Mark can

 4                  respond to that better.  He

 5                  said that documents were

 6                  produced in the initial

 7                  disclosures.  And I'm not

 8                  certain.  I guess he can

 9                  answer whether there are any

10                  documents in addition to

11                  those that have not already

12                  been produced.

13              MR. TINDAL:  There's nothing in

14                  addition to the initial

15                  disclosure.

16          (Off-the-Record discussion)

17   Q.    Mr. McKnight, I'm not wanting to give your

18         trade secrets away to another insurance

19         agent.  But do you have any clients or

20         customers in Pike County where the

21         underlying case will be tried?  I'm just

22         interested for jury-striking purposes.

23              MR. WHITEHEAD:  First answer
```

# FREEDOM COURT REPORTING

```
 1                          whether you have any period

 2                          before we talk about names.

 3   A.    I'm sure we have a few.

 4   Q.    Can you think of their names in Brundidge

 5         or Troy?

 6   A.    Sammy Carter in Brundidge.  There's a

 7         Walker fellow in Brundidge, I believe,

 8         Kenneth Walker.  He may be in Ozark.

 9              MR. TINDAL:  Would it be easier

10              to get a list?

11   A.    I can provide you with a list later.

12   Q.    Okay.  We'll just send your lawyers a

13         request.  And then we'll have the

14         stipulation that we'll use it only for

15         limited purposes.

16         All right.  Mr. McKnight, going back

17         to your relationship with Mr. Morris and

18         Riverside Turf.  Did you have any kind of

19         understanding with them or arrangement

20         with them for financing of truckers'

21         insurance?

22   A.    Not directly with me.  They would -- I

23         know Ray would assist, I think, with Ricky
```

# FREEDOM COURT REPORTING

1     and maybe one other one, that he would

2     assist in seeing that their payments got

3     paid, you know, to keep their insurance

4     current.

5  Q.    To make sure it stayed in place.  Right.

6     Were there deductions taken from certain

7     drivers, and Riverside Turf would make

8     sure that the payments were made on a

9     monthly or quarterly basis?

10  A.    I'm not sure how Ray did it.

11  Q.    Okay.  Well, did you for Ricky Lane in

12     particular, did you get -- the Payments

13     for his Progressive Insurance, did that

14     come to the McKnight Agency or would that

15     go directly to Progressive?

16  A.    Went to a premium finance company that

17     financed the premiums.

18  Q.    Okay.  And the premium finance company --

19          MR. WHITEHEAD:  There would have

20            been an initial premium.

21  Q.    But you would have gotten the initial

22     premium payment?

23  A.    I seem to think that Ray sent a check for

## 367 VALLEY AVENUE
## (877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

# FREEDOM COURT REPORTING

```
 1            the down payment.  Yes, sir.

 2    Q.      Okay.  To the McKnight Agency?

 3    A.      Yes, sir.

 4    Q.      Did you own or have any interest in the

 5            premium finance company?

 6    A.      No, sir.

 7    Q.      Mr. McKnight, have you had the opportunity

 8            to have read any portion of Ricky Lane's

 9            testimony relating to his insurance?

10    A.      Yes, sir.

11    Q.      And did you read that Mr. Lane says that

12            he came to see you about driving for

13            Riverside Turf and discussed with you the

14            fact that he needed at least $750,000.00

15            of liability insurance?

16    A.      Yes, sir.

17    Q.      Is that accurate?

18    A.      Yes, sir.

19    Q.      You had that such discussion with him?

20    A.      Yes.

21    Q.      When did you have the discussion with

22            Ricky Lane about his need for $750,000.00

23            or more in insurance?
```

# FREEDOM COURT REPORTING

```
1    A.      It would have been on March the 10th, on

2            the day that he came in to apply for the

3            insurance.

4    Q.      Of '03 or '04?

5    A.      '03.

6    Q.      Do you have a set of documents in front of

7            you that you can look at, Mr. McKnight,

8            you or your lawyer?

9                    MR. WHITEHEAD:  Yeah.  Hold on

10                        just a second.

11                   THE WITNESS:  These are not in

12                       order.  I can tell that.

