# FREEDOM COURT REPORTING

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF ALABAMA
 3                   NORTHERN DIVISION
 4
 5    PROGRESSIVE SPECIALTY      )
 6    INSURANCE COMPANY,         )
 7              Plaintiff,       )       COPY
 8    vs.                        )    CASE NUMBER:
 9    MCKNIGHT AGENCY, INC.,     )    2:05-CV-438-W
10    JOE MCKNIGHT; RICKY LANE;  )
11    RIVERSIDE TURF FARM,       )
12    et al.,                    )
13              Defendants.      )
14
15         DEPOSITION OF RAYMOND MORRIS, JR.
16             In accordance with Rule 5(d) of
17    The Alabama Rules of Civil Procedure, as
18    Amended, effective May 15, 1988, I, Cindy
19    Weldon, am hereby delivering to Mark E.
20    Tindal, the original transcript of the oral
21    testimony taken on the 18th day of November,
22    2005, along with exhibits.
23             Please be advised that this is the
```

# FREEDOM COURT REPORTING

1    same and not retained by the Court Reporter,

2    nor filed with the Court.

# FREEDOM COURT REPORTING

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5    PROGRESSIVE SPECIALTY       )

6    INSURANCE COMPANY,          )

7         Plaintiff,             )

8    vs.                         )   CASE NUMBER:

9                                )   2:05-CV-438-W

10   MCKNIGHT AGENCY, INC.,      )

11   JOE MCKNIGHT; RICKY LANE;)

12   RIVERSIDE TURF FARM,        )

13   et al.,                     )

14        Defendants.            )

15

16            S T I P U L A T I O N

17          IT IS STIPULATED AND AGREED, by

18   and between the parties through their

19   respective counsel, that the deposition of

20   RAYMOND MORRIS, JR., may be taken before

21   Cindy Weldon, Certified Shorthand Reporter,

22   Commissioner and Notary Public, at the

23   offices of Lynn Jinks, 219 North Prairie
```

## FREEDOM COURT REPORTING

1    Street, Union Springs, Alabama, on November

2    the 18th, 2005 at 2:00 p.m.

3           IT IS FURTHER STIPULATED AND

4    AGREED that the signature to and the reading

5    of the deposition by the witness is waived,

6    the deposition to have the same force and

7    effect as if full compliance had been had

8    with all laws and rules of Court relating to

9    the taking of depositions.

10          IT IS FURTHER STIPULATED AND

11   AGREED that it shall not be necessary for

12   any objections to be made by counsel to any

13   questions, except as to form or leading

14   questions, and that counsel for the parties

15   may make objections and assign grounds at

16   the time of trial, or at the time said

17   deposition is offered in evidence, or prior

18   thereto.

19          IT IS FURTHER STIPULATED AND

20   AGREED that notice of filing of the

21   deposition by the Commissioner is waived.

22

23

# FREEDOM COURT REPORTING

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4           MR. R. LARRY BRADFORD

 5           2020 CANYON ROAD

 6           SUITE 100

 7           BIRMINGHAM, ALABAMA  35216

 8

 9   FOR THE DEFENDANT:

10           MR. MARK E. TINDAL

11           2501 TWENTIETH PLACE SOUTH

12           SUITE 300

13           BIRMINGHAM, ALABAMA  35223

14

15           MR. NATHAN DICKSON

16           219 NORTH PRAIRIE STREET

17           UNION SPRINGS, ALABAMA  36089

18

19           MR. ALEX HOLTSFORD

20           4001 CARMICHAEL ROAD SUITE 300

21           MONTGOMERY, ALABAMA  36106

22

23
```

# FREEDOM COURT REPORTING

Page 6

1        MR. RANDY LYONS

2        418 SCOTT STREET, SUITE B

3        MONTGOMERY, ALABAMA   36101

4

5        MR. JEREMY KNOWLES

6        131 MAIN STREET

7        ALEXANDER CITY, ALABAMA   35011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

```
 1                    I N D E X

 2

 3    EXAMINATION BY:                      PAGE

 4    MR.  TINDAL                              8

 5    MR.  BRADFORD                          80

 6    MR.  KNOWLES                           81

 7

 8

 9                 E X H I B I T S

10                                         PAGE

11    DEFENDANT'S EXHIBIT NO.  1             8

12    DEFENDANT'S EXHIBIT NO.  2            35

13    DEFENDANT'S EXHIBIT NO.  3            44

14    DEFENDANT'S EXHIBIT NO.  4            44

15    DEFENDANT'S EXHIBIT NO.  5            77

16

17

18

19

20

21

22

23
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

## FREEDOM COURT REPORTING

1           RAYMOND MORRIS, JR.,

2      after first being duly sworn, testified

3                  as follows:

4   EXAMINATION BY MR. TINDAL:

5           THE COURT REPORTER:  Usual

6   stipulations?

7           MR. TINDAL:  That's fine.

8           MR. LYONS:  That's fine.

9           (Whereupon, Defendant's Exhibit

10  No. 1 was marked for identification.)

11      Q.   Can you state your full name for

12  the record, please, sir.

13      A.   Raymond H. Morris, Jr.

14      Q.   My Morris, my name is Mark

15  Tindal.  I represent Joe McKnight and the

16  McKnight Agency.  We've met previously;

17  correct?

18      A.   That's correct.

19      Q.   Good to see you again.  I'm going

20  to be asking you some questions today.  I

21  don't think we'll be going very long.  It's

22  my understanding that you have been in a

23  deposition before; is that right?

