# EXHIBIT B
## JOE MCKNIGHT DEPOSITION

## FREEDOM COURT REPORTING

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    PROGRESSIVE SPECIALTY COMPANY,

6              Plaintiff,

7     versus                          2:05-CV-438-W

8    MCKNIGHT AGENCY, INC., et al.,

9              Defendants.

10

11                                        COPY

12

13

14          *  *  *  *  *  *  *  *  *  *  *  *

15          DEPOSITION OF JOE MCKNIGHT,

16   taken pursuant to stipulation and agreement

17   before Jackie Parham, Certified Shorthand

18   Reporter and Commissioner for the State of

19   Alabama at Large, in the law offices of Lloyd,

20   Gray & Whitehead, 2501 Twentieth Place South,

21   Suite 300, Birmingham, Alabama, on Friday, the

22   28th day of October, 2005, commencing at

23   approximately 9:20 a.m.

# FREEDOM COURT REPORTING

1          here about a policy of insurance that was

2          sold to an individual named Ricky Lane?

3    A.    Yes, sir.

4    Q.    Tell me what your experience is in the

5          insurance field.

6    A.    Well, I've been in the insurance business

7          since 1982.

8    Q.    And starting in 1982, take us from that

9          date up through today in terms of where

10         you worked, and what you did, and along

11         the way what licenses you have acquired.

12   A.    Okay.  In 1982 I started as a life and

13         health agent as an employee of United

14         Insurance Company.  In 1992 I got my

15         property and casualty license and opened

16         McKnight Agency.  And --

17   Q.    Did you have a life and health license?

18   A.    I had a life and health license until

19         1992.

20   Q.    And then you obtained a property license?

21   A.    Yes, sir.

22   Q.    Property and casualty?

23   A.    Right.

## FREEDOM COURT REPORTING

```
1    Q.    And both of those licenses are issued by

2          the Alabama Department of Insurance; is

3          that right?

4    A.    That's correct.

5    Q.    Okay.  From 1982 until '92 did you work

6          just for United?

7    A.    I worked for a brief time for Metropolitan

8          Life.

9    Q.    And I haven't even asked you.  What is

10         your residence and business addresses?

11   A.    203 West Washington Street in Abbeville.

12         And that's both of them.  I live there,

13         and my office is in my house.

14   Q.    Okay.  Now, we got up to 1992 when you

15         obtained your property and casualty

16         license.

17   A.    Right.  And that's when I started McKnight

18         Agency.

19   Q.    And did you own the McKnight Agency alone,

20         that is, you were the sole owner of that

21         business?

22   A.    Yes, sir.

23   Q.    Was it a corporation?
```

## FREEDOM COURT REPORTING

1    A.    Yes, sir.

2    Q.    And when did you sell it to Young,

3          Johnston & Associates?

4    A.    December of 2004.

5    Q.    From 1992 until December of 2004 did you

6          sell at the McKnight Agency any other

7          types of insurance aside from property and

8          casualty?

9    A.    No, sir.

10    Q.    Okay.  What companies did you sell for?

11    A.    Progressive, Sagamore, Victoria.  We had a

12          number of brokerage contracts with

13          companies like Southern Cross

14          Underwriters, Britt Paulk Insurance

15          Agency, Grechian (phonetic) & Associates,

16          Insurance Connection, Burns & Wilcox,

17          Dagle (phonetic) & Associates.  That's

18          basically the main ones.

19    Q.    Okay.

20             MR. WHITEHEAD:  You named about

21              half of my clients.

22    Q.    When did you start selling for

23          Progressive?

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

# FREEDOM COURT REPORTING

```
1    A.      Probably in '92.

2    Q.      And was there a contract or agreement that

3            set forth the relationship between

4            Progressive and the McKnight Agency?

5    A.      Yes, sir.

6    Q.      And what is that document called?

7    A.      I guess it would be a Producer's

8            Agreement.

9    Q.      Okay.  And in that Producer's Agreement,

10           or whatever the correct term is, what was

11           the McKnight Agency designated as?

12           Producer?

13   A.      Agent, producer.  I'm not sure.

14   Q.      What types of Progressive products did you

15           sell?

16   A.      Auto and commercial auto.

17   Q.      Auto and commercial auto?

18   A.      Uh-huh (positive response).

19   Q.      Yes, sir?

20   A.      Yes.

21   Q.      Okay.  And commercial auto, generally

22           speaking, that would be in the trucking

23           business?
```

# FREEDOM COURT REPORTING

1       be hauling.  And when we get through and

2       get to the end of the steps in this

3       process, it gives us the premium and the

4       payment plans that are available.

