# EXHIBIT B
## JOE MCKNIGHT DEPOSITION

## FREEDOM COURT REPORTING

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4

 5   PROGRESSIVE SPECIALTY COMPANY,

 6            Plaintiff,

 7      versus                        2:05-CV-438-W

 8   MCKNIGHT AGENCY, INC., et al.,

 9            Defendants.

10

11                                    COPY

12

13

14            *  *  *  *  *  *  *  *  *  *  *  *

15            DEPOSITION OF JOE MCKNIGHT,

16   taken pursuant to stipulation and agreement

17   before Jackie Parham, Certified Shorthand

18   Reporter and Commissioner for the State of

19   Alabama at Large, in the law offices of Lloyd,

20   Gray & Whitehead, 2501 Twentieth Place South,

21   Suite 300, Birmingham, Alabama, on Friday, the

22   28th day of October, 2005, commencing at

23   approximately 9:20 a.m.
```

# FREEDOM COURT REPORTING

1       here about a policy of insurance that was

2       sold to an individual named Ricky Lane?

3   A.  Yes, sir.

4   Q.  Tell me what your experience is in the

5       insurance field.

6   A.  Well, I've been in the insurance business

7       since 1982.

8   Q.  And starting in 1982, take us from that

9       date up through today in terms of where

10      you worked, and what you did, and along

11      the way what licenses you have acquired.

12  A.  Okay.  In 1982 I started as a life and

13      health agent as an employee of United

14      Insurance Company.  In 1992 I got my

15      property and casualty license and opened

16      McKnight Agency.  And --

17  Q.  Did you have a life and health license?

18  A.  I had a life and health license until

19      1992.

20  Q.  And then you obtained a property license?

21  A.  Yes, sir.

22  Q.  Property and casualty?

23  A.  Right.

# FREEDOM COURT REPORTING

1   Q.   And both of those licenses are issued by

2        the Alabama Department of Insurance; is

3        that right?

4   A.   That's correct.

5   Q.   Okay.  From 1982 until '92 did you work

6        just for United?

7   A.   I worked for a brief time for Metropolitan

8        Life.

9   Q.   And I haven't even asked you.  What is

10       your residence and business addresses?

11   A.   203 West Washington Street in Abbeville.

12       And that's both of them.  I live there,

13       and my office is in my house.

14   Q.   Okay.  Now, we got up to 1992 when you

15       obtained your property and casualty

16       license.

17   A.   Right.  And that's when I started McKnight

18       Agency.

19   Q.   And did you own the McKnight Agency alone,

20       that is, you were the sole owner of that

21       business?

22   A.   Yes, sir.

23   Q.   Was it a corporation?

# FREEDOM COURT REPORTING

```
1    A.    Yes, sir.

2    Q.    And when did you sell it to Young,

3          Johnston & Associates?

4    A.    December of 2004.

5    Q.    From 1992 until December of 2004 did you

6          sell at the McKnight Agency any other

7          types of insurance aside from property and

8          casualty?

9    A.    No, sir.

10   Q.    Okay.  What companies did you sell for?

11   A.    Progressive, Sagamore, Victoria.  We had a

12         number of brokerage contracts with

13         companies like Southern Cross

14         Underwriters, Britt Paulk Insurance

15         Agency, Grechian (phonetic) & Associates,

16         Insurance Connection, Burns & Wilcox,

17         Dagle (phonetic) & Associates.  That's

18         basically the main ones.

19   Q.    Okay.

20               MR. WHITEHEAD:  You named about

21                    half of my clients.