13                   MR. WHITEHEAD:  Let me just --

14                       Give me one minute, Randy.

15                   MR. HAYNES:  Sure.

16                   (Off-the-Record discussion)

17                   (Plaintiff's Exhibit 1 marked

18                       for purposes of identification)

19   Q.      Mr. McKnight, if I refer to a Bates number

20           on a document, you see down in the

21           right-hand corner where it's got McKnight

22           0001?

23   A.      Yes, sir.
```

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | Q. | I want to look at that first one there |
| 2 | | that bears Bates number 0001.  And I've |
| 3 | | marked that document, which is apparently |
| 4 | | an invoice, as Plaintiff's Exhibit 1. |
| 5 | | This appears to be an invoice to Ricky |
| 6 | | Lane, care of Riverside Turf, dated March |
| 7 | | 10, 2003.  Do you see that? |
| 8 | A. | Yes, sir. |
| 9 | Q. | It shows that the company insuring |
| 10 | | Mr. Lane was Progressive; is that right? |
| 11 | A. | That's correct. |
| 12 | Q. | And it shows under the heading Description |
| 13 | | one million dollars liability; is that |
| 14 | | right? |
| 15 | A. | That's correct. |
| 16 | Q. | Is that the date you had the discussion |
| 17 | | with Ricky Lane about his need for |
| 18 | | $750,000.00 or more in liability insurance |
| 19 | | so as to comply with federal and state |
| 20 | | law? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Tell me what the discussion was between |
| 23 | | you and Mr. Lane on that date. |

# FREEDOM COURT REPORTING

```
1   A.    Basically, I remember Ricky coming in and

2         he said that he needed some insurance to

3         start hauling for Ray Morris.  And we put

4         everything in the computer.  I went

5         through the rating process of, you know,

6         entering all of his data, the vehicle

7         data.  And when we got down to the end,

8         after the MVR was run and the vehicle

9         check and the Retail Credit Report of

10        whatever they do was done, I told him what

11        the premium would be and what his payment

12        options were.

13  Q.    Okay.  When he said that he would be

14        starting hauling for Ray Morris, did you

15        understand by that that he needed

16        $750,000.00 or more?

17  A.    Ray, most of his drivers -- and I don't

18        remember if this has been -- most of the

19        drivers we have hauling for Ray have a

20        million dollars.  And I told Ricky it

21        wouldn't be a whole lot of difference

22        between a million and 750.

23  Q.    But you understood, because he referenced
```

# FREEDOM COURT REPORTING

```
 1              Ray Morris and Riverside Turf, that it was

 2              an interstate situation --

 3    A.        Right.

 4    Q.        -- whereby the federal laws will have to

 5              be complied with in terms of the amount of

 6              liability insurance; is that right?

 7    A.        That's true.

 8    Q.        And then you said to Ricky Lane that it

 9              wasn't much difference in the cost between

10              one million dollars worth of liability

11              insurance versus 750,000; is that right?

12    A.        That's correct.

13    Q.        And, so, you billed Mr. Lane for a million

14              dollars worth of liability insurance; is

15              that right?

16    A.        That's correct.

17                        MR. WHITEHEAD:  Object to the

18                            form.  The document speaks

19                            for itself.

20    Q.        Did the insurance that covered Ricky Lane

21              from March 10, 2003 for one year, did that

22              end up being one million dollars of

23              liability insurance?
```

# FREEDOM COURT REPORTING

```
1   A.    Could you repeat that?

2   Q.    I'm not sure.  Did Mr. -- Let me strike

3         that and start all over.

4              It was clear, wasn't it,

5         Mr. McKnight, that Ricky Lane wanted a

6         million dollars worth of insurance; is

7         that right?

8   A.    Yes, sir.

9   Q.    And you intended for Ricky Lane to have

10        one million dollars worth of liability

11        insurance through Progressive; is that

12        true also?

13  A.    That's true.

14  Q.    So both of you wanted one million dollars

15        worth of Progressive Insurance, correct?

16  A.    That's right.

17  Q.    And also Mr. Morris over at Riverside Turf

18        was requiring either 750 or a million

19        dollars worth of insurance, wasn't he?