# FREEDOM COURT REPORTING

1    A.    That's correct.

2    Q.    You've been deposed before?

3    A.    That's correct.

4    Q.    All right.  So basically all I

5  want to make sure is that we understand each

6  other.  I'm going to be asking you

7  questions.  And sometimes they may not be

8  very clear questions or too wordy.

9          And if they don't make any sense

10  or you don't understand them, let me know

11  and I'll rephrase them, okay?

12    A.    Okay.

13    Q.    Otherwise, whatever I ask you and

14  you answer -- the court reporter is going to

15  be typing everything down -- we're just

16  going to assume you understood the question

17  when you answered it.  All right?

18    A.    Okay.

19    Q.    What is your current address, sir?

20    A.    My home address?

21    Q.    Yes, sir.

22    A.    90 Poya Point Road, Fort Gaines,

23  Georgia.

# FREEDOM COURT REPORTING

1    Q.    You live in Georgia?

2    A.    That's correct.

3    Q.    I'm sorry.  When she's typing

4  things down, you'll need to answer out

5  loud.

6    A.    Okay.

7    Q.    What's your occupation?

8    A.    Self-employed.  The turf business.

9    Q.    That's Riverside Turf?

10   A.    Riverside Turf.

11   Q.    What's the business address for

12  Riverside Turf?

13   A.    11969 State Highway 10 East,

14  Shorterville, Alabama.

15   Q.    How long have you been the owner

16  of Riverside Turf?

17   A.    About eighteen, nineteen years.

18   Q.    Has the address been the same that

19  entire time?

20   A.    The address has been the same

21  other than an E-911 change, the physical

22  address has been the same.

23   Q.    So is your mailing address -- has

# FREEDOM COURT REPORTING

1    it been the same the entire eighteen,

2    nineteen years?

3         A.    No.

4         Q.    When did the mailing address

5    change?

6         A.    I'm not sure.  Maybe two, three

7    years.  I'm not sure exactly when it

8    changed.

9         Q.    Do you think that it changed

10   before March of 2003?

11        A.    I don't know when it changed.

12        Q.    I'm looking at what I have marked

13   as Defendant's Exhibit 1, which are

14   documents that your lawyers produced to us

15   pursuant to the deposition -- the document

16   request in the deposition notice.

17             And the first page is a June 8,

18   2001 certificate of liability insurance for

19   Ricky Lane.  And it has the address that I

20   believe you just stated --

21        A.    Right.

22        Q.    On the bottom left; is that right?

23        A.    Yes.

## FREEDOM COURT REPORTING

Page 12

1      Q.   So do you think that the mailing
2  address --
3      A.   No.  This isn't the one I just
4  stated.  It's 11969 State Highway 10 East.
5      Q.   Okay.
6      A.   So that's not correct.
7      Q.   Okay.  Looking at the second page
8  is another certificate of liability
9  insurance.  And it's dated March 10, 2003;
10  is that right?  Can you read it?
11      A.   It appears to be.
12      Q.   All right.  Let's look at the
13  invoice which is page five.  And look at
14  that address.  Is that your current address
15  for the business?
16      A.   Yes.
17      Q.   That document is dated March 10,
18  2003; correct?
19      A.   Right.
20      Q.   So the address for Riverside Turf
21  has been 11969 State Highway 10 East,
22  Shorterville, Alabama 36373 at least since
23  March 10 of 2003; is that right?

# FREEDOM COURT REPORTING

1       A.    That's correct.

2       Q.    Briefly tell me about your

3    education, please.

4       A.    I graduated from high school and

5    graduated from college.

6       Q.    Where did you go to college?

7       A.    The University of Georgia.

8       Q.    In Georgia.   What was your degree

9    in?

10       A.    Business administration.

11       Q.    When did you finish at Georgia?

12       A.    I think --

13       Q.    Let me ask it a --

14       A.    I think it was in the '70's.   I

15    can't remember the exact year.

16       Q.    What did you do when you got out

17    of college?

18       A.    I worked for an export company in

19    Atlanta.

20       Q.    What did you do for this export

21    company?

22       A.    Sales.

23       Q.    What did you sell?

## FREEDOM COURT REPORTING

Page 14

```
 1          A.    Food.

 2          Q.    What types of food?

 3          A.    Beef, pork, poultry, fish.

 4          Q.    You were like a traveling salesman

 5   or would you make calls from your office in

 6   Georgia?  How did that work?

 7          A.    Both.

 8          Q.    Both.  All right.  Did that

 9   involve having to drive eighteen wheelers,

10   tractor trailer rigs?

11          A.    No.

12          Q.    What did you do after you left the

13   export company?

14          A.    I moved back to Fort Gaines and

15   worked for my dad's equipment dealership.

16          Q.    What did you do for the

17   dealership?

18          A.    Sales, management.

19          Q.    Did you have any responsibilities

20   for administration of the company?

21          A.    Some.

22          Q.    What were those?

23          A.    Just general administration.
```

# FREEDOM COURT REPORTING

Page 15

1    Q.   Did you deal with reviewing

2  employment applications?

3    A.   Yes.

4    Q.   Deal with insurance matters?

5    A.   Sometimes.

6    Q.   And those all required reading and

7  understanding documents for that -- whatever

8  role you had in the administrative process;

9  correct?

10    MR. LYONS:  Object to the form.

11    A.   You know, I don't know that I

12  always understood them.  But I could read

13  them.

14    Q.   Okay.  So you can read and write?

15    A.   Yes.

16    Q.   And I don't mean that in an

17  offensive way.

18    A.   Yes, I know.

19    Q.   So how long did you work for your

20  dad generally?