5   Q.  Okay.  Has that been true for at least the

6       last five years, that's the way it's

7       worked?

8   A.  Yes, sir.

9   Q.  Would you have to call anyone in Cleveland

10      or some other place for Progressive as

11      part of the process to insure someone?

12  A.  No, sir.

13  Q.  What about underwriting, how is that done,

14      if it is done?

15  A.  Well, the software itself has a list of

16      questions that it asks about what you're

17      hauling and your distances and that sort

18      of stuff.  And then their software runs

19      all the reports that you need, does all

20      the underwriting for you.  It does the

21      Retail Credit Report.  It checks the VIN

22      of the vehicle to make sure that you've

23      classed it right as far as weight.  And it

# FREEDOM COURT REPORTING

1          runs a Motor Vehicle Report. And those

2          three criteria are basically what

3          determines what the premium is.

4    Q.    And Motor Vehicle Report, is that checking

5          the driver's history?

6    A.    Yes, sir.

7    Q.    So that's done by the Progressive computer

8          system; is that right?

9    A.    That's correct.

10   Q.    But if you put that information in and

11         this hypothetical person had a good enough

12         driving record, then you have the

13         authority to bind Progressive; is that

14         true?

15   A.    The software wouldn't let you bind if the

16         points were too high or something.

17   Q.    For example, if I walked in and my license

18         were revoked, the software wouldn't let

19         you bind? Is that what you're saying?

20   A.    I think that's right. I know if you've

21         got too many points, then it wouldn't

22         allow you to bind certain amounts of

23         coverage.

## FREEDOM COURT REPORTING

1  Q.   Okay.  And the truckers would obtain

2       insurance through the McKnight Agency, and

3       then you would provide proof via a

4       certificate to Mr. Morris at Riverside

5       Turf; is that right?

6  A.   That's correct.

7  Q.   Do you know his partner, Mr. Nixon?

8  A.   No, sir.

9  Q.   Was there any requirement that you know of

10      that Ray Morris and Riverside Turf

11      required of the drivers who obtained

12      coverage?

13 A.   They usually required a million dollars.

14 Q.   Did you understand that Riverside Turf

15      sold its products in several southeastern

16      states?

17 A.   Yes, sir.

18 Q.   And you knew that that would constitute

19      interstate trucking?

20 A.   Right.

21           MR. SEARS:  Object to the form.

22 Q.   Let me direct this to your lawyer.

23           MR. HAYNES:  Steve, do you have

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

## FREEDOM COURT REPORTING

1    Q.    I want to look at that first one there

2          that bears Bates number 0001.  And I've

3          marked that document, which is apparently

4          an invoice, as Plaintiff's Exhibit 1.

5          This appears to be an invoice to Ricky

6          Lane, care of Riverside Turf, dated March

7          10, 2003.  Do you see that?

8    A.    Yes, sir.

9    Q.    It shows that the company insuring

10         Mr. Lane was Progressive; is that right?

11   A.    That's correct.

12   Q.    And it shows under the heading Description

13         one million dollars liability; is that

14         right?

15   A.    That's correct.

16   Q.    Is that the date you had the discussion

17         with Ricky Lane about his need for

18         $750,000.00 or more in liability insurance

19         so as to comply with federal and state

20         law?

21   A.    Yes, sir.

22   Q.    Tell me what the discussion was between

23         you and Mr. Lane on that date.

# FREEDOM COURT REPORTING

Page 30

```
 1          Ray Morris and Riverside Turf, that it was

 2          an interstate situation --

 3    A.    Right.

 4    Q.    -- whereby the federal laws will have to

 5          be complied with in terms of the amount of

 6          liability insurance; is that right?

 7    A.    That's true.

 8    Q.    And then you said to Ricky Lane that it

 9          wasn't much difference in the cost between

10          one million dollars worth of liability

11          insurance versus 750,000; is that right?

12    A.    That's correct.

13    Q.    And, so, you billed Mr. Lane for a million

14          dollars worth of liability insurance; is

15          that right?

16    A.    That's correct.

17                MR. WHITEHEAD:  Object to the

18                    form.  The document speaks

19                    for itself.

20    Q.    Did the insurance that covered Ricky Lane

21          from March 10, 2003 for one year, did that

22          end up being one million dollars of

23          liability insurance?
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

# FREEDOM COURT REPORTING

```
1    A.    Could you repeat that?