22   Q.    When did you start selling for

23         Progressive?
```

# FREEDOM COURT REPORTING

1    A.    Probably in '92.

2    Q.    And was there a contract or agreement that

3         set forth the relationship between

4         Progressive and the McKnight Agency?

5    A.    Yes, sir.

6    Q.    And what is that document called?

7    A.    I guess it would be a Producer's

8         Agreement.

9    Q.    Okay. And in that Producer's Agreement,

10        or whatever the correct term is, what was

11        the McKnight Agency designated as?

12        Producer?

13   A.    Agent, producer. I'm not sure.

14   Q.    What types of Progressive products did you

15        sell?

16   A.    Auto and commercial auto.

17   Q.    Auto and commercial auto?

18   A.    Uh-huh (positive response).

19   Q.    Yes, sir?

20   A.    Yes.

21   Q.    Okay. And commercial auto, generally

22        speaking, that would be in the trucking

23        business?

## FREEDOM COURT REPORTING

1    be hauling.  And when we get through and

2    get to the end of the steps in this

3    process, it gives us the premium and the

4    payment plans that are available.

5  Q.  Okay.  Has that been true for at least the

6    last five years, that's the way it's

7    worked?

8  A.  Yes, sir.

9  Q.  Would you have to call anyone in Cleveland

10    or some other place for Progressive as

11    part of the process to insure someone?

12  A.  No, sir.

13  Q.  What about underwriting, how is that done,

14    if it is done?

15  A.  Well, the software itself has a list of

16    questions that it asks about what you're

17    hauling and your distances and that sort

18    of stuff.  And then their software runs

19    all the reports that you need, does all

20    the underwriting for you.  It does the

21    Retail Credit Report.  It checks the VIN

22    of the vehicle to make sure that you've

23    classed it right as far as weight.  And it

# FREEDOM COURT REPORTING

1          runs a Motor Vehicle Report.  And those

2          three criteria are basically what

3          determines what the premium is.

4    Q.    And Motor Vehicle Report, is that checking

5          the driver's history?

6    A.    Yes, sir.

7    Q.    So that's done by the Progressive computer

8          system; is that right?

9    A.    That's correct.

10   Q.    But if you put that information in and

11         this hypothetical person had a good enough

12         driving record, then you have the

13         authority to bind Progressive; is that

14         true?

15   A.    The software wouldn't let you bind if the

16         points were too high or something.

17   Q.    For example, if I walked in and my license

18         were revoked, the software wouldn't let

19         you bind?  Is that what you're saying?

20   A.    I think that's right.  I know if you've

21         got too many points, then it wouldn't

22         allow you to bind certain amounts of

23         coverage.

## FREEDOM COURT REPORTING

1  Q.   Okay.  And the truckers would obtain

2       insurance through the McKnight Agency, and

3       then you would provide proof via a

4       certificate to Mr. Morris at Riverside

5       Turf; is that right?

6  A.   That's correct.

7  Q.   Do you know his partner, Mr. Nixon?

8  A.   No, sir.

9  Q.   Was there any requirement that you know of

10      that Ray Morris and Riverside Turf

11      required of the drivers who obtained

12      coverage?

13 A.   They usually required a million dollars.

14 Q.   Did you understand that Riverside Turf

15      sold its products in several southeastern

16      states?

17 A.   Yes, sir.

18 Q.   And you knew that that would constitute

19      interstate trucking?

20 A.   Right.

21           MR. SEARS:  Object to the form.

22 Q.   Let me direct this to your lawyer.

23           MR. HAYNES:  Steve, do you have

# FREEDOM COURT REPORTING

```
1   Q.    I want to look at that first one there

2         that bears Bates number 0001.  And I've

3         marked that document, which is apparently

4         an invoice, as Plaintiff's Exhibit 1.

5         This appears to be an invoice to Ricky

6         Lane, care of Riverside Turf, dated March

7         10, 2003.  Do you see that?

8   A.    Yes, sir.

9   Q.    It shows that the company insuring

10        Mr. Lane was Progressive; is that right?

11  A.    That's correct.

12  Q.    And it shows under the heading Description

13        one million dollars liability; is that

14        right?