20  A.    That's correct.

21  Q.    So, as far as you know, that's what

22        everybody intended when he first obtained

23        Progressive -- Ricky Lane first obtained
```

# FREEDOM COURT REPORTING

Page 32

```
 1           Progressive Insurance through your agency?
 2    A.     Right.
 3    Q.     In fact, when that policy was issued or
 4           that coverage was obtained by Progressive,
 5           was it, in fact, one million dollars of
 6           liability insurance?  Were the limits one
 7           million dollars?
 8    A.     No, sir.
 9    Q.     Were those limits $300,000.00?
10    A.     Yes, sir.
11    Q.     Was that a mistake?
12    A.     Yes, sir.
13    Q.     What was the mistake that caused the wrong
14           amount of liability limits to be issued?
15    A.     I'm not sure how it happened.  Progressive
16           has their computer software, and there's a
17           pull-down menu where you select the
18           amounts.  And it would only be speculation
19           on my part as to how I selected -- or how
20           300,000 got selected instead of the one
21           million that I intended for it to be.
22    Q.     Okay.  And I haven't been through these
23           documents.  But, Mr. McKnight, do any of
```

# FREEDOM COURT REPORTING

Page 33

```
 1              these documents in your file reflect what

 2              you called the pull-down menu?

 3    A.        No, sir.

 4    Q.        Okay.  But when you -- It's like ordering

 5              a -- I ordered some maple syrup from

 6              Vermont one time.  You can get 6 ounces,

 7              12 ounces, 18 or 24.  And it's got -- you

 8              take your computer mouse and select which

 9              one you want; is that right?

10    A.        That's correct.

11    Q.        I guess something similar is what happened

12              here.  You intended to click one million

13              dollars worth of liability insurance but

14              apparently you clicked 300,000.  Is that

15              what happened?

16    A.        Apparently so, yes, sir.

17    Q.        But just to dispense with why it happened,

18              it was simply a mistake, apparently, on

19              your part; is that right?

20    A.        That's correct.

21    Q.        When you would obtain coverage for

22              truckers through Progressive, did you

23              personally handle that or did you assign
```

# FREEDOM COURT REPORTING

1              that to a clerk in your office?

2    A.    I handled it.

3    Q.    Okay.  Plaintiff's Exhibit 1, this

4              invoice, shows that the liability

5              insurance was basically $3500.00 and the

6              cargo insurance was a little under

7              700,000; is that right?

8    A.    A little under $700.00.

9                        MR. WHITEHEAD:  You said

10                        thousand.

11   Q.    I meant 700.  Excuse me.

12   A.    Yes, sir.

13   Q.    So we're talking about roughly $3500.00

14              worth of liability insurance, a $3500.00

15              premium for the liability insurance; is

16              that right?

17   A.    That's correct.

18   Q.    And that amount, did that come from

19              Progressive, that $3500.00, after you went

20              through the process and the MVR run was

21              done, the Retail Credit Report was

22              obtained and they checked Mr. Lane's

23              driving record?

# FREEDOM COURT REPORTING

1  A.   That's correct.

2  Q.   Do you know what the premium would have

3       been, approximately, had you clicked one

4       million dollars instead of what you

5       apparently did clicking the $300,000.00

6       box?

7  A.   I can't say with any certainty because

8       there's so many variables.  And, for

9       instance, the driving record of the Retail

10      Credit Report, like somebody with a poor

11      credit, poor driving record would pay more

12      than somebody with excellent credit and no

13      points on their license.  So there are

14      just too many variables.

15 Q.   You can't tell me what Ricky Lane's would

16      have been in March of 2003?

17 A.   Not sitting here now.  No, sir.

18 Q.   Okay.  Do you know how many points

19      Mr. Lane had when his driving record was

20      checked?

21 A.   I know now that he had 5 points.  But I

22      don't recall looking at that at the time.

23 Q.   Okay.  But you now know that he had 5

# FREEDOM COURT REPORTING

1        points.  That would indicate, wouldn't it,

2        Mr. McKnight, that he would have qualified

3        to have obtained one million dollars

4        limits through Progressive?

5    A.  Yes, sir.

6    Q.  Did Ricky Lane's coverage with Progressive

7        remain in place throughout that year, that

8        first year, from March 10, 2003 through

9        March 9, 2004?

10   A.  Yes, sir.

11   Q.  And then did Mr. Lane come in sometime

12       either late February or early March of

13       2004 to obtain a renewal?

14   A.  Yes, sir.

15   Q.  And did you renew his coverage in March of

16       2004?

17   A.  Yes, sir.

18   Q.  And how does that renewal process work?

19   A.  Progressive sends a notice -- a renewal

20       offer -- I forget exactly what they call

21       it.  But, in essence, it's a renewal offer

22       telling them what their new premium is

23       going to be for the coming year.  And they

# FREEDOM COURT REPORTING

1           send that out, I guess, about two weeks in

2           advance and it's sent to the insured.

3   Q.      One is sent directly to the insured; is

4           that right?

5   A.      Yes, sir.

6   Q.      And then do you get a copy of it?

7   A.      Yes, sir.

8                   (Plaintiff's Exhibits 2 and 3

9                    marked for purposes of

10                   identification)

11  Q.      Let me show you what has been marked as

12          Plaintiff's Exhibits 2 and 3 to your

13          deposition.  Can you identify what those

14          are, Mr. McKnight?

15  A.      That's Progressive's offer of renewal for

16          the 2004 to 2005 policy year.

17  Q.      Before we got to the offer of renewal,

18          would Ricky Lane have gotten anything in

19          the mail, I'm speaking about after March

20          10, 2003, would he have gotten anything in

21          the mail from either your agency or from

22          Progressive?

23  A.      Okay.  I understand the question to be

# FREEDOM COURT REPORTING