21    A.   About five years.

22    Q.   What did you do after leaving

23  there?

## FREEDOM COURT REPORTING

1       A.    Well, I really haven't left there.

2       Q.    Even as of today?

3       A.    Right.

4       Q.    You still have some

5   responsibilities for that business?

6       A.    Right.

7       Q.    Explain those, please.

8       A.    It's administrative.

9       Q.    Administrative.  Are you an

10  officer of his company?

11      A.    Yes.

12      Q.    What's your title?

13      A.    President.

14      Q.    President of that company?

15      A.    Yes.

16      Q.    And that's in Fort Gaines,

17  Georgia?

18      A.    Uh-huh.

19      Q.    Is that a yes.

20      A.    Yes.  I'm sorry.

21      Q.    It's all right.  It's hard to

22  remember that when you're not used to giving

23  depositions.  What's the next job you had

# FREEDOM COURT REPORTING

Page 17

```
1    since you started working for your dad?
2         A.   The turf business.
3         Q.   All right.  So that leads us up to
4    the present time?
5         A.   Yes.
6         Q.   What is your official title with
7    Riverside Turf?
8         A.   General partner.
9         Q.   General partner.  And since it's
10   been going for eighteen or nineteen years, I
11   take it it's a successful business?
12        A.   Up and down.
13        Q.   Successful enough to last almost
14   twenty years; right?
15        A.   Yes.
16        Q.   Riverside Turf always tries to use
17   best business practices in its operations;
18   right?
19        A.   Yes.
20        Q.   Now, I'm assuming that you have
21   experience with dealing with insurance
22   matters in your operation of Riverside Turf;
23   is that true?
```

# FREEDOM COURT REPORTING

1      A.    Some.

2      Q.    Some?  Is there a person there

3  that handles insurance matters?

4      A.    No.  It's me.

5      Q.    It's you?  You handle all the

6  insurance matters; is that right?

7      A.    Yes.

8      Q.    What types of policies does

9  Riverside Turf have covering itself?

10      A.    Liability, general liability.

11      Q.    Anything else?

12      A.    And physical insurance.

13      Q.    Like property and casualty?

14      A.    Right.

15      Q.    Who's your agent for those

16  policies?

17      A.    Farm Bureau.

18      Q.    Farm Bureau?  Is that someone

19  local?

20      A.    Yes.

21      Q.    Where are they located?

22      A.    Fort Gaines.

23      Q.    In Fort Gaines.  So do you fill

# FREEDOM COURT REPORTING

Page 19

```
 1    out the applications?
 2         A.    I don't remember filling one out.
 3         Q.    Okay.  These are, I take it then,
 4    policies that you've had for a long period
 5    of time and they just are renewed every
 6    year?
 7         A.    Pretty much.
 8         Q.    If anyone did apply for the
 9    insurance, would it have been you?
10         A.    Yes.
11         Q.    All right.  So I'm -- For the two
12    types of -- the two policies, the general
13    liability and the property and casualty, at
14    renewal, what do you -- Well, let's go back
15    to the inception date.
16              If you remember, what did you
17    receive from your insurance agent when you
18    applied for those policies?
19         A.    I can't remember.
20         Q.    All right.  When the policies are
21    renewed every year, what do you receive from
22    the agent?
23         A.    It's a list of equipment.
```

# FREEDOM COURT REPORTING

1      Q.    And he asks you -- I'm assuming

2  it's a he; is that right?

3      A.    Yes.

4      Q.    He asks you to check and make sure

5  that you still own that equipment?

6      A.    Exactly.

7      Q.    And let him know if there's any

8  additions or deletions?

9      A.    Right.

10     Q.    Do you get anything prior to the

11 renewal date from the insurance company or

12 the insurance agent reminding you of the

13 renewal?

14     A.    He will usually call and say --

15     Q.    The agent will?

16     A.    Yes.

17     Q.    You don't receive anything in the

18 mail saying your policy is up for renewal

19 and this is going to be the premium for the

20 following year?

21     A.    I don't remember getting anything

22 like that.

23     Q.    Do you have a copy of those

# FREEDOM COURT REPORTING

Page 21

1  policies?

2      A.   Of the Farm Bureau policies?

3      Q.   Yes, sir.

4      A.   I assume we do.  I'm not sure that

5  we do.

6      Q.   Okay.  Do you have a copy of the

7  declarations pages for those policies?

8      A.   I don't know what that is.

9      Q.   Okay.  That was my next -- I

10  should have asked that first actually.

11          Do you have a certain place at

12  Riverside Turf where you keep important

13  business documents?

14      A.   Just in normal files.

15      Q.   You have a file cabinet?

16      A.   Yes.

17      Q.   Is it in your office?

18      A.   No.

19      Q.   Do you have an assistant?

20      A.   I have a secretary, yes.

21      Q.   Secretary.  Does she keep track of

22  filing all these documents that you receive

23  for the business?

## FREEDOM COURT REPORTING

1       A.    Some, she does and some, I do.

2       Q.    What's her name?

3       A.    The current one is Debbie

4  Williams.

5       Q.    How long has Debbie been with you?

6       A.    About a year.

7       Q.    Who was your secretary before

8  Debbie?

9       A.    Ann Lynn.

10      Q.    Is that A-N-N?

11      A.    Right.

12      Q.    L-Y-N-N?

13      A.    That's correct.

14      Q.    How long was Ann your secretary?

15      A.    I'm not sure.

16      Q.    Was she your secretary in March of

17  2003?

18      A.    I think she probably was.  But I'm

19  not sure of that.