2    Q.    I'm not sure.  Did Mr. -- Let me strike

3          that and start all over.

4               It was clear, wasn't it,

5          Mr. McKnight, that Ricky Lane wanted a

6          million dollars worth of insurance; is

7          that right?

8    A.    Yes, sir.

9    Q.    And you intended for Ricky Lane to have

10         one million dollars worth of liability

11         insurance through Progressive; is that

12         true also?

13   A.    That's true.

14   Q.    So both of you wanted one million dollars

15         worth of Progressive Insurance, correct?

16   A.    That's right.

17   Q.    And also Mr. Morris over at Riverside Turf

18         was requiring either 750 or a million

19         dollars worth of insurance, wasn't he?

20   A.    That's correct.

21   Q.    So, as far as you know, that's what

22         everybody intended when he first obtained

23         Progressive -- Ricky Lane first obtained
```

# FREEDOM COURT REPORTING

1        these documents in your file reflect what

2        you called the pull-down menu?

3   A.    No, sir.

4   Q.    Okay.  But when you -- It's like ordering

5        a -- I ordered some maple syrup from

6        Vermont one time.  You can get 6 ounces,

7        12 ounces, 18 or 24.  And it's got -- you

8        take your computer mouse and select which

9        one you want; is that right?

10  A.    That's correct.

11  Q.    I guess something similar is what happened

12       here.  You intended to click one million

13       dollars worth of liability insurance but

14       apparently you clicked 300,000.  Is that

15       what happened?

16  A.    Apparently so, yes, sir.

17  Q.    But just to dispense with why it happened,

18       it was simply a mistake, apparently, on

19       your part; is that right?

20  A.    That's correct.

21  Q.    When you would obtain coverage for

22       truckers through Progressive, did you

23       personally handle that or did you assign

## FREEDOM COURT REPORTING

```
1          after March 10th, 2003?

2    Q.    Yes, sir.

3    A.    What would Ricky have gotten in the mail?

4    Q.    Right.

5    A.    He would have gotten a coupon book from a

6          premium finance specialist.

7    Q.    All right.

8    A.    To make his payments to the premium

9          finance company.

10   Q.    Okay.

11   A.    And he would have gotten a copy of a

12         policy and I.D. cards from Progressive.

13   Q.    Did anybody else get a copy of the policy?

14   A.    I got an agent's copy.  Yes, sir.

15   Q.    What about Riverside Turf, would they get

16         a copy?

17   A.    At that time I don't think they would

18         have.  Because Ricky only applied for

19         liability coverage in the beginning.

20   Q.    Did Riverside Turf get a certificate from

21         you?

22   A.    Yes, sir.  And --

23   Q.    I didn't mean to cut you off.
```

# FREEDOM COURT REPORTING

Page 39

```
1    A.      I faxed a copy to Riverside on the 10th,

2            the day that he bought the policy.

3    Q.      And did that copy that you faxed to

4            Riverside on March 10, 2003, did it

5            reflect one million dollars worth of

6            liability limits?

7    A.      Yes, sir.

8                        (Plaintiff's Exhibit 4 marked

9                         for purposes of identification)

10   Q.      I'm going to mark as Plaintiff's Exhibit 4

11           a Certificate of Liability Insurance that

12           appears to be from March 10, 2003 through

13           March 10, 2004.  It reflects a combined

14           single limit of a million dollars.  Do you

15           see that?

16   A.      Yes, sir.

17   Q.      Is that a copy of the certificate that you

18           would have faxed to Riverside Turf?

19   A.      Yes, sir.

20   Q.      Did Progressive authorize you as their

21           agent to send this certificate to

22           Riverside Turf?

23                   MR. SEARS:   Object to form.
```

## FREEDOM COURT REPORTING

1          the wrong box?

2    A.    Yes, sir.

3    Q.    And when Ricky Lane -- did he actually

4          come back in to renew in March of 2004?

5    A.    Yes, sir.  I don't remember what date he

6          came in.  I don't remember when.

7    Q.    Sir?

8    A.    I really don't remember if he came back in

9          or if he -- I think he did, though.

10         Because we would have had some documents

11         for him to sign with National Fire and

12         Marine.

13   Q.    And do they have the cargo coverage?

14   A.    Yes, sir.  But there would have been no

15         application or any reason for him to come

16         back in on the Progressive.

17   Q.    Let me show you two documents, Mr.

18         McKnight.  The first I'm going to mark as

19         Plaintiff's Exhibit Number 5.  And it has

20         the Bates number of 0015.  It appears to

21         me to be a Progressive Insurance Company's

22         receipt dated March 8, 2004 and reflecting

23         a payment of $4219.00 to Progressive.  Do

## FREEDOM COURT REPORTING

```
1   Q.    You knew he was still hauling for

2         Riverside Turf, didn't you?

3   A.    Yes, sir.

4   Q.    And is it correct that it would have been

5         your understanding that he needed 750,000

6         or more in limits; is that right?