15  A.    That's correct.

16  Q.    Is that the date you had the discussion

17        with Ricky Lane about his need for

18        $750,000.00 or more in liability insurance

19        so as to comply with federal and state

20        law?

21  A.    Yes, sir.

22  Q.    Tell me what the discussion was between

23        you and Mr. Lane on that date.
```

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

# FREEDOM COURT REPORTING

1         Ray Morris and Riverside Turf, that it was

2         an interstate situation --

3    A.   Right.

4    Q.   -- whereby the federal laws will have to

5         be complied with in terms of the amount of

6         liability insurance; is that right?

7    A.   That's true.

8    Q.   And then you said to Ricky Lane that it

9         wasn't much difference in the cost between

10        one million dollars worth of liability

11        insurance versus 750,000; is that right?

12   A.   That's correct.

13   Q.   And, so, you billed Mr. Lane for a million

14        dollars worth of liability insurance; is

15        that right?

16   A.   That's correct.

17             MR. WHITEHEAD:   Object to the

18                  form.   The document speaks

19                  for itself.

20   Q.   Did the insurance that covered Ricky Lane

21        from March 10, 2003 for one year, did that

22        end up being one million dollars of

23        liability insurance?

**367 VALLEY AVENUE**
**(877) 373-3660   BIRMINGHAM, ALABAMA   (205) 397-2397**

## FREEDOM COURT REPORTING

```
1    A.    Could you repeat that?

2    Q.    I'm not sure.  Did Mr. -- Let me strike

3          that and start all over.

4                It was clear, wasn't it,

5          Mr. McKnight, that Ricky Lane wanted a

6          million dollars worth of insurance; is

7          that right?

8    A.    Yes, sir.

9    Q.    And you intended for Ricky Lane to have

10         one million dollars worth of liability

11         insurance through Progressive; is that

12         true also?

13   A.    That's true.

14   Q.    So both of you wanted one million dollars

15         worth of Progressive Insurance, correct?

16   A.    That's right.

17   Q.    And also Mr. Morris over at Riverside Turf

18         was requiring either 750 or a million

19         dollars worth of insurance, wasn't he?

20   A.    That's correct.

21   Q.    So, as far as you know, that's what

22         everybody intended when he first obtained

23         Progressive -- Ricky Lane first obtained
```

# FREEDOM COURT REPORTING

```
1        these documents in your file reflect what

2        you called the pull-down menu?

3   A.   No, sir.

4   Q.   Okay.  But when you -- It's like ordering

5        a -- I ordered some maple syrup from

6        Vermont one time.  You can get 6 ounces,

7        12 ounces, 18 or 24.  And it's got -- you

8        take your computer mouse and select which

9        one you want; is that right?

10  A.   That's correct.

11  Q.   I guess something similar is what happened

12       here.  You intended to click one million

13       dollars worth of liability insurance but

14       apparently you clicked 300,000.  Is that

15       what happened?

16  A.   Apparently so, yes, sir.

17  Q.   But just to dispense with why it happened,

18       it was simply a mistake, apparently, on

19       your part; is that right?