```
 1              after March 10th, 2003?

 2    Q.    Yes, sir.

 3    A.    What would Ricky have gotten in the mail?

 4    Q.    Right.

 5    A.    He would have gotten a coupon book from a

 6          premium finance specialist.

 7    Q.    All right.

 8    A.    To make his payments to the premium

 9          finance company.

10    Q.    Okay.

11    A.    And he would have gotten a copy of a

12          policy and I.D. cards from Progressive.

13    Q.    Did anybody else get a copy of the policy?

14    A.    I got an agent's copy.  Yes, sir.

15    Q.    What about Riverside Turf, would they get

16          a copy?

17    A.    At that time I don't think they would

18          have.  Because Ricky only applied for

19          liability coverage in the beginning.

20    Q.    Did Riverside Turf get a certificate from

21          you?

22    A.    Yes, sir.  And --

23    Q.    I didn't mean to cut you off.
```

## FREEDOM COURT REPORTING

```
 1    A.    I faxed a copy to Riverside on the 10th,

 2          the day that he bought the policy.

 3    Q.    And did that copy that you faxed to

 4          Riverside on March 10, 2003, did it

 5          reflect one million dollars worth of

 6          liability limits?

 7    A.    Yes, sir.

 8                    (Plaintiff's Exhibit 4 marked

 9                     for purposes of identification)

10    Q.    I'm going to mark as Plaintiff's Exhibit 4

11          a Certificate of Liability Insurance that

12          appears to be from March 10, 2003 through

13          March 10, 2004.  It reflects a combined

14          single limit of a million dollars.  Do you

15          see that?

16    A.    Yes, sir.

17    Q.    Is that a copy of the certificate that you

18          would have faxed to Riverside Turf?

19    A.    Yes, sir.

20    Q.    Did Progressive authorize you as their

21          agent to send this certificate to

22          Riverside Turf?

23                    MR. SEARS:  Object to form.
```

# FREEDOM COURT REPORTING

1   A.    This particular one?

2   Q.    Yes, sir.

3   A.    No, sir.  I assumed that to be part of my

4         abilities as an agent of Progressive, to

5         be able to issue certificates.

6   Q.    Okay.  You had the authority, as you've

7         already told me, to have binded -- or

8         bound Progressive Insurance on March 10,

9         2003 when Ricky Lane came in and you went

10        through the process in the Progressive

11        software, and with his having 5 points,

12        you had the authority to bind Progressive

13        with one million dollar liability limits,

14        didn't you?

15  A.    Yes, sir.

16  Q.    And that is what you intended to do?

17  A.    Yes, sir.

18  Q.    And that would not have been outside the

19        scope of your agency relationship with

20        Progressive, would it?

21  A.    No, sir.

22  Q.    And in terms of criteria whether someone

23        is insurable or not, that's built into the

## FREEDOM COURT REPORTING

Page 41

```
 1            Progressive system when you go through

 2            their software package; is that right?