20      Q.    Who was your secretary before Ann?

21      A.    Stephanie -- I'll think of her

22  last name in a minute.

23      Q.    Just let me if you think of it.

# FREEDOM COURT REPORTING

Page 23

```
1    As far as your father's business in Fort
2    Gaines, are you responsible for getting
3    insurance policies for that company?
4         A.    Yes.
5         Q.    Do you have an assistant there?
6         A.    Yes.
7         Q.    What's your assistant's name
8    there?
9         A.    Probably Diane Cox.
10        Q.    And I don't think I ever asked you
11   the name of that company.  What's the name
12   of that company?
13        A.    Morris Tractor Company.
14        Q.    Have you had an occasion to apply
15   for any insurance for Morris Tractor Company
16   within the last five years?
17        A.    I'm sure I have.
18        Q.    Who's the agent that you use for
19   Morris Tractor Company?
20        A.    We've had two or three.  I'm not
21   sure what the guy's name is.  I can't recall
22   the guy's name that we're using right now.
23        Q.    It's a different one that you use
```

# FREEDOM COURT REPORTING

Page 24

1  for Riverside Turf?

2      A.   Yes.

3      Q.   When you do -- When you did apply

4  for insurance for Morris Tractor Company,

5  did you go to the agent's office to fill out

6  the application?

7      A.   No.

8      Q.   He came to you?

9      A.   Yes.

10     Q.   Tell me the process.  The two of

11  you would sit down in your office and what

12  would happen?

13     A.   He would ask for a list of

14  equipment and make suggestions on the

15  coverage he thought we should have.  And

16  then we'd just come to a decision, what we

17  wanted liability-wise.  And then the

18  equipment was usually market based.

19     Q.   When the agent is completed with

20  the process, does he leave any documents

21  with you or did he leave any documents with

22  you?

23     A.   I don't know.

## FREEDOM COURT REPORTING

1    Q.    Have you ever --

2    A.    I assume he did.  But I can't

3  specifically remember.

4    Q.    Do you recall receiving a binder

5  of coverage?

6    A.    For cars, cars and trucks.

7    Q.    All right.  And that's something

8  that the agent would give you to show that

9  you have --

10   A.    Right.

11   Q.    -- purchased a policy; right?

12   A.    And what the coverage was.

13   Q.    All right.  And is it your

14  understanding that that binder is temporary

15  until you receive the policy?

16   A.    I don't know that.

17   Q.    Okay.  When you apply for this

18  policy that we're talking about right now,

19  did you eventually receive a copy of the

20  policy?

21   A.    No.

22        MR. LYONS:  I'm sorry.  Which

23  policy are you talking about?  The one for

## FREEDOM COURT REPORTING

```
 1        - -
 2              MR. TINDAL:  Morris Tractor
 3    Company.
 4              MR. LYONS:  I'm sorry.  I was
 5    confused.
 6              MR. TINDAL:  I'm sorry.
 7        A.   I think we did.
 8        Q.   All right.  Do you recall
 9    receiving a declarations page?
10        A.   I'm not sure what that is.
11        Q.   Do you recall receiving a one-page
12    summary of what the coverages are from that
13    policy?
14        A.   Seems like I recollect seeing
15    something like that.  But I'm not sure.
16        Q.   Okay.  And then I'm assuming you
17    would keep those documents in a certain
18    place at Morris Tractor Company?
19        A.   Yes.
20        Q.   And Riverside Turf is responsible
21    for paying the premiums on the policies
22    issued to it; correct?
23        A.   Yes.
```

# FREEDOM COURT REPORTING

1    Q.    Do you pay those premiums?

2    A.    Me personally?

3    Q.    Do you write the check?

4    A.    Yes.

5    Q.    On a Riverside Turf account, I

6    assume?

7    A.    Yes.

8    Q.    Is the same true for Morris

9    Tractor Company?

10    A.    Yes.

11    Q.    Do you have a calendar -- a

12    calendaring system set up at either Morris

13    Tractor Company or Riverside Turf to keep up

14    with when the policies expire?

15    A.    Yes.

16    Q.    You do?  Okay.  So you will look

17    at that occasionally to make sure that your

18    insurance coverage doesn't lapse?

19    A.    Yes.

20    Q.    And is that for Riverside Turf and

21    Morris?

22    A.    Yes.

23    Q.    What's your understanding of the

## FREEDOM COURT REPORTING

Page 28

```
1    different types of insurance coverages that
2    truck drivers are required to obtain?
3         A.    Just what I've heard in these
4    depositions.  But I know that they have to
5    have seven hundred and fifty thousand to
6    cross the state line.
7         Q.    Is it your understanding they have
8    to have a separate -- or they have to have
9    an insurance policy that provides physical
10   damage coverage?
11        A.    No.  I didn't know.  Not physical
12   damage.  I didn't realize they had to have
13   that.
14        Q.    Did you know that that's available
15   to truckers, truck drivers?
16        A.    Yes.
17        Q.    You've seen physical damage
18   coverage policies in the past?
19        A.    We've got coverage here.
20        Q.    And you're referring to the
21   National Fire -- well, I'm sorry.  That's
22   cargo coverage.
23             MR. LYONS:  This one.
```

# FREEDOM COURT REPORTING

```
 1         A.   A loss payee.  My understanding is
 2    that that's physical damage.
 3         Q.   All right.  And you're referring
 4    to what will be page three and four of
 5    Exhibit 1; is that right?
 6         A.   I don't know about the numbers.
 7    But this is the page that I'm referring to.
 8         Q.   All right.
 9         A.   And my understanding is that this
10    is the physical damage and the deductible on
11    the physical damage on the truck.
12         Q.   All right.
13              MR. LYONS:  Just for the record,
14    he's pointing at the twelve thousand dollar
15    limit on liability at the bottom of the
16    document.
17         Q.   Are you aware of the fact that the
18    physical damage coverage pays for damage to
19    the truck itself?
20         A.   Yes.
21         Q.   And that if there's any type of
22    damage, then the insurance company, if it
23    approves the claim, will pay money to the
```

# FREEDOM COURT REPORTING

1   owner of the truck or someone who has an

2   interest in the truck; is that right?