7   A.    Yes, sir.

8   Q.    And was it also your assumption and belief

9         that he, in fact, had one million dollars

10        of liability limits through Progressive?

11  A.    Yes, sir.

12  Q.    And, apparently, that was his

13        understanding also?

14              MR. WHITEHEAD:   Object to the

15                   form.

16  A.    I can't answer for what his understanding

17        was.  But it was my understanding.

18  Q.    Well, you told me earlier, I thought, you

19        read some of his testimony.  That was his

20        understanding, according to his deposition

21        testimony, wasn't it?

22  A.    Yes, sir.

23              MR. WHITEHEAD:   Well, okay.
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA    (205) 397-2397**

# FREEDOM COURT REPORTING

```
 1          the same day we uploaded the money.
 2                  (Plaintiff's Exhibit 7 marked
 3                  for purposes of identification)
 4   Q.     Let me show you Plaintiff's Exhibit 7,
 5          Mr. McKnight.  Is that a copy of the March
 6          2004 certificate to Riverside Turf?
 7   A.     Yes, sir.
 8   Q.     And does that likewise reflect liability
 9          limits of one million dollars?
10   A.     Yes, sir.
11                  (Off-the-Record discussion)
12   Q.     Mr. McKnight, have you ever discussed the
13          point system with -- the Progressive point
14          system with anyone at Riverside Turf?
15   A.     Not to my knowledge.
16   Q.     How did you know to send a Certificate of
17          Insurance on Ricky Lane to Riverside Turf?
18   A.     Ricky told me he was going to be hauling
19          for Riverside.  So if he's hauling, Ray is
20          going to need a certificate.
21   Q.     Is that just normal business procedure?
22   A.     Yes.
23   Q.     Do you do that for all your trucker
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