20  A.   That's correct.

21  Q.   When you would obtain coverage for

22       truckers through Progressive, did you

23       personally handle that or did you assign
```

1      after March 10th, 2003?

2  Q.  Yes, sir.

3  A.  What would Ricky have gotten in the mail?

4  Q.  Right.

5  A.  He would have gotten a coupon book from a

6      premium finance specialist.

7  Q.  All right.

8  A.  To make his payments to the premium

9      finance company.

10  Q.  Okay.

11  A.  And he would have gotten a copy of a

12      policy and I.D. cards from Progressive.

13  Q.  Did anybody else get a copy of the policy?

14  A.  I got an agent's copy. Yes, sir.

15  Q.  What about Riverside Turf, would they get

16      a copy?

17  A.  At that time I don't think they would

18      have. Because Ricky only applied for

19      liability coverage in the beginning.

20  Q.  Did Riverside Turf get a certificate from

21      you?

22  A.  Yes, sir. And --

23  Q.  I didn't mean to cut you off.

## FREEDOM COURT REPORTING

1    A.    I faxed a copy to Riverside on the 10th,

2          the day that he bought the policy.

3    Q.    And did that copy that you faxed to

4          Riverside on March 10, 2003, did it

5          reflect one million dollars worth of

6          liability limits?

7    A.    Yes, sir.

8                    (Plaintiff's Exhibit 4 marked

9                     for purposes of identification)

10   Q.    I'm going to mark as Plaintiff's Exhibit 4

11         a Certificate of Liability Insurance that

12         appears to be from March 10, 2003 through

13         March 10, 2004.  It reflects a combined

14         single limit of a million dollars.  Do you

15         see that?

16   A.    Yes, sir.

17   Q.    Is that a copy of the certificate that you

18         would have faxed to Riverside Turf?

19   A.    Yes, sir.

20   Q.    Did Progressive authorize you as their

21         agent to send this certificate to

22         Riverside Turf?

23                  MR. SEARS:  Object to form.

## FREEDOM COURT REPORTING

1        the wrong box?

2  A.    Yes, sir.

3  Q.    And when Ricky Lane -- did he actually

4        come back in to renew in March of 2004?

5  A.    Yes, sir.  I don't remember what date he

6        came in.  I don't remember when.

7  Q.    Sir?

8  A.    I really don't remember if he came back in

9        or if he -- I think he did, though.

10       Because we would have had some documents

11       for him to sign with National Fire and

12       Marine.

13  Q.    And do they have the cargo coverage?

14  A.    Yes, sir.  But there would have been no

15       application or any reason for him to come

16       back in on the Progressive.

17  Q.    Let me show you two documents, Mr.

18       McKnight.  The first I'm going to mark as

19       Plaintiff's Exhibit Number 5.  And it has

20       the Bates number of 0015.  It appears to

21       me to be a Progressive Insurance Company's

22       receipt dated March 8, 2004 and reflecting

23       a payment of $4219.00 to Progressive.  Do

## FREEDOM COURT REPORTING

1  Q.   You knew he was still hauling for

2        Riverside Turf, didn't you?

3  A.   Yes, sir.

4  Q.   And is it correct that it would have been

5        your understanding that he needed 750,000

6        or more in limits; is that right?

7  A.   Yes, sir.

8  Q.   And was it also your assumption and belief

9        that he, in fact, had one million dollars

10       of liability limits through Progressive?

11  A.   Yes, sir.

12  Q.   And, apparently, that was his

13       understanding also?

14             MR. WHITEHEAD:  Object to the

15                  form.

16  A.   I can't answer for what his understanding

17       was.  But it was my understanding.

18  Q.   Well, you told me earlier, I thought, you

19       read some of his testimony.  That was his

20       understanding, according to his deposition

21       testimony, wasn't it?

22  A.   Yes, sir.

23             MR. WHITEHEAD:  Well, okay.

## FREEDOM COURT REPORTING

```
1              the same day we uploaded the money.

2                      (Plaintiff's Exhibit 7 marked

3                      for purposes of identification)

4    Q.    Let me show you Plaintiff's Exhibit 7,

5          Mr. McKnight.  Is that a copy of the March

6          2004 certificate to Riverside Turf?

7    A.    Yes, sir.

8    Q.    And does that likewise reflect liability

9          limits of one million dollars?

10   A.    Yes, sir.

11                     (Off-the-Record discussion)

12   Q.    Mr. McKnight, have you ever discussed the

13         point system with -- the Progressive point

14         system with anyone at Riverside Turf?

15   A.    Not to my knowledge.

16   Q.    How did you know to send a Certificate of

17         Insurance on Ricky Lane to Riverside Turf?

18   A.    Ricky told me he was going to be hauling

19         for Riverside.  So if he's hauling, Ray is

20         going to need a certificate.