 3            When you put that information in,

 4            Progressive determines who will be insured

 5            and who will not be; is that right?

 6   A.       That's correct.

 7   Q.       And how long does that take, assuming

 8            everything is working that day?

 9   A.       Just a matter of sixty seconds or so.

10   Q.       Okay.  And when Ricky Lane would have

11            walked out of your office that day, what

12            documents would he have had on March 10,

13            2003?

14   A.       In my normal course of issuing policies, I

15            can't state exactly what Ricky walked out

16            with.  But in a normal day-to-day routine,

17            I give the people a copy of their receipt

18            where they've paid their money.  I give

19            them a copy of an I.D. card.  It's a

20            temporary I.D. card that's printed out at

21            the time you print the application.  And

22            if anybody ever requests it, I make them a

23            copy of the application that they just
```

# FREEDOM COURT REPORTING

1      signed.

2   Q.   That's not normal, though, is it?

3   A.   Not usually, no, sir.

4   Q.   Okay.  Would the receipt have reflected

5        the liability limits?

6   A.   No, sir.

7   Q.   Would the temporary I.D. card have

8        reflected the liability limits?

9   A.   No, sir.

10  Q.   How would Ricky Lane have shown a state

11       trooper who stopped him that he had

12       minimum limits in accordance with federal

13       law of $750,000.00 or more?

14  A.   Nothing that would be issued from us.

15  Q.   Okay.  Would the copy of the application,

16       if he had asked for that, would that have

17       reflected the liability limits?

18  A.   Yes, sir.

19  Q.   And what would that have reflected, what

20       amount?

21  A.   In this case Ricky's application would

22       have reflected 300,000.

23  Q.   Because of the mistake you made?

# FREEDOM COURT REPORTING

```
 1   A.    Yes, sir.

 2   Q.    Then the items you identified that would

 3         have come in the mail most likely to

 4         Mr. Lane, which ones of those, if any,

 5         would have reflected the liability limits?

 6               MR. WHITEHEAD:  Let him finish.

 7   Q.    I'm going to go over the three of them.

 8   A.    Okay.

 9   Q.    Would the coupon book have reflected the

10         limits?

11   A.    No, sir.

12   Q.    Would the policy?

13   A.    Yes, sir.

14   Q.    What about the I.D. card?

15   A.    The I.D. card does not.  No, sir.

16   Q.    Do the truckers get something like a

17         certificate that they can keep in their

18         truck to show what the limits are?

19   A.    They couldn't get a certificate because

20         these are issued to the certificate

21         holders.  And if they ask for it, we could

22         give them a copy of what we send the

23         certificate holders.  But we just don't
```

## FREEDOM COURT REPORTING

1        give a trucker a blank certificate,

2        because we're responsible for these

3        certificate holders being notified if the

4        policy cancels.

5  Q.    Yes, sir.  I understand that.  But do the

6        truckers get anything in case they're

7        stopped and their insurance -- a trooper

8        or a policeman wants to check to see

9        whether they're in compliance?  Do they

10       get anything that you know of either from

11       your agency or from Progressive that would

12       reflect what the limits are?

13  A.    They get a copy of the policy that if they

14       wanted to keep that in their truck would

15       show it.  But the I.D. card that we issue

16       as a matter of everyday doing business,

17       there's no policy limits on it.

18  Q.    Okay.

19  A.    But they get a copy of a policy that they

20       could put in the truck if they wanted to.

21  Q.    Okay.  What address would have been listed

22       on the policy?  I see on Plaintiff's

23       Exhibit 1, the invoice, the billing

# FREEDOM COURT REPORTING

```
 1          invoice shows Ricky Lane, care of

 2          Riverside Turf at the Riverside Turf

 3          address in Shorterville.

 4    A.    The address on the policy you're stating?

 5    Q.    Yes, sir.

 6    A.    Would have had P.O. Box 85, Shorterville.

 7    Q.    And did you understand that to be Ricky

 8          Lane's Post Office Box?

 9    A.    Yes, sir.

10    Q.    And then you also would have gotten, you

11          told me, an agent's copy of the policy; is

12          that right?