3       A.   Yes.

4       Q.   Are you aware that there is cargo

5   coverage available to truck drivers?

6       A.   Yes.

7       Q.   What's your understanding of what

8   that covers?

9       A.   Whatever is being hauled by the

10  truck.

11      Q.   So what's your understanding of

12  who receives the insurance money if a claim

13  is paid?

14      A.   I would assume that we would

15  eventually.  I'm not sure who the check goes

16  to initially.

17      Q.   Is it your understanding that

18  whoever owns that cargo is the one that

19  receives the money?

20      A.   I would assume eventually he would

21  get it.  But I would think that it would be

22  a joint check to the trucker and the owner

23  of the cargo.

# FREEDOM COURT REPORTING

1     Q.   But ultimately, it would go to the

2  owner of the cargo?

3     A.   Right.

4     Q.   Are you aware of what's called bob

5  tail coverage?

6     A.   No.

7     Q.   I'm assuming you're aware of

8  liability coverage that's available to truck

9  drivers?

10     A.   Yes.

11     Q.   And is it your understanding that

12  the liability policy will pay money to

13  someone that's injured if it turns out that

14  the truck driver is at fault?

15     A.   I don't know at what point, but my

16  understanding is that the liability does go

17  to injured parties.

18     Q.   All right.  Ultimately if a claim

19  is paid by an insurance company on a

20  liability policy, you understand it goes to

21  the injured party?

22     A.   Right.

23     Q.   All right.  I was going to ask you

## FREEDOM COURT REPORTING

```
 1   a couple of insurance terms and see if you
 2   know what they are.  I think we've already
 3   established you know what an application is?
 4        A.   Yes.
 5        Q.   You understand that that has to be
 6   completed to get an insurance policy; right?
 7        A.   Yes.
 8        Q.   Do you understand what a
 9   certificate of liability coverage is?
10        A.   Yes.
11        Q.   What's your understanding of that?
12        A.   It's proof that we are a named
13   insured for the liability on that truck.
14        Q.   For the physical damage or the
15   liability?
16        A.   No.  For the liability.
17        Q.   All right.  Explain what you mean
18   by that.
19        A.   That if someone is injured, it's
20   proof that there's a million dollars or some
21   amount of liability insurance available to
22   that trucker at that time for the period of
23   the certificate.
```

# FREEDOM COURT REPORTING

1     Q.    To that truck driver; right?

2     A.    Yes.

3     Q.    Okay.  What's your understanding

4     of what a binder is?

5     A.    I would -- I'm not sure.  But I

6     assume a -- I don't know how binding a

7     binder is.

8     Q.    I understand.

9     A.    But I assume that it guarantees

10    somebody that they have coverage in the

11    interim period.

12    Q.    All right.

13    A.    Initially.

14    Q.    Right.  Thank you.  You understand

15    what a policy is?

16    A.    Yes.

17    Q.    Do you understand what the term

18    premiums means?

19    A.    Yes.

20    Q.    What's your understanding of that?

21    A.    What you pay for the policy.

22    Q.    Pay to the insurance company;

23    correct?

# FREEDOM COURT REPORTING

Page 34

1    A.    Right.

2    Q.    And you understand what -- when

3 people talk about the limits on an insurance

4 policy, you understand what that means;

5 correct?

6    A.    Yes.

7    Q.    What's your understanding of that?

8    A.    It's how much the policy will pay

9 under certain situations.

10    Q.    I'm assuming you have used truck

11 drivers before using Ricky Lane to haul for

12 Riverside Turf; correct?

13    A.    Yes.

14    Q.    And I received some responses to

15 interrogatories that Progressive sent.  I'll

16 mark that as Defendant's Exhibit 2.

17        Looking on this attachment here on

18 the back, there's a list of companies.  Are

19 those companies that you have used for

20 hauling?

21    A.    Yes.

22        MR. LYONS:  I apologize.  That was

23 not sent -- those were not Progressive's

## FREEDOM COURT REPORTING

Page 35

1  interrogatories, I don't believe.  I think

2  those were sent by Ms. Holmes in an

3  underlying case.

4          MR. TINDAL:  I apologize.  That's

5  correct.

6          MR. LYONS:  And I just want the

7  record to be clear.  Those are some

8  responses to interrogatories -- some

9  subsequent interrogatories from Ms. Holmes'

10 attorney.

11         MR. TINDAL:  All right.  I don't

12 want to mark this.  I don't want to mark

13 this.

14         MR. LYONS:  But they did ask for a

15 list of folks who had pulled for them.  And

16 I think having an abundance of caution, my

17 secretary included everybody on there.

18         MR. TINDAL:  I understand.  I'm

19 just going to take the list and mark that as

20 Exhibit 2.

21         (Whereupon, Defendant's Exhibit

22 No. 2 was marked for identification.)

23     Q.   If you'd look at all those pages

# FREEDOM COURT REPORTING

1  and make sure that I didn't add anything I

2  shouldn't have to Exhibit 2.