```
 1            was an issue or question about the amount
 2            of Ricky Lane's liability limits?
 3   A.   It was -- I don't know.  It was a week or
 4            so later Ricky called me and said that
 5            Progressive told him he only had 300,000.
 6            And I told him I didn't think that was
 7            correct.  And I went to the file and
 8            pulled his file and then went through the
 9            policy and found where he did, in fact,
10            have 300,000.
11   Q.   Did you say anything to Ricky other than
12            you didn't believe that to be the case?
13   A.   Initially, before I checked the file?
14   Q.   Yes, sir.  Before you checked the file.
15   A.   I don't recall saying anything else.
16   Q.   After you checked the file did you talk
17            again to Ricky Lane?
18   A.   Yes, sir.
19   Q.   And when was that conversation?
20   A.   He held on while I pulled his file.
21   Q.   Oh, okay.  So you went and pulled his file
22            while he was on hold?
23   A.   Yes, sir.
```

# FREEDOM COURT REPORTING

1    Q.    And when you came back on the phone, what

2          did you say to Ricky?

3    A.    I told him, I said, "I don't know how it

4          happened, but you've got 300,000 is what

5          the policy says." And I didn't know how

6          it happened.

7    Q.    Did you ever say anything to Ricky to the

8          effect that you'll have a million dollars

9          of liability limits either through

10         Progressive because of what you had

11         previously told him and what you had done

12         or from your own E and O carrier?

13   A.    I don't recall that. No, sir.

14   Q.    Did you ever talk to anyone at Progressive

15         Insurance about the mistake in Ricky

16         Lane's getting insured and actually

17         getting underinsured?

18   A.    Sometime after they talked to Ricky I got

19         a call from -- it may be in the file

20         somewhere. I don't recall his name. But

21         he wanted a copy of the application faxed

22         to him. And I faxed it to him. But I

23         don't remember any kind of statements at

# FREEDOM COURT REPORTING

1    dollars coverage?  That's not what

2    happened, is it?

3              MR. SEARS:  Object to the form.

4  A.   No.

5  Q.   In fact, he did qualify, and you and he

6       intended for him to have a million

7       dollars; is that right?

8              MR. SEARS:  Same objection.

9  A.   That's correct.

10 Q.   And but for your mistake, he would have

11      had a million dollars coverage; is that

12      right?

13             MR. WHITEHEAD:  Object to the

14                  form.

15             MR. SEARS:  Same objection.

16 A.   Yes, sir.

17 Q.   I don't believe I have anything else.

18      Thank you, Mr. McKnight.

19             EXAMINATION

20 BY MR. LYONS:

21 Q.   Mr. McKnight, my name is Randy Lyons.  I

22      represent Riverside Turf.  I've just got a

23      couple of questions I want to ask you

## 367 VALLEY AVENUE

1    anyone else assisted in the procurement of

2    Ricky Lane's policy; is that true?

3  A.   That's correct.

4  Q.   All right.  And you would be the one

5    responsible for inputting the information

6    into Progressive's software to procure

7    that coverage for Ricky Lane; is that

8    true?

9  A.   That's true.

10 Q.   Are you contending at all that there's

11    anything Progressive's representatives did

12    or didn't do to procure the policy for

13    Ricky Lane?

14 A.   Could you repeat that?  I don't quite --

15 Q.   It's probably a poor question.

16         Do you place any of the blame or

17    fault for the improper procurement of

18    Ricky Lane's policy on Progressive's

19    representatives?

20         MR. WHITEHEAD:  Object to the

21           form.

22 Q.   You can answer.

23 A.   As far as completing this application?

# FREEDOM COURT REPORTING

Page 70

1   Q.   Right.

2   A.   No, sir.

3   Q.   So you don't believe they did anything

4        wrong in obtaining this policy?

5   A.   No, sir.

6   Q.   At the time that you obtained the policy

7        originally for Ricky Lane in 2003 and in

8        2004, did you have any conversations

9        whatsoever with any of Progressive's

10       representatives about the policy?

11  A.   Not to my knowledge.

12  Q.   My real question is, did you ever call

13       them up and say, "Hey, I'm sitting here

14       looking at your software, and I need to

15       get this guy a million dollars worth of

16       coverage.  Tell me how to do it"?

17  A.   No, sir.

18  Q.   You knew how to do it correctly?

19  A.   Yes, sir.

20  Q.   You had been trained on how to use that

21       software?

22  A.   I don't recall ever receiving any

23       training.  It was a program we had been

# FREEDOM COURT REPORTING

1           using for years.  And I don't recall ever
2           receiving any training on it.
3      Q.   How long did you use that program?
4      A.   We've been using the Pro-Rater system for
5           seven or eight years, I guess.
6      Q.   Had you ever had any previous problems
7           with the Pro-Rater system?
8      A.   No, sir.
9      Q.   And you believe at that time in 2003 you
10          knew how to accurately use the Pro-Rater
11          system?
12     A.   Yes, sir.
13     Q.   And just to make sure I understand.  You
14          never called Progressive either in 2003 or
15          2004, when you were obtaining the policies
16          for Ricky Lane, to discuss either coverage
17          or problems with the Pro-Rater system?
18     A.   No, sir.
19     Q.   After you uploaded -- Before I get to
20          that, once you went to the pull-down menu
21          to select the limits of coverage for
22          Mr. Lane originally in 2003, was there a
23          button that you had to press or a link

# FREEDOM COURT REPORTING

```
1          policy and/or the dec page?

2    A.    I remember reviewing it.  Yes, sir.

3    Q.    Now, what I want you to do, if you don't

4          mind, is look at I think it's your

5          Bates-stamp number -- it's been copied

6          several times, but it looks like it's 80

7          and 112.  Do you have either of those?

8    A.    Yes, sir.

9    Q.    And at the top -- It says McKnight 80 on

10         the bottom but at the top it says policy

11         period March 10, 2003 to March 10, 2004;

12         is that correct?

13   A.    That's correct.

14   Q.    Is this your copy of the dec page that you

15         received from Progressive?

16   A.    Yes, sir.

17   Q.    And this would have been sent to you as,

18         quote, the agent's copy; is that correct?

19   A.    That's correct.

20   Q.    All right.  And on this dec page did it

21         note anywhere the combined single limit

22         for the insurance issued to Mr. Lane?