21   Q.    Is that just normal business procedure?

22   A.    Yes.

23   Q.    Do you do that for all your trucker
```

# FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | | was an issue or question about the amount |
| 2 | | of Ricky Lane's liability limits? |
| 3 | A. | It was -- I don't know.  It was a week or |
| 4 | | so later Ricky called me and said that |
| 5 | | Progressive told him he only had 300,000. |
| 6 | | And I told him I didn't think that was |
| 7 | | correct.  And I went to the file and |
| 8 | | pulled his file and then went through the |
| 9 | | policy and found where he did, in fact, |
| 10 | | have 300,000. |
| 11 | Q. | Did you say anything to Ricky other than |
| 12 | | you didn't believe that to be the case? |
| 13 | A. | Initially, before I checked the file? |
| 14 | Q. | Yes, sir.  Before you checked the file. |
| 15 | A. | I don't recall saying anything else. |
| 16 | Q. | After you checked the file did you talk |
| 17 | | again to Ricky Lane? |
| 18 | A. | Yes, sir. |
| 19 | Q. | And when was that conversation? |
| 20 | A. | He held on while I pulled his file. |
| 21 | Q. | Oh, okay.  So you went and pulled his file |
| 22 | | while he was on hold? |
| 23 | A. | Yes, sir. |

## FREEDOM COURT REPORTING

1   Q.   And when you came back on the phone, what

2        did you say to Ricky?

3   A.   I told him, I said, "I don't know how it

4        happened, but you've got 300,000 is what

5        the policy says." And I didn't know how

6        it happened.

7   Q.   Did you ever say anything to Ricky to the

8        effect that you'll have a million dollars

9        of liability limits either through

10       Progressive because of what you had

11       previously told him and what you had done

12       or from your own E and O carrier?

13   A.   I don't recall that. No, sir.

14   Q.   Did you ever talk to anyone at Progressive

15       Insurance about the mistake in Ricky

16       Lane's getting insured and actually

17       getting underinsured?

18   A.   Sometime after they talked to Ricky I got

19       a call from -- it may be in the file

20       somewhere. I don't recall his name. But

21       he wanted a copy of the application faxed

22       to him. And I faxed it to him. But I

23       don't remember any kind of statements at

# FREEDOM COURT REPORTING

1    dollars coverage?  That's not what

2    happened, is it?

3              MR. SEARS:  Object to the form.

4    A.   No.

5    Q.   In fact, he did qualify, and you and he

6         intended for him to have a million

7         dollars; is that right?

8              MR. SEARS:  Same objection.

9    A.   That's correct.

10   Q.   And but for your mistake, he would have

11        had a million dollars coverage; is that

12        right?

13             MR. WHITEHEAD:  Object to the

14                  form.

15             MR. SEARS:  Same objection.

16   A.   Yes, sir.

17   Q.   I don't believe I have anything else.

18        Thank you, Mr. McKnight.

19                  EXAMINATION

20   BY MR. LYONS:

21   Q.   Mr. McKnight, my name is Randy Lyons.  I

22        represent Riverside Turf.  I've just got a

23        couple of questions I want to ask you

**FREEDOM COURT REPORTING**

1          anyone else assisted in the procurement of

2          Ricky Lane's policy; is that true?

3     A.   That's correct.

4     Q.   All right.  And you would be the one

5          responsible for inputting the information

6          into Progressive's software to procure

7          that coverage for Ricky Lane; is that

8          true?

9     A.   That's true.

10    Q.   Are you contending at all that there's

11         anything Progressive's representatives did

12         or didn't do to procure the policy for

13         Ricky Lane?

14    A.   Could you repeat that?  I don't quite --

15    Q.   It's probably a poor question.

16              Do you place any of the blame or

17         fault for the improper procurement of

18         Ricky Lane's policy on Progressive's

19         representatives?

20                   MR. WHITEHEAD:  Object to the

21                   form.