13    A.    That's correct.

14    Q.    To your knowledge, Mr. McKnight, were

15          there any claims or lawsuits filed against

16          Ricky Lane that would have invoked his

17          liability coverage during that first

18          policy year, let's call it, from March 10,

19          2003 for the next 365 days?

20    A.    Not to my knowledge.  No, sir.

21    Q.    Was it your understanding that he had a

22          million dollars worth of insurance and you

23          just overlooked the fact that you clicked
```

# FREEDOM COURT REPORTING

```
 1              the wrong box?
 2    A.        Yes, sir.
 3    Q.        And when Ricky Lane -- did he actually
 4              come back in to renew in March of 2004?
 5    A.        Yes, sir.  I don't remember what date he
 6              came in.  I don't remember when.
 7    Q.        Sir?
 8    A.        I really don't remember if he came back in
 9              or if he -- I think he did, though.
10              Because we would have had some documents
11              for him to sign with National Fire and
12              Marine.
13    Q.        And do they have the cargo coverage?
14    A.        Yes, sir.  But there would have been no
15              application or any reason for him to come
16              back in on the Progressive.
17    Q.        Let me show you two documents, Mr.
18              McKnight.  The first I'm going to mark as
19              Plaintiff's Exhibit Number 5.  And it has
20              the Bates number of 0015.  It appears to
21              me to be a Progressive Insurance Company's
22              receipt dated March 8, 2004 and reflecting
23              a payment of $4219.00 to Progressive.  Do
```

## 367 VALLEY AVENUE
## (877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

# FREEDOM COURT REPORTING

Page 47

1          you see that document?

2   A.     Yes, sir.

3               (Plaintiff's Exhibit 5 marked

4                    for purposes of identification)

5   Q.     What is that?

6   A.     That's where we uploaded Ricky's payment

7          to Progressive to renew his policy.

8   Q.     And would that indicate the date most

9          likely was March 8, 2004?

10  A.     Yes, sir.

11  Q.     And, of course, that would have been two

12         days before the end of the first year's

13         policy, right?

14  A.     That's correct.

15              (Plaintiff's Exhibit 6 marked

16                   for purposes of identification)

17  Q.     And then Plaintiff's Exhibit 6 is the

18         March 10, 2004 invoice; is that right?

19  A.     That's correct.

20  Q.     Let's see.  That should be the same

21         amount, and it is, as the receipt,

22         $4219.00 for the liability and physical

23         damage?

# FREEDOM COURT REPORTING

```
 1   A.      That's correct.

 2                   MRS. EADY:  That's Bates-stamped

 3                   14.

 4                   MR. WHITEHEAD:  Randy, just for

 5                   the Record, the invoice date

 6                   appears to be February 24th.

 7                   You may have meant for the

 8                   March 10 renewal date.

 9                   MR. HAYNES:  I said that wrong.

10   Q.      It's actually invoice date 2/24.  The

11           effective date, though, is March 10, 2004.

12                   MR. WHITEHEAD:  Correct.

13   Q.      Is that right?

14   A.      Right.

15   Q.      Was there any discussion between you and

16           Ricky Lane in late February or early March

17           2004 about his liability limits?

18   A.      Okay.  Between what dates?

19   Q.      Well, whenever he came in, apparently in

20           late February of 2004, to get his renewal,

21           did you have any discussion with him about

22           his liability limits?

23   A.      No, sir.
```

# FREEDOM COURT REPORTING

```
 1   Q.   You knew he was still hauling for
 2        Riverside Turf, didn't you?
 3   A.   Yes, sir.
 4   Q.   And is it correct that it would have been
 5        your understanding that he needed 750,000
 6        or more in limits; is that right?
 7   A.   Yes, sir.
 8   Q.   And was it also your assumption and belief
 9        that he, in fact, had one million dollars
10        of liability limits through Progressive?
11   A.   Yes, sir.
12   Q.   And, apparently, that was his
13        understanding also?
14             MR. WHITEHEAD:  Object to the
15                  form.
16   A.   I can't answer for what his understanding
17        was.  But it was my understanding.
18   Q.   Well, you told me earlier, I thought, you
19        read some of his testimony.  That was his
20        understanding, according to his deposition
21        testimony, wasn't it?
22   A.   Yes, sir.
23             MR. WHITEHEAD:  Well, okay.
```

# FREEDOM COURT REPORTING

```
 1   Q.    And I know you can't get in his mind.  But

 2         both of you understood, apparently, that

 3         he had one million dollars of limits

 4         through Progressive; is that right?