3          A.    I don't see anything added.

4          Q.    That shouldn't be in that exhibit?

5          A.    Right.

6          Q.    Do you recall when Ricky Lane

7  first started hauling for you, for Riverside

8  Turf?

9          A.    No, I don't.

10         Q.    Is Ricky Lane still hauling for

11 Riverside Turf?

12         A.    He hasn't in the last -- No, he's

13 not right now.

14         Q.    Has he been let go or are you just

15 not using him?

16         A.    Just not using him.

17         Q.    Currently or --

18         A.    Currently.

19         Q.    Okay.  Let me ask it this way.  Is

20 it your intention never to use Ricky Lane

21 again to haul for Riverside Turf?

22         A.    I don't know.

23         Q.    Okay.  Now, would these other --

# FREEDOM COURT REPORTING

1  I'm going to refer to them as truck

2  drivers.  Is that fair?  The list in Exhibit

3  2?

4       A.    They are trucking companies.

5       Q.    Trucking companies.  All right.

6  Say J & M Trucking is the second one on the

7  list.  Is that a business name for an

8  individual truck driver?

9       A.    I'm not sure how many employees or

10  how many trucks he has.  But that was the

11  name of his trucking company.

12       Q.    Is he the only truck driver?

13       A.    I'm not sure.

14       Q.    What about Carl Whigham Trucking,

15  is that an individual driver?

16       A.    I'm not sure.

17       Q.    Okay.  Now, with truck drivers

18  that you have used in the past, are those

19  situations where those drivers always own

20  their own tractor?

21       A.    No.

22       Q.    Is it a mix?  You own some of the

23  tractors and they own some of the tractors?

## FREEDOM COURT REPORTING

1      A.   We own?

2      Q.   Riverside Turf.

3      A.   We don't own any tractors.

4      Q.   You never have and --

5      A.   Never have.

6      Q.   In the eighteen, nineteen years?

7      A.   Never have.

8      Q.   So when you use a truck driver,

9  you require that truck driver to go out and

10 get their own insurance; is that right?

11     A.   Exactly.

12     Q.   Do you -- You used Joe McKnight --

13 I'm sorry.  Let me rephrase that.  Joe

14 McKnight was the agent that sold the policy

15 to Ricky Lane; correct?

16     A.   That's correct.

17     Q.   Did you refer Ricky Lane to Joe

18 McKnight?

19     A.   No.

20     Q.   Do you know how Ricky Lane got Joe

21 McKnight's name?

22     A.   No.

23     Q.   To your knowledge, have any of the

# FREEDOM COURT REPORTING

1    other truck drivers that you've ever -- that

2    Riverside Turf has ever used gone to Joe

3    McKnight to get insurance?

4         A.    Yes.

5         Q.    About how many percentage-wise?

6         A.    I can think of two right off.

7         Q.    Two others?

8         A.    And I'm not sure of that.  But I

9    think there were two.

10        Q.    All right.

11        A.    That I know of.  It could have

12   been more.

13        Q.    That's fine.  That's a good

14   point.  This is not a memory test.  I'm just

15   trying to get what you remember.

16        A.    Yes.

17        Q.    What you recall at this point.  Do

18   you know who the insurer was for the other

19   truck drivers you can remember that used Joe

20   McKnight?

21        A.    Who the insurer was?

22        Q.    The insurance company.

23        A.    No.

## FREEDOM COURT REPORTING

1      Q.   All right.  With these other truck

2   drivers -- and I'm talking about the entire

3   time that Riverside Turf has been doing

4   business -- what documents do you receive

5   from the insurance company?

6      A.   A certificate of insurance.

7      Q.   All right.  What documents do you

8   receive from the insurance agent?

9      A.   Well, let me clarify that.  I'm

10  not sure where the certificates of insurance

11   -- if they all come from the agent or that

12  some of them may come from the company

13  themselves.

14     Q.   All right.  Do you ever get a copy

15  of a policy from the insurance company for

16  the truck drivers?

17     A.   I don't ever recall getting one.

18     Q.   Do you ever recall receiving a

19  binder?

20     A.   No.  Because it wasn't my

21  insurance.

22     Q.   And why do you -- Do you ask the

23  insurance -- the truck driver to ask the

# FREEDOM COURT REPORTING

1    insurance agent to send you a certificate?

2        A.    Yes.

3        Q.    Why do you do that?

4        A.    So we'll have proof that they have

5    a certain amount of insurance.

6        Q.    So that's for Riverside Turf's

7    benefit to have that document in its

8    possession?

9        A.    That's correct.

10       Q.    All right.  And I'm assuming that

11   you never have received a declarations page

12   for the truck drivers' policies; is that

13   right?

14       A.    No.  I'm not sure what a

15   declarations page is.  But the only thing

16   that I can remember us ever receiving for

17   any of the truck drivers is a certificate.

18       Q.    All right.

19       A.    With the exception of -- In

20   Ricky's case, we've got the --

21       Q.    The invoice --

22       A.    The loss payable.

23       Q.    Do you know -- And that's what

# FREEDOM COURT REPORTING

1    I'll represent to you is page three and four

2    of Exhibit 1.  Do you know where this

3    document came from, who sent it to Riverside

4    Turf?

5         A.   I guess I could look at it and

6    see.  But I'm not sure.  I assume it's --

7              MR. LYONS:  Just for the record,

8    there's also another one for '04 and '05.

9         A.   It's got Progressive on the top.

10   So -- and it says the insurer is

11   Progressive.

12        Q.   So you think you got that from

13   Progressive?

14        A.   I guess.  I'm not sure.  McKnight

15   could have gotten it and sent it to me.  I

16   don't know.

17        Q.   Now, this is new to me.  So at the

18   bottom -- and I'm looking at the one that's

19   from March 10, 2003 to March 20, 2004.  It

20   says lienholder copy?

21        A.   Yes.

22        Q.   And it says Riverside Turf was

23   receiving that because it had a lien on the

# FREEDOM COURT REPORTING

```
 1    truck; is that right?
 2         A.   On the tractor.
 3         Q.   On the tractor.  So my
 4    understanding at the time was that Ricky
 5    Lane had a Freightliner truck; is that right
 6    -- tractor; is that right?
 7         A.   It says International.
 8         Q.   International?  Okay.  He had an
 9    International at the time and then he
10    switched to a Freightliner later; is that
11    right?
12         A.   I think this is the truck he's got
13    now.
14         Q.   Okay.  Because Mr. Lane and Mr.
15    McKnight have testified that in August of
16    2003, he switched tractors.  His older
17    tractor he no longer wanted for whatever
18    reason.
19              And then he acquired a new one.
20    Mr. Lane says that he borrowed the money
21    from Riverside Turf to purchase the tractor
22    and then paid Riverside -- would pay
23    Riverside Turf back; is that right?
```

## FREEDOM COURT REPORTING

1    A.    Right.  And that's this tractor.

2    Q.    All right.  So on -- bear with me

3  one second, please.  All right.  We'll come

4  back to that.

5         We'll look here at what I will

6  mark as Exhibit 3, which is an August 8,

7  2003 insurance binder.

8         (Whereupon, Defendant's Exhibit

9  No. 3 and 4 were was marked for

10  identification.)

11    Q.    It's Bates stamped McKnight 27.

12  I'll just do that one page.  I'll ask you if

13  you recognize that document?

14         MR. BRADFORD:  Was that something

15  that was produced today?

16         MR. TINDAL:  No.

17         MR. LYONS:  No.

18    A.    This looks like something that we

19  have gotten.  But I'm not sure that it is.

20  It would be in my -- in the package that I

21  gave you if we'd gotten it because that's

22  everything that we had.

23    Q.    Okay.  So what we've marked as

# FREEDOM COURT REPORTING

1    Defendant's Exhibit 1 are all the documents

2    in Riverside Turf's possession that relate

3    to this insurance policy?

4         A.    Right.  I'm not sure.  This looks

5    like one of those.  But I'm not sure whether

6    it is or not.  I don't know if the binder is

7    the same as a certificate or --

8         Q.    I'm going to show you what's been

9    marked as --

10        A.    When I say that's all that we've

11   got, that's all that I could find.

12        Q.    All you could find.  Okay.  This

13   is what was marked as Exhibit 1 to Mr.

14   Lane's deposition.  I understand that --

15   Have you seen his deposition transcript?

16        A.    No.

17        Q.    Have you seen the exhibits to his

18   deposition?

19        A.    No.

20        Q.    All right.  Part of Exhibit 1 is

21   an application.  And this is one of the

22   pages of the application.  And it refers to

23   a 1990 International tractor.  You see that?

## 367 VALLEY AVENUE
### (877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397

# FREEDOM COURT REPORTING

1      A.    Yes.

2      Q.    All right.  Riverside Turf was not

3  a lienholder for the 1990 International

4  tractor; correct?

5      A.    No.

6      Q.    Only for the 1995 tractor?

7      A.    '95, right.

8      Q.    All right.  So you do recall

9  loaning -- on behalf of Riverside Turf,

10  loaning money to Ricky Lane for the 1995

11  tractor?

12      A.    Yes.

13      Q.    Do you recall when that was?

14      A.    I don't know exactly.

15      Q.    Looking at Exhibit 3, which is a

16  binder -- and it's your understanding that a

17  binder is something that would be issued at

18  the time of an application for an insurance

19  policy; is that right?

20      A.    I would assume that it's issued

21  when you've got insurance.  It says a

22  temporary insurance contract on the top.

23      Q.    Here this one is dated August 8,

## FREEDOM COURT REPORTING

1    2003.  And it refers to the 1995

2    International that Riverside Turf had a lien

3    on; correct?

4        A.   I'm not sure about this document.

5    You know, I haven't seen this.

6        Q.   I understand you haven't seen it.

7    All I'm trying to get at is, do you think

8    that it was around August of 2003 that you

9    loaned Ricky Lane --

10       A.   It could have been.  I'm just not

11   sure of the exact date.

12       Q.   And what was the arrangement, the

13   money would be taken out of his check, his

14   paycheck?

15       A.   Yes.

16       Q.   Now, it's also my understanding

17   that for this Progressive policy, there was

18   a down payment that was required; is that

19   right?

20       A.   Yes.

21       Q.   And then --

22            MR. BRADFORD:  Are you talking

23   about any particular policy period?

# FREEDOM COURT REPORTING

1          MR. TINDAL:  Every year.  We'll

2   start with the 2003, 2004 policy year.

3          Q.   Is it your understanding that a

4   portion of the premiums were financed?

5          A.   Yes.

6          Q.   And the other portion was what was

7   required to be paid as a down payment; is

8   that right?

9          A.   I think so.

10          Q.   And Riverside -- Did Riverside

11   Turf loan Ricky Lane the down payment?

12          A.   I'm not sure about all cases.  In

13   some cases, we did.

14          Q.   All right.  In those cases where

15   you did allow Riverside Turf to loan the

16   money to Ricky Lane, Ricky Lane would

17   ultimately be responsible for paying those

18   premiums; correct?

19          A.   Yes.

20          Q.   And the portion of the premiums

21   that were financed, those were ultimately to

22   be paid by Mr. Lane as well; right?

23          A.   Yes.

## FREEDOM COURT REPORTING

1    Q.    Now, have you ever allowed

2    Riverside Turf to loan money to other truck

3    drivers to purchase a tractor?

4    A.    We have had liens on other

5    tractors yes.  But not -- I don't think it

6    was purchase money.

7    Q.    How was it done, if you recall?

8    A.    If we loan them some money, we get

9    a -- have a lien on the tractor for

10   collateral.

11   Q.    Okay.  All right.  And has Ricky

12   Lane paid off the loan for the 1995 tractor?

13   A.    Not entirely.

14   Q.    Has he paid off most of it?

15   A.    I can't remember exactly where he

16   is on it.

17   Q.    All right.  Is he still paying on

18   it?

19   A.    Well, he hasn't in -- yes.

20   Q.    Now, in 2003 when -- March of 2003

21   when Ricky Lane got the Progressive policy

22   from Mr. McKnight, did you call Mr. McKnight

23   and ask him to send you the certificate?

# FREEDOM COURT REPORTING

1      A.    I don't remember.  I would think

2  Ricky did.

3      Q.    Okay.  You think Ricky would have

4  done what?

5      A.    Called and asked.  I probably

6  would have asked Ricky to get a certificate

7  sent to us.

8      Q.    All right.  I'll tell you, Mr.

9  McKnight, and I think Mr. Lane to some

10  extent, testified that in March of 2003, Mr.

11  Lane came into the McKnight Agency to get a

12  quote for the insurance policy.  Is that

13  your understanding?

14      A.    I'm not sure about that.

15      Q.    Do you recall Mr. Lane coming to

16  Riverside Turf and saying -- I'm

17  paraphrasing here -- I've talked to Mr.

18  McKnight, this is what the premiums are

19  going to be on the policy and I need a

20  certain amount of money for the down

21  payment?

22          MR. LYONS:  Object to the form.

23      A.    I can't remember that

```
 1   conversation.  I just can't remember.
 2        Q.   Is it possible that that occurred
 3   and you just don't recall?
 4        A.   It's possible.
 5        Q.   Okay.  And then so at some point,
 6   Riverside Turf wrote a check for the down
 7   payment on the premiums; is that right?
 8        A.   On some of them.  I'm not sure
 9   whether we did on all of them.
10        Q.   I'm just talking about the 2003,
11   2004 policy year.
12        A.   I'm not sure.
13        Q.   When you received the certificate
14   from -- it came from Mr. McKnight; correct?
15        A.   I assume it did.  I'm not sure
16   where they come from.
17        Q.   Was it -- Do you know if it was
18   faxed to you?  Looking at what I've got as
19   page two of Exhibit 1, is the one that's in
20   March of 2003, is that what y'all are
21   looking at?
22             MR. LYONS:  Yes.
23        Q.   You see the fax line on the top?
```

# FREEDOM COURT REPORTING

Page 52

```
1              MR. LYONS:  The copy we're looking

2    at has been faxed and faxed.

3              MR. TINDAL:  Right.

4         A.   This says Auburn Speedy Print.

5              MR. LYONS:  That's out of my

6    office.

7         Q.   My only question really is, when

8    you received that certificate in March of

9    2003, did you turn around and give a copy to

10   Mr. Lane?

11        A.   I'm not sure.  I might have.

12        Q.   Okay.  But it's your recollection

13   that Mr. Lane -- you asked Mr. Lane to ask

14   Mr. McKnight to send you the certificate;

15   correct?

16        A.   That's what we typically do with

17   truck drivers.  We just say get somebody to

18   send us a certificate, whoever your

19   insurance agent is or insurance company or

20   whatever.

21        Q.   So is that your understanding of

22   what happened in March of 2003?

23        A.   Yes.
```

# FREEDOM COURT REPORTING

```
1         Q.   Okay.  So if you had asked Mr.

2   Lane to have Mr. McKnight send you the

3   certificate, then that wouldn't make sense

4   that you would then turn around and give Mr.

5   Lane the certificate, does it?

6         A.   Well, if he asked for one, I'd

7   give him one.

8         Q.   Do you recall him asking for one?

9         A.   I don't remember.

10         Q.   All right.  Do you recall him

11   asking for one in March of 2004?

12         A.   I don't recall.

13         Q.   Do you recall him asking for one

14   in August of 2003?

15              MR. BRADFORD:  A copy of the

16   certificate?

17         Q.   For a copy of the certificate?

18         A.   I don't recall that.  He very well

19   could have.

20         Q.   Okay.

21         A.   If he did, I'd have no reason not

22   to give him a copy.

23         Q.   I understand.  You were at Mr.
```

# FREEDOM COURT REPORTING

1   McKnight's deposition a couple of weeks ago;

2   right?

3        A.   That's correct.

4        Q.   And you heard Mr. McKnight say

5   that it was his intention to sell Mr. Lane a

6   policy with one million dollar limits;

7   right?

8        A.   Yes.

9        Q.   So you understand that was his

10  intent, was to give him the million dollar

11  limits; right?

12       A.   Yes.

13       Q.   So are you aware that Ricky Lane

14  has testified that it was his intention to

15  purchase a policy with one million dollar

16  limits?

17       A.   I assume that.  I don't know that

18  for a fact.  But I assume that.

19       Q.   You don't have any reason to doubt

20  that?

21       A.   No.

22       Q.   All right.  So assuming that we

23  know that Mr. McKnight and Mr. Lane both