23   A.    Yes, sir.
```

# FREEDOM COURT REPORTING

Page 75

| | | |
|---|---|---|
| 1 | Q. | Where did it note that? |
| 2 | A. | In the Coverage, Limits of Liability, it |
| 3 | | states 300,000. |
| 4 | Q. | And at the time that you reviewed McKnight |
| 5 | | number 80, which is the dec page, your |
| 6 | | copy, did you contact Progressive and say, |
| 7 | | "Something is wrong. We've got the wrong |
| 8 | | amount on here"? |
| 9 | A. | No, sir. |
| 10 | | MR. WHITEHEAD: Object to the |
| 11 | | form. |
| 12 | Q. | Did you ever contact them at all -- |
| 13 | | Progressive's reps at all after you |
| 14 | | received McKnight Bates-stamped 80? |
| 15 | A. | No, sir. |
| 16 | Q. | I want you to look at McKnight Bates-stamp |
| 17 | | number 120, please. |
| 18 | A. | Okay. |
| 19 | Q. | Can you tell me what McKnight Bates-stamp |
| 20 | | 120 is? |
| 21 | A. | That's the agent's copy of the renewal |
| 22 | | policy. |
| 23 | Q. | And is that policy period from March 10th, |

## FREEDOM COURT REPORTING

```
1          2004 to March 10th, 2005?

2    A.    Yes, sir.

3    Q.    And, again, did you receive a copy of this

4          dec page for Ricky Lane?

5    A.    Yes, sir.

6    Q.    And did you note at the time of the

7          renewal or at the time that you received

8          this copy the combined single limit of the

9          coverage?

10   A.    I notice now it's 300,000.  I apparently

11         didn't catch it at the time.

12   Q.    Did you review this document when you

13         received it, Mr. McKnight?

14   A.    Yes, sir.

15   Q.    And that same question applies to the time

16         of the renewal.  When you renewed Ricky

17         Lane's policy, I guess it was March 8th

18         was your testimony of 2004, did you upload

19         it the same way in the Pro-Rater system

20         for Progressive?

21   A.    Yes, sir.

22   Q.    And when you went on to the system, did

23         you request to review information
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

## FREEDOM COURT REPORTING

```
 1          McKnight Bates-stamp 120, which was the
 2          agent's copy of the dec page?
 3   A.     That's true.
 4   Q.     Now, at any time after you received the
 5          agent's copy of the dec page in 2003 or in
 6          2004, did Ricky Lane ever call you and
 7          say, "Hey, look, I've got this dec page
 8          and it's got the wrong coverage amount"?
 9   A.     No, sir.
10   Q.     If at any time in either 2003 or 2004 you
11          wanted to check the limits of liability
12          coverage for Mr. Lane through Progressive
13          could you have done that?
14   A.     Yes, sir.
15   Q.     How would you have done that?
16   A.     You go into their "For Agents Only" web
17          site and look at a policy summary.
18   Q.     You testified earlier that it took sixty
19          or so seconds to obtain a policy through
20          Progressive and to input the information
21          for the application.  How long would it
22          take you to get on there to check
23          someone's liability limits that you have
```

# FREEDOM COURT REPORTING

```
1          procured insurance for?

2                    MR. WHITEHEAD:  Objection, to the

3                         extent, Shane, I don't think

4                         he said it takes sixty

5                         seconds to fill out the

6                         application.  It takes sixty

7                         seconds to get the

8                         information back once he

9                         uploaded it.  But in any

10                        event, restate your

11                        question.

12     Q.   You can answer my question.  Do you

13          understand what I asked?

14                   MR. WHITEHEAD:  Answer the

15                        question whether you

16                        understand what he asked

17                        first.

18     A.   Well --

19                   MR. WHITEHEAD:  I'd like to have

20                        the question read back.

21     Q.   Mr. McKnight, how long does it take you on

22          the computer, on the Pro-Rater system, to

23          fill out the application for Progressive's
```

# FREEDOM COURT REPORTING

1      policy?

2  A.   Probably five or ten minutes.

3  Q.   Okay.  How long did it take you with Ricky

4       Lane?

5  A.   Probably five or ten minutes.

6  Q.   How long would it take you to get on the

7       "For Agents Only" web site to look and

8       determine someone's liability limits

9       through Progressive?

10 A.   Just a matter of a minute or so.

11 Q.   Did you ever do that for Ricky Lane?

12 A.   No, sir.

13 Q.   Did you ever do that in 2003, 2004 or

14      since then to determine his liability

15      limits?

16 A.   No, sir.

17 Q.   Do you remember any conversations

18      whatsoever that you've had with any of

19      Progressive's representatives?

20 A.   Can we back up to that other question?

21 Q.   Yeah.  Absolutely.  Which one?

22 A.   Since 2003 have I ever gone on the "For

23      Agents Only" and checked Ricky's coverage?