22    Q.   You can answer.

23    A.   As far as completing this application?

## FREEDOM COURT REPORTING

| | | |
|---|---|---|
| 1 | Q. | Right. |
| 2 | A. | No, sir. |
| 3 | Q. | So you don't believe they did anything |
| 4 | | wrong in obtaining this policy? |
| 5 | A. | No, sir. |
| 6 | Q. | At the time that you obtained the policy |
| 7 | | originally for Ricky Lane in 2003 and in |
| 8 | | 2004, did you have any conversations |
| 9 | | whatsoever with any of Progressive's |
| 10 | | representatives about the policy? |
| 11 | A. | Not to my knowledge. |
| 12 | Q. | My real question is, did you ever call |
| 13 | | them up and say, "Hey, I'm sitting here |
| 14 | | looking at your software, and I need to |
| 15 | | get this guy a million dollars worth of |
| 16 | | coverage. Tell me how to do it"? |
| 17 | A. | No, sir. |
| 18 | Q. | You knew how to do it correctly? |
| 19 | A. | Yes, sir. |
| 20 | Q. | You had been trained on how to use that |
| 21 | | software? |
| 22 | A. | I don't recall ever receiving any |
| 23 | | training. It was a program we had been |

## FREEDOM COURT REPORTING

1            using for years.  And I don't recall ever

2            receiving any training on it.

3     Q.     How long did you use that program?

4     A.     We've been using the Pro-Rater system for

5            seven or eight years, I guess.

6     Q.     Had you ever had any previous problems

7            with the Pro-Rater system?

8     A.     No, sir.

9     Q.     And you believe at that time in 2003 you

10           knew how to accurately use the Pro-Rater

11           system?

12    A.     Yes, sir.

13    Q.     And just to make sure I understand.  You

14           never called Progressive either in 2003 or

15           2004, when you were obtaining the policies

16           for Ricky Lane, to discuss either coverage

17           or problems with the Pro-Rater system?

18    A.     No, sir.

19    Q.     After you uploaded -- Before I get to

20           that, once you went to the pull-down menu

21           to select the limits of coverage for

22           Mr. Lane originally in 2003, was there a

23           button that you had to press or a link

## FREEDOM COURT REPORTING

1      policy and/or the dec page?

2  A.   I remember reviewing it.  Yes, sir.

3  Q.   Now, what I want you to do, if you don't

4      mind, is look at I think it's your

5      Bates-stamp number -- it's been copied

6      several times, but it looks like it's 80

7      and 112.  Do you have either of those?

8  A.   Yes, sir.

9  Q.   And at the top -- It says McKnight 80 on

10     the bottom but at the top it says policy

11     period March 10, 2003 to March 10, 2004;

12     is that correct?

13  A.   That's correct.

14  Q.   Is this your copy of the dec page that you

15     received from Progressive?

16  A.   Yes, sir.

17  Q.   And this would have been sent to you as,

18     quote, the agent's copy; is that correct?

19  A.   That's correct.

20  Q.   All right.  And on this dec page did it

21     note anywhere the combined single limit

22     for the insurance issued to Mr. Lane?

23  A.   Yes, sir.

## FREEDOM COURT REPORTING

1    Q.    Where did it note that?

2    A.    In the Coverage, Limits of Liability, it

3          states 300,000.

4    Q.    And at the time that you reviewed McKnight

5          number 80, which is the dec page, your

6          copy, did you contact Progressive and say,

7          "Something is wrong.  We've got the wrong

8          amount on here"?

9    A.    No, sir.

10                MR. WHITEHEAD:  Object to the

11                form.

12   Q.    Did you ever contact them at all --

13         Progressive's reps at all after you

14         received McKnight Bates-stamped 80?

15   A.    No, sir.

16   Q.    I want you to look at McKnight Bates-stamp

17         number 120, please.

18   A.    Okay.

19   Q.    Can you tell me what McKnight Bates-stamp

20         120 is?

21   A.    That's the agent's copy of the renewal

22         policy.

23   Q.    And is that policy period from March 10th,

# FREEDOM COURT REPORTING

Page 76

| | | |
|---|---|---|
| 1 | | 2004 to March 10th, 2005? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And, again, did you receive a copy of this |
| 4 | | dec page for Ricky Lane? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And did you note at the time of the |
| 7 | | renewal or at the time that you received |
| 8 | | this copy the combined single limit of the |
| 9 | | coverage? |
| 10 | A. | I notice now it's 300,000. I apparently |
| 11 | | didn't catch it at the time. |
| 12 | Q. | Did you review this document when you |
| 13 | | received it, Mr. McKnight? |
| 14 | A. | Yes, sir. |
| 15 | Q. | And that same question applies to the time |
| 16 | | of the renewal. When you renewed Ricky |
| 17 | | Lane's policy, I guess it was March 8th |
| 18 | | was your testimony of 2004, did you upload |
| 19 | | it the same way in the Pro-Rater system |
| 20 | | for Progressive? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And when you went on to the system, did |
| 23 | | you request to review information |

# FREEDOM COURT REPORTING

1       McKnight Bates-stamp 120, which was the

2       agent's copy of the dec page?

3    A.  That's true.

4    Q.  Now, at any time after you received the

5       agent's copy of the dec page in 2003 or in

6       2004, did Ricky Lane ever call you and

7       say, "Hey, look, I've got this dec page

8       and it's got the wrong coverage amount"?

9    A.  No, sir.

10   Q.  If at any time in either 2003 or 2004 you

11      wanted to check the limits of liability

12      coverage for Mr. Lane through Progressive

13      could you have done that?

14   A.  Yes, sir.

15   Q.  How would you have done that?

16   A.  You go into their "For Agents Only" web

17      site and look at a policy summary.

18   Q.  You testified earlier that it took sixty

19      or so seconds to obtain a policy through

20      Progressive and to input the information

21      for the application.  How long would it

22      take you to get on there to check

23      someone's liability limits that you have

## FREEDOM COURT REPORTING

1          procured insurance for?

2                    MR. WHITEHEAD:  Objection, to the

3                         extent, Shane, I don't think

4                         he said it takes sixty

5                         seconds to fill out the

6                         application.  It takes sixty

7                         seconds to get the

8                         information back once he

9                         uploaded it.  But in any

10                        event, restate your

11                        question.

12    Q.    You can answer my question.  Do you

13          understand what I asked?

14                   MR. WHITEHEAD:  Answer the

15                        question whether you

16                        understand what he asked

17                        first.

18    A.    Well --

19                   MR. WHITEHEAD:  I'd like to have

20                        the question read back.

21    Q.    Mr. McKnight, how long does it take you on

22          the computer, on the Pro-Rater system, to

23          fill out the application for Progressive's

# FREEDOM COURT REPORTING

1         policy?

2   A.     Probably five or ten minutes.

3   Q.     Okay.  How long did it take you with Ricky

4         Lane?

5   A.     Probably five or ten minutes.

6   Q.     How long would it take you to get on the

7         "For Agents Only" web site to look and

8         determine someone's liability limits

9         through Progressive?

10   A.     Just a matter of a minute or so.

11   Q.     Did you ever do that for Ricky Lane?

12   A.     No, sir.

13   Q.     Did you ever do that in 2003, 2004 or

14         since then to determine his liability

15         limits?

16   A.     No, sir.

17   Q.     Do you remember any conversations

18         whatsoever that you've had with any of

19         Progressive's representatives?

20   A.     Can we back up to that other question?

21   Q.     Yeah.  Absolutely.  Which one?

22   A.     Since 2003 have I ever gone on the "For

23         Agents Only" and checked Ricky's coverage?