 5   A.    Yes, sir.

 6   Q.    And at the time of the renewal in March of

 7         2004 you still had the authority to bind

 8         Progressive, didn't you?

 9   A.    Yes, sir.

10   Q.    And there was no human being you had to

11         call up to get permission to renew Ricky

12         Lane, was there?

13   A.    No, sir.

14   Q.    You didn't have to call Cleveland and talk

15         to anybody, did you?

16   A.    No, sir.

17   Q.    And was Ricky Lane's renewal processed

18         just like you did your other customers?

19   A.    Yes, sir.

20   Q.    And did a new certificate get issued to

21         Riverside Turf on or about March 10, 2004?

22   A.    I think, yes, sir.  I believe there's one

23         in here.  It was probably sent on the 8th,
```

# FREEDOM COURT REPORTING

1           the same day we uploaded the money.

2                     (Plaintiff's Exhibit 7 marked

3                      for purposes of identification)

4     Q.    Let me show you Plaintiff's Exhibit 7,

5           Mr. McKnight.  Is that a copy of the March

6           2004 certificate to Riverside Turf?

7     A.    Yes, sir.

8     Q.    And does that likewise reflect liability

9           limits of one million dollars?

10    A.    Yes, sir.

11                    (Off-the-Record discussion)

12    Q.    Mr. McKnight, have you ever discussed the

13          point system with -- the Progressive point

14          system with anyone at Riverside Turf?

15    A.    Not to my knowledge.

16    Q.    How did you know to send a Certificate of

17          Insurance on Ricky Lane to Riverside Turf?

18    A.    Ricky told me he was going to be hauling

19          for Riverside.  So if he's hauling, Ray is

20          going to need a certificate.

21    Q.    Is that just normal business procedure?

22    A.    Yes.

23    Q.    Do you do that for all your trucker

## FREEDOM COURT REPORTING

1       customers?

2   A.    Yes, sir.

3   Q.    When did you learn, Mr. McKnight, that

4       Ricky Lane had be involved in the accident

5       in Troy where Ms. Daisy Beasley was

6       killed?

7   A.    It was either that day or the next day

8       Ricky called me.  I believe it might have

9       been the next morning.  I'm not sure.

10   Q.    And what do you remember his saying in

11       that conversation?

12   A.    Just said he had been involved in an

13       accident in Troy and that a woman had been

14       killed.  And I gave him the 1-800

15       Progressive number and told him he needed

16       to call and report it.  We try to have our

17       insureds call in because they have

18       information that I may not think to ask

19       them that they may want on the claim.  So

20       we just give them the telephone number to

21       Progressive and have them report it

22       directly.

23   Q.    Did Ricky Lane say anything to you in that

# FREEDOM COURT REPORTING

| | |
|---|---|
| 1 | telephone conversation about how the wreck |
| 2 | in Troy happened? |
| 3 | A.  I don't recall.  Seems like he told me he |
| 4 | -- Well, I just don't recall that much |
| 5 | about the conversation, other than that |
| 6 | there was a fatality, and that him and |
| 7 | another truck were involved.  I do |
| 8 | remember that.  And I just told him he |
| 9 | needed to report it directly to |
| 10 | Progressive. |
| 11 | Q.  Were you ever asked to function as an |
| 12 | investigator or an adjuster for |
| 13 | Progressive in relation to this accident? |
| 14 | A.  No, sir. |
| 15 | Q.  In that telephone conversation you had |
| 16 | with Ricky Lane the morning after the |
| 17 | accident, did you have any discussion then |
| 18 | about the amount of his liability limits? |
| 19 | A.  No, sir. |
| 20 | Q.  Was it still your assumption that his |
| 21 | limits were one million dollars? |
| 22 | A.  Yes, sir. |
| 23 | Q.  When did you first become aware